**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **EDELSON PC,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **vs.** ) | |
| ) | |
| **THOMAS GIRARDI, GIRARDI KEESE,** ) | |
| **ERIKA GIRARDI, EJ GLOBAL LLC,** ) | |
| **GIRARDI FINANCIAL, INC., DAVID** ) | **Case No. 20 C 7115** |
| **LIRA, KEITH GRIFFIN, JOHNSON** ) | |
| **HUTCHINSON & LIRA LLP, ROBERT** ) | |
| **FINNERTY, ABIR COHEN TREYZON** ) | |
| **SALO, LLP, CALIFORNIA ATTORNEY** ) | |
| **LENDING II, INC., STILLWELL** ) | |
| **MADISON, LLC, and JOHN DOE 1-10,** ) | |
| ) | |
| **Defendants.** ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

MATTHEW F. KENNELLY, District Judge:

Edelson PC brought this suit seeking to recover money it contends it is owed and disgorgement of money owed to clients in an underlying matter. Defendants David Lira and Keith Griffin have moved to dismiss the claims against them. Pursuant to Federal Rule of Civil Procedure 12(b)(2), Griffin contends that the Court lacks personal jurisdiction over him. Lira, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(3), asserts that the Court lacks subject matter jurisdiction; this district is an improper venue for litigating these claims; and the claims against him must be automatically stayed under the Bankruptcy Code.[1]

---

[1] Lira includes Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6) in his motion's title but does not advance any arguments related to these rules.

**Background[2]**

Edelson alleges that Lira and Griffin, then attorneys at the law firm Girardi Keese, worked together with Thomas Girardi to embezzle settlement proceeds, commingled those proceeds with attorneys' fees that belonged to Edelson, and shared in the illicit profits.

At the center of the parties' dispute is litigation that followed a tragedy. In October 2018, as the result of a fundamental system failure, Lion Air Flight 610 plunged into the Java Sea. All 189 people on board were killed. Investigators determined that the aircraft's anti-stall system had malfunctioned. The malfunction that caused Flight 610 to crash was attributed to design defects and other failures by the Boeing Company, the plane's designer and manufacturer.

Nearly a dozen families of those who perished retained Girardi Keese, a California-based firm, to represent them in litigation against Boeing.[3] Because the litigation took place in Chicago, Girardi Keese contracted with Edelson so that Edelson's attorneys would serve as local counsel and assist in the litigation and settlement process.

Two contracts governed the relationship between Girardi Keese and Edelson. The first contract provided that Edelson would receive 50 percent of the total attorneys'

---

[2] The following facts are drawn from Edelson's complaint. Because the Court is considering a motion to dismiss, the Court accepts as true the well-pleaded factual allegations in the complaint and views those allegations in the light most favorable to Edelson. *See Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 332 (7th Cir. 2019).

[3] *See In Re: Lion Air Flight JT 610 Crash*, No. 18 C 7686 (N.D. Ill.).

fees recovered by a specific portion of the clients.  Griffin presented and executed this contract.  The second contract guaranteed that Edelson would receive 20 percent of the total attorneys' fees recovered for another set of clients.  Lira presented and executed the second contract.

In 2020, the parties finalized individual settlements for each of the families Girardi Keese and Edelson represented.  The litigation against Boeing was dismissed on February 24, 2020.  Girardi Keese maintained total and exclusive control over communications with the clients throughout the litigation and the post-settlement process.  Therefore, Boeing transferred the clients' settlement payments to Girardi Keese, whose attorneys were responsible for disbursing funds to the clients.

Between February 2020 and December 2020, Edelson attorneys were in frequent communication with Lira and Griffin about the status of the settlement.  Initially, through April and May, Griffin and Lira maintained that Girardi Keese had not received any settlement funds because Boeing would fund the settlements only after it had received all the clients' executed settlement agreements and releases.  When Boeing signaled publicly that it would consider bankruptcy, an Edelson attorney expressed concern about the delay in finalizing the settlements.  Lira responded by e-mail and repeated that Boeing would release the settlement funds after receiving the agreements and releases.  Lira further explained that the settlement funds were paid by Boeing's insurer and were secured in an escrow account.

In June 2020, Lira informed Edelson that he had left Girardi Keese.  During a phone call with an unidentified person at Edelson, Lira said the settlement had been funded and that "the bulk of the funds were received and held by" Girardi Keese.  Lira

3

wondered which firm should be held responsible for paying Edelson's share of the attorneys' fees—Girardi Keese or his new firm. Edelson asked whether the clients had received their proceeds from the settlements, but Lira "failed to provide a coherent answer." Compl. ¶ 46. Then, in July 2020, Lira sent a letter to Edelson asserting that some of the firms' clients had received their settlement proceeds, and some had not. With his letter, Lira included a portion of the attorneys' fees owed to Edelson and indicated that this was a partial payment of what was owed to the firm.

Edelson did not cash the check. Instead, it sent a letter to both Girardi and Lira inquiring on the status of the settlement payouts and declining to "accept any monies until [it was] given adequate assurances that each and every one of our collective clients . . . received the entirety of the monies owed." *Id.* ¶ 47. Lira responded but did not say which clients had received full settlement payments and whether any clients were still owed money. He further explained that because he was no longer with Girardi Keese, he no longer had any ongoing involvement in the cases. Lira directed further questions to Griffin and Girardi, Girardi Keese's sole equity partner.

In July 2020, Edelson's managing partner, Rafi Balabanian, took the lead in communicating with Girardi Keese. When Balabanian contacted Girardi and Griffin, he received many of the same answers Edelson's other attorneys had already received. Griffin said that though Boeing had fully funded the settlements, the clients had not yet received the full amount owed to them. He estimated that the clients were still owed about half of the settlement amount. Griffin said he could not explain why the clients had not received their full settlements or when they would receive the remaining proceeds because Thomas Girardi had exclusive control over the firm's bank accounts,

including the client trust accounts.  And, Griffin said, Girardi was not available to answer
questions about this matter because he was unavailable due to serious illness.

Later in July, Balabanian was finally able to speak with Girardi.  To the extent
Girardi provided an explanation for the delay, he blamed his illness and his clients' late
submission of the settlement agreements and releases.  He promised to disburse the
remaining money within a few days and said he would follow up once he had done so.
Girardi kept neither promise.  Balabanian spoke to Girardi again in August 2020—after
several unsuccessful attempts to touch base.  Girardi took umbrage at Balabanian's
inquiries but nevertheless reported that he had made arrangement for his clients to
receive the remainder of the money owed.

In September 2020, Griffin told Balabanian that Girardi Keese had wired half of
the outstanding amount to clients, with the other half ready to be sent the next week.
But although Griffin said he would send proof of the wired funds, he never did.
Regardless, Edelson attorneys were under the impression that the clients had been
paid and all that remained to be paid were its own fees.  In November 2020, Lira wrote
Edelson that Girardi had transferred some portion of the attorneys' fees generated from
the litigation to a litigation funder.  Edelson expressed concern, again.

When Balabanian talked with Griffin next—Girardi was again receiving medical
treatment—he learned that Girardi had not paid his clients the remaining amount due.
Worse, Griffin said that he was skeptical that Girardi or the Girardi Keese firm had the
financial means to satisfy the firm's obligations to its clients or to Edelson.  In the final
analysis, a substantial portion of the settlement funds were never disbursed to Girardi
Keese's clients, and Edelson was never paid the share of the attorneys' fees it was

owed.

In December 2020—after Edelson filed the complaint in this case—a number of Girardi Keese's creditors filed involuntary Chapter 7 bankruptcy petitioners against the firm and Girardi in the United States Bankruptcy Court for the Central District of California. The bankruptcy court opened Chapter 7 cases against the firm and Girardi, and trustees have been appointed to manage the respective estates. Neither Lira nor Griffin has filed for bankruptcy.

## Discussion

Before turning to the merits, the Court addresses the standards for considering the defendants' motions. Griffin challenges the sufficiency of Edelson's complaint under Rule 12(b)(2). A complaint is not deficient just because facts demonstrating personal jurisdiction are not included among the complaint's allegations. *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). When a defendant moves to dismiss a complaint under Rule 12(b)(2), however, the plaintiff must establish the existence of jurisdiction. *Curry v. Revolution Lab'ys, LLC*, 949 F.3d 385, 392 (7th Cir. 2020) (internal quotation marks omitted). When, as here, a court has not held an evidentiary hearing (Griffin did not seek one), the plaintiff only bears "the burden of making a prima facie case for personal jurisdiction." *Id.* at 393.

When considering a Rule 12(b)(2) motion, the Court is permitted to consider affidavits, but "in evaluating whether the prima facie standard has been satisfied, the plaintiff is entitled to the resolution in its favor of all disputes concerning relevant facts presented in the record." *Id.* (alterations accepted) (internal quotation marks omitted). Therefore, though the Court must accept as true "any facts in the defendants' affidavits

6

that do not conflict with anything in the record," *id.*, "[t]he plaintiff is entitled to have any conflicts in the affidavits (or supporting materials) resolved in its favor." *Purdue Rsch. Found.*, 338 F.3d at 783.

Lira seeks dismissal under Rules 12(b)(1) and (b)(3). He first challenges Edelson's standing under Rule 12(b)(1). When considering a challenge to subject matter jurisdiction, "the court must first determine whether a factual or facial challenge has been raised." *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015). In a facial challenge to subject matter jurisdiction, the defendant argues that the plaintiff has insufficiently alleged a basis for subject matter jurisdiction. *Id.* Because the plaintiff is the party who invoked federal jurisdiction, when faced with a facial challenge, he "bears the burden of establishing the required elements of standing." *Lee v. City of Chicago*, 330 F.3d 456, 468 (7th Cir. 2003)

In a factual challenge, the defendant contends that "the complaint is formally sufficient but . . . that there is *in fact* no subject matter jurisdiction." *Apex Digital*, 572 F.3d at 444 (internal quotation marks omitted). When weighing factual challenges, a court must look past "the jurisdictional allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists." *Id.* (internal quotation marks omitted). Plaintiffs undergoing a factual challenge to standing must establish standing by a preponderance of the evidence. *See Kathrein v. City of Evanston*, 636 F.3d 906, 914 (7th Cir. 2011).

Rule 12(b)(3) allows dismissal for improper venue. *RAH Color Techs., LLC v. Quad/Graphics, Inc.*, No. 17 C 4931, 2018 WL 439210, at *1 (N.D. Ill. Jan. 16, 2018). When reviewing a motion to dismiss under 12(b)(3), courts "assume[ ] the truth of the

allegations in the plaintiff's complaint, *unless* contradicted by the defendant's affidavits." *Deb v. SIRVA, Inc.*, 832 F.3d 800, 809 (7th Cir. 2016). The "low" burden of establishing proper venue rests with the plaintiff. *RAH Color Techs., LLC*, 2018 WL 439210, at *1 ("[T]he plaintiff's burden in defending a Rule 12(b)(3) motion is low because courts resolve factual conflicts in the plaintiff's favor.").

## A.     Griffin's motion to dismiss

With the proper standards in mind, the Court begins its analysis by considering the issue of personal jurisdiction. This case was brought under the Court's diversity jurisdiction. *See* 28 U.S.C. § 1332. As such, the Court may exercise personal jurisdiction only if an Illinois state court would have jurisdiction over the defendant. *See Citadel Grp. Ltd. v. Washington Reg'l Med. Ctr.*, 536 F.3d 757, 760 (7th Cir. 2008) ("A federal court sitting in diversity has personal jurisdiction only where a court of the state in which it sits would have such jurisdiction."). Illinois law permits its courts to exercise jurisdiction to the extent allowed by both the Illinois and federal constitutions. *Colucci v. Whole Foods Mkt. Servs., Inc.*, No. 19-CV-8379, 2021 WL 1222804, at *2 (N.D. Ill. Apr. 1, 2021); 735 Ill. Comp. Stat. 5/2-209(c). Because "the Illinois Constitution is co-extensive with the Federal Constitution, jurisdiction is proper as long as it meets due process requirements." *Id.* (citing *Noboa v. Barcelo Corporacion Empresarial, SA*, 812 F.3d 571, 572 (7th Cir. 2016)); *see also Citadel Grp. Ltd.*, 536 F.3d at 761 ("We have previously noted . . . that no case has yet emerged where due process was satisfied under the federal constitution but not under the Illinois constitution . . . . thus, we will proceed with the federal analysis.").

There are two types of personal jurisdiction, general and specific. *Goodyear*

*Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011).  General jurisdiction exists only "in the limited number of fora in which the defendant can be said to be 'at home.'"  *Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 800 (7th Cir. 2014), as corrected (May 12, 2014).  Specific jurisdiction, by contrast, exists when a "defendant's contacts with the forum" are "directly related to the conduct pertaining to the claims asserted."  *Brook v. McCormley*, 873 F.3d 549, 552 (7th Cir. 2017).

Griffins argues that the Court does not have general jurisdiction over him because he is not and never has been domiciled in Illinois.  Edelson makes no counterargument.  Therefore, the Court will limit its discussion to specific personal jurisdiction.  *Cf. Rogers v. City of Hobart*, 996 F.3d 812, 818 (7th Cir. 2021) ("Here, Mr. Rogers focuses solely on [specific jurisdiction], so we need not evaluate whether he could show general jurisdiction.").

Specific jurisdiction exists when: (1) "the defendant's contacts with the forum state . . . show that it purposefully availed itself of the privilege of conducting business in the forum state or purposefully directed its activities at the state"; (2) "the plaintiff's alleged injury . . . [arose] out of the defendant's forum-related activities"; and (3) "any exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice."  *Lexington Ins. Co. v. Hotai Ins. Co., Ltd*., 938 F.3d 874, 878 (7th Cir. 2019) (alterations accepted) (internal quotation marks omitted).

### 1. Purposeful availment

"[T]he nature of the purposeful-direction/purposeful-availment inquiry depends in large part on the type of claim at issue."  *Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir.

9

2012).  To determine whether a defendant has purposefully availed himself of the privilege of conducting business in the forum state, courts look to see if there are "minimum contacts between the defendant and the forum State."  *Lexington Ins. Co.,* 938 F.3d at 879 (internal quotation marks omitted).  A defendant may not be "haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or third person."  *Curry,* 949 F.3d at 396 (internal quotation marks omitted).

In a breach-of-contract suit, personal jurisdiction typically will turn "on whether the defendant purposefully availed himself of the privilege of conducting business in the forum state."  *Felland,* 682 F.3d at 674; *see also Tamburo v. Dworkin,* 601 F.3d 693, 702 (7th Cir. 2010) ("Personal jurisdiction in breach-of-contract actions often turns on whether the defendant 'purposefully availed' himself of the privilege of conducting business or engaging in a transaction in the forum state.").  By contrast, the personal jurisdiction inquiry in a case involving an intentional tort typically focuses "on whether the conduct underlying the claim was purposely directed at the forum state."  *Felland,* 682 F.3d at 674 (alterations accepted) (internal quotation marks omitted) (citing *Tamburo,* 601 F.3d at 702).  There are three requirements to demonstrate "purposeful direction" in the intentional torts context:  "(1) intentional conduct (or 'intentional and allegedly tortious' conduct); (2) expressly aimed at the forum state; (3) with the defendant's knowledge that the effects would be felt—that is, the plaintiff would be injured—in the forum state."  *Tamburo,* 601 F.3d at 703.

"The relevant contacts are those that center on the relations among the defendant, the forum, and the litigation."  *Advanced Tactical Ordnance Sys.,* 751 F.3d at

10

801. But not all contacts are created equal. Purposeful availment is demonstrated through the defendant's suit-related conduct and that conduct's substantial connection with the forum state. *Id.* "The mere fact that defendant's conduct affected plaintiffs with connections to the forum [state] does not suffice to authorize jurisdiction." *Id.* (alterations accepted) (internal quotation marks omitted); *see also Walden v. Fiore*, 571 U.S. 277, 285 (2014) (stating that minimum contacts are "the defendant's contacts with the forum [state] itself, not the defendant's contacts with persons who reside there"). "Contacts between the plaintiff or other third parties and the forum do not satisfy this requirement." *Advanced Tactical Ordnance Sys.*, 751 F.3d at 801.

Turning to the case before the Court, Edelson asserts that several facts demonstrate Griffin's purposeful availment. First, in order to litigate in Illinois, Griffin prepared and executed with Edelson one of the two contracts that retained Edelson as local counsel. Second, Griffin submitted petitions to practice *pro hac vice* in Illinois, designated a Chicago-based Edelson attorney as his associated Illinois attorney, and registered with the Illinois Attorney Registration and Disciplinary Commission (IARDC). And third, Griffin flew to Chicago on separate occasions to participate in in-person mediations for the *Lion Air* case.

Griffin disagrees. He says he was, at all times identified in the complaint, "a W-2 employee" of Girardi Keese. Dkt. no. 42-9 ¶ 1. Given his status as an employee, Griffin argues that during the relevant times, his actions were on behalf of his employer and "cannot be manipulated into any individual conduct of purposeful availment." Griffin's Br. at 10. In other words, Griffin contends that the contacts cited by Edelson are irrelevant because they were undertaken not on his own behalf but on behalf of his

employer.[4]

With regard to the Court's jurisdiction over Edelson's contract claims (breach of contract and unjust enrichment), the Court concludes that Griffin purposefully availed himself "of the privilege of conducting business or engaging in a transaction" in Illinois. *See Tamburo*, 601 F.3d at 702. Several facts support this conclusion. First, the fee-sharing contract that Griffin executed. The Supreme Court has "emphasized that parties who reach out beyond one state and create continuing relationships and obligations with citizens of another state are subject to regulation and sanctions in the other State for the consequences of their activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 473 (1985) (internal quotation marks omitted); *see also Walden*, 571 U.S. at 285 ("Accordingly, we have upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State.").

At bottom, the complaint alleges that Griffin did just that. The complaint alleges that Girardi Keese wanted to engage Edelson as local counsel so that Griffin could

---

[4] In his reply brief, Griffin argues that personal jurisdiction is barred by Illinois's so-called fiduciary shield doctrine, which "denies personal jurisdiction over an individual whose presence and activity in the state in which the suit is brought were solely on behalf of his employer or other principal." *See Fletcher v. Doig*, 125 F. Supp. 3d 697, 716 (N.D. Ill. 2014) (internal quotation marks omitted). That argument was not made in his initial brief. Instead, Griffin cited only federal caselaw and (seemingly) argued that his status as an employee precluded personal jurisdiction under federal due process principles. *See* Griffin's Br. at 9–10. Thus, Griffin's argument under the fiduciary shield doctrine is forfeited. *See O'Neal v. Reilly*, 961 F.3d 973, 974 (7th Cir. 2020) ("[W]e have repeatedly recognized that district courts are entitled to treat an argument raised for the first time in a reply brief as waived.").

appear in Illinois courts on behalf of the *Lion Air* clients.[5]  Griffin, on behalf of Girardi Keese, signed and executed an agreement to this effect.  He, along with other defendants, received and benefited from the legal services provided by Edelson in Illinois.  Though Griffin argues that he was not a party to the agreement he signed—a fact that is arguably neither dispositive in or even important to determining whether he purposefully availed himself of Illinois and its laws—the complaint alleges otherwise. *See* Compl. ¶ 106 ("Defendants GK, Girardi, and Griffin, and Lira breached their contractual obligations by not paying Edelson its share of attorney's fees.").  At this stage, the Court accepts the well-pleaded allegations from the complaint.  *See Menzies*, 943 F.3d at 332.

The second and third facts that Edelson offers to support personal jurisdiction are that Griffin requested permission to practice *pro hac vice* in Illinois and registered with the IARDC, the administrative agency charged with regulating Illinois's lawyers.  Finally, Edelson says, Griffin traveled to Chicago on two occasions to participate in in-person mediations that resulted in the *Lion Air* settlements at issue in this case.  *See Walden*, 571 U.S. at 285 ("And although physical presence in the forum is not a prerequisite to jurisdiction . . . physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact.").  These are not "random, fortuitous, or attenuated contacts."  *See Curry*, 949 F.3d at 396 (internal quotation marks omitted).  Rather, each was deliberate and directly connected

---

[5] Griffin contends that he did not appear in the *Lion Air* Illinois state court proceedings or make an appearance in federal court once the case was removed.  Griffin's Reply Br. at 3.  He does not explain why this would matter, but in any event his non-appearance would not undermine or negate his other contacts with Illinois.

to the matters at issue in the present case.

Regarding jurisdiction over Edelson's intentional tort claim (conversion), the Court concludes that Edelson has sufficiently shown that Griffin's alleged conduct with respect to that claim was purposely directed at Illinois. *See Tamburo*, 601 F.3d at 702. There can be no question that the complaint alleges Griffin's conduct was intentional. Edelson alleges that Griffin participated in the "theft and subsequent cover-up" of the *Lion Air* settlement proceeds paid by Boeing. Pl.'s Resp. Br. at 17; *see* Compl. ¶¶ 40–56. Likewise, there can be no doubt Griffin knew his conduct, to the extent it deprived Edelson of fees it was owed, was aimed at or would be felt in Illinois, the state where Edelson is based. Edelson alleges that Griffin and his co-defendants assumed control of the agreed upon attorney's fees, deprived Edelson of this property, and despite multiple demands refused to transfer Edelson the amount it was owed. *See* Compl. ¶¶ 114–20.

Griffin argues that because all of these contacts were in furtherance of his employer's interest, he cannot have purposefully availed himself of Illinois and its laws. That argument does not wash. (Again, Griffin has forfeited for present purposes the fiduciary shield argument asserted for the first time in his reply brief.) Federal due process principles do not permit Griffin to use his status as an employee to shield him from personal jurisdiction. *Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Petitioners are correct that their contacts with California are not to be judged according to their employer's activities there. On the other hand, their status as employees does not somehow insulate them from jurisdiction. Each defendant's contacts with the forum State must be assessed individually."). Having assessed Griffin's actions vis-à-vis

Illinois, the Court concludes that Edelson has shown contacts sufficient to support jurisdiction over Griffin here.

### 2. Arise out of or relate to

"The proper exercise of specific jurisdiction requires that the defendant's minimum contacts with the forum state be *suit-related*." *Curry*, 949 F.3d at 401 (internal quotation marks omitted). Until recently, the Supreme Court had not elaborated on this requirement beyond stating that "the plaintiff must also show that his injury 'arises out of' or 'relates to' the conduct that comprises the defendant's contacts." *See Felland*, 682 F.3d at 676; *see also Tamburo*, 601 F.3d at 708. This lack of elaboration has led to "difficulty in applying" the requirement and "conflict among the circuits." *Tamburo*, 601 F.3d at 708. The split centers around "how close the causal connection must be; more specifically, the circuits disagree about whether the defendant's contacts must have been the factual cause of the plaintiff's injury, the factual and proximate cause, or perhaps some intermediate standard between the two." *Felland*, 682 F.3d at 676. It does not appear the Seventh Circuit has taken a firm position in this debate. *See id*. at 676–77 (citations omitted) ("We have suggested in passing that a mere 'but for' causal relationship is insufficient to establish the required nexus between a defendant's contacts and the underlying cause of action, but we have declined to definitively resolve the question.")

In a recent case, the Supreme Court clarified that this inquiry does not require the claim to result from the in-defendant's state contacts. *See Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021) ("[W]e have never framed the specific jurisdiction inquiry as always requiring proof of causation—*i.e.*, proof that

the plaintiff's claim came about because of the defendant's in-state conduct.").  Instead, the Supreme Court's "most common formulation of the rule demands that the suit 'arise out of *or relate* to the defendant's contacts with the forum.'"  *Id.*  In other words, specific jurisdiction can be satisfied with a causal showing *or* "another 'activity or occurrence' involving the defendant that takes place in the State."  *Id.* (alterations accepted).

Griffin contends that *Ford Motor* is distinguishable because that case involved a company that "systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States."  *See id.*, 141 S. Ct. at 1028; Griffin's Reply Br. at 4–5.  That difference might matter if the Court were analogizing the facts in this case to the facts in *Ford Motor*.  But the fact that Griffin is not a multinational corporation with systematic contacts does not shield him from the Supreme Court's more general proposition:  the Court has "never framed the specific jurisdiction inquiry as always requiring proof of causation."  *Ford Motor Co*, 141 S. Ct. at 1026; *see also id.* at 1033 (Alito, J., concurring) ("Ford . . . asks us to adopt an unprecedented rule under which a defendant's contacts with the forum State must be proven to have been a but-for cause of the tort plaintiff 's injury.  The Court properly rejects that argument . . .").  Thus, the Court is not persuaded that *Ford Motor* should not apply in this case.

Griffin argues that all the claimed wrongdoing that led to this suit took place in California and thus the Court may not exercise jurisdiction over him.  Griffin Br. at 9. ("[A]ny injury suffered by the Plaintiff did not arise from any forum-related activity by Defendant Griffin.").  This argument is akin to the one made by the petitioner in *Ford Motor*.  *See Ford Motor*, 141 S. Ct. at 1026 (explaining Ford's view that "[j]urisdiction

attaches 'only if the defendant's forum conduct *gave rise* to the plaintiff's claims.'"). The Supreme Court rejected that argument, and so does this Court. *See id.* at 1026 ("Ford's causation-only approach finds no support in this Court's requirement of a 'connection' between a plaintiff's suit and a defendant's activities."). It may be true that many, if not all of, the alleged actions regarding Griffin's involvement in withholding the attorneys' fees took place in California.[6] If so, however, that would only shut down the "arises out of" route to personal jurisdiction, not the "or related to" route.

Griffin's contacts with Illinois are undoubtedly related to Edelson's claims. In order to appear in Illinois court, Griffin prepared and executed a contract that made Edelson local counsel. That contract guaranteed Edelson a portion of the *Lion Air* settlement and it is the basis for each of Edelson's claims against Griffin. For the underlying case, Griffin executed petitions for permission to practice *pro hac vice* in Illinois, appointed an Illinois-based Edelson attorney as his associated Illinois attorney, and registered with the state's regulating body for attorneys. Griffin also flew to Chicago to participate in mediations for the underlying litigation; these mediations led to the settlement at the heart of this matter.

Along with his causation argument, Griffin also asserts that the Court lacks personal jurisdiction over him for the same reasons discussed in *Wallace v. Herron*, 778

---

[6] Griffin says that his all his communications with Edelson about the fee dispute took place in California and were with Rafey Balabanian, a California-based lawyer. *See* Griffin Br. at 11 (citing Dkt. no. 42-1). Therefore, Griffin claims, Edelson's claims cannot have arisen out of his conduct in Illinois. Yet, Edelson has submitted an affidavit from Ari J. Scharg, an Edelson attorney based in Illinois, who swears that Griffin communicated with him about the settlements as well. *See* Dkt. no. 78-5. It is unclear if Griffin and Scharg specifically discussed the fee dispute or even if these communications were related to other allegations in the complaint.

F.2d 391 (7th Cir. 1985), and *Cote v. Wadel*, 796 F.2d 981 (7th Cir. 1986). Those

cases, however, bear little resemblance to this one. In *Wallace*, the defendant-

attorneys "lacked the necessary minimum contacts with Indiana" because the asserted

contacts were attenuated. *Wallace*, 778 F.2d at 394. Three of the defendants had

never had contact with Indiana having "[n]ever set foot in Indiana, conducted business

in Indiana, or been licensed to practice law in Indiana." *Id.* Though one defendant had

come to Indiana "on one occasion to take depositions," the controversy at the heart of

the case did not arise out of her single contact with Indiana. *Id.* And although the

defendants filed motions on behalf of their clients, those motions were not filed in

Indiana. *Id.* The case for jurisdiction in *Cote* was even weaker than in *Wallace*. *Cote*,

796 F.2d at 984. The plaintiff brought a malpractice suit against his attorney and the

attorney's law firm, but "there was no act or omission" by the defendants that occurred

in the forum state. *See id.* Because the "only significant connection between the suit

and [the forum state] was that the plaintiff live[d] there," jurisdiction was improper. *Id.*

As established above, Griffin's contacts are far stronger than the contacts (or lack

thereof) in *Wallace* and *Cote*. Griffin traveled to Illinois to participate in the underlying

litigation. He contracted with an Illinois based firm so that he could appear in an Illinois

court. He executed the necessary paperwork to represent the *Lion Air* plaintiffs in

Illinois. Finally, Griffin's contacts with the state are related to Edelson's claims, as those

contacts are related to the underlying litigation and its settlement, out of which Edelson's

fee claims arise. Said differently, this suit has the "essential foundation" for specific

jurisdiction: a strong relationship between Griffin, Illinois, and the claims presented.

*See Ford Motor*, 141 S. Ct. at 1028. As such, the Court concludes that the connection

between the plaintiff's claims and Griffin activities is "close enough to support jurisdiction." *See id* at 1032.

### 3. Traditional notions of fair play and justice

There is one final step. The Court must ensure that the "exercise of jurisdiction does not offend traditional notions of fair play and substantial justice." *Curry*, 949 F.3d at 402 (internal quotation marks omitted). To make this determination, the Court may evaluate:

> the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of the underlying dispute, and the shared interest of the several States in furthering fundamental substantive social policies.

*Purdue Rsch. Found.*, 338 F.3d at 781 (7th Cir. 2003) (alterations accepted). "When the defendant's minimum contacts with the forum are relatively weak (although existent), these considerations may militate in favor of the exercise of jurisdiction." *Id.*

Griffin claims that exercising personal jurisdiction over him would run afoul of traditional notions of fair play and substantial justice, for two reasons. First, he says "it cannot be disputed that the burdens on [him] to litigate [are] substantial" because he is a "now-unemployed attorney residing in California." Griffin Br. at 13. Though the Court sympathizes with Griffin, it is not persuaded by this argument. "[A]s long as the plaintiff has made a threshold showing of minimum contacts, that showing is generally defeated only where the defendant presents 'a compelling case that the presence of some other considerations would render jurisdiction unreasonable.'" *Curry*, 949 F.3d at 402. Griffin's personal circumstances, while unfortunate, are not unreasonable or a proper basis to decline to exercise jurisdiction over him.

Griffin's second argument is that Edelson cannot obtain "convenient and effective relief" in this Court because Girardi Keese has filed for bankruptcy and cannot be sued or cross-claimed. Griffin Br. at 14 (internal quotation marks omitted). As discussed earlier, the complaint alleges that Griffin was a party to the contract. *See* Compl. ¶ 106 ("Defendants GK, Girardi, and Griffin, and Lira breached their contractual obligations by not paying Edelson its share of attorney's fees."). If Edelson establishes this, Griffin would be individually liable on the breach-of-contract claim. And even if the complaint did not assert a breach of contract against Griffin, he is still named as a defendant on Edelson's conversion claim and would be individually liable on that claim if Edelson prevails. The fact that Griffin cannot assert a claim against Girardi for contribution or indemnification in any place other than bankruptcy court has no bearing on the proper exercise of jurisdiction here.

In short, Griffin had sufficient contacts with Illinois that are clearly related to the claims in this suit. The Court is convinced that exercising jurisdiction over Griffin would not offend traditional notions of fair play and substantial justice. For these and the other reasons discussed, the Court concludes that it may exercise personal jurisdiction over Griffin and therefore denies his motion to dismiss.

**B.     Lira's motion to dismiss**

Next, the Court considers Lira's arguments for dismissal.

**1.     Standing**

In federal courts, a plaintiff must meet the "irreducible constitutional minimum of standing" to establish that his claim is justiciable. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). To establish Article III standing, a plaintiff must demonstrate that:

20

(1) he "has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical"; (2) his "injury is fairly traceable to the challenged action of the defendant"; and (3) "it is likely, as opposed to merely speculative, that [his] injury will be redressed by a favorable decision." *Silha*, 807 F.3d 173 (internal quotation marks omitted).

In drive-by fashion, Lira argues that Edelson may not assert its claims for conversion, nor seek the remedies of constructive trust or accounting, because Edelson seeks to recover fees on behalf of the *Lion Air* clients—the plaintiffs in the underlying case, with whom Edelson no longer has an attorney-client relationship with.[7]  Though this argument is barely developed in Lira's initial brief, as Edelson itself recognizes, the Court is "duty-bound" to consider standing whenever the question arises.  *See Robertson v. Allied Sols., LLC*, 902 F.3d 690, 698 (7th Cir. 2018) ("Article III's requirements must be continuously met throughout the life of a case.").

 Lira does not say whether his challenge to Edelson's standing is a facial challenge or a factual one, so the Court will consider Lira's arguments under both analyses, starting with the facial challenge.  When considering a facial challenge to subject matter jurisdiction, the Court accepts "all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff."  *Silha*, 807 F.3d at 173. As noted earlier, the plaintiffs have the burden of establishing that they meet the requirements for standing.  *See Disability Rts. Wis., Inc. v. Walworth Cty. Bd. of Supervisors*, 522 F.3d 796, 800 (7th Cir. 2008).  The Court considers Edelson's

---

[7] Lira does not challenge Edelson's standing to assert its the breach-of-contract claim.

standing on each of the challenged remedies or claims separately.

First up is the request for an accounting.[8]  Edelson has sufficiently alleged that it suffered an injury in fact (the loss of attorneys' fees it was owed) and that its injury was the result of the defendants' actions (the alleged theft and cover-up).  Lira does not contest this.  Instead, Lira asserts that by pursuing an accounting, Edelson is seeking relief on behalf of the *Lion Air* clients, not on its own behalf.   Specifically, Lira points to language in the complaint where Edelson says that it seeks "an accounting of all funds transferred from Boeing that were intended for any GK client (inclusive of any transfers to third parties associated with, or transfers made for the benefit of, GK) related to settlements in *In Re: Lion Air Flight JT 610 Crash* and a full accounting of what subsequently became of those funds."  Compl. ¶ 16; *see also id.* at 29, ¶ B.

The Court disagrees.  The availability of an accounting is dependent on the facts of the case.  *See Tufo v. Tufo*, 2021 IL App (1st) 192521, ¶ 93.  Looking to the complaint's full allegations, it is plain that Edelson does not seek this remedy on behalf of the *Lion Air* plaintiffs.  Edelson claims that it has no knowledge of the "whereabouts, distribution, allocation, or transfer" of the "large, but confidential sum of money" from the settlement.  Compl. ¶¶ 97–98.  And because Edelson is not certain which defendant "is responsible, in what amount, for its damages," it seeks an accounting of the all transactions or records relating to the settlement.  *Id.* ¶¶ 99–100.  An accounting of all

---

[8] An accounting is an equitable remedy.  *See Kempner Mobile Elecs., Inc. v. Sw. Bell Mobile Sys.*, 428 F.3d 706, 715 (7th Cir. 2005).  A plaintiff seeking the remedy of an accounting must allege "the absence of an adequate remedy at law."  *Id.*  Moreover, the plaintiff must allege at least one of the following: "(1) a breach of a fiduciary relationship, (2) a need for discovery, (3) fraud, or (4) the existence of mutual accounts which are of a complex nature."  *Id.*

*Lion Air* transactions makes sense and seems prudent, as the fee-sharing agreements between Edelson and Girardi Keese are dependent on the settlement amount for the *Lion Air* clients. In other words, in order for Edelson to know and prove what it is owed, it reasonably needs to "trace the stolen funds and . . . understand the nature of the financial relationship" among the defendants. Pl.'s Resp. Br. at 6. That is enough to confer standing for this equitable remedy.

Next is Edelson's request for a constructive trust as a remedy for the defendants' unjust enrichment.[9] Again, Lira asserts that Edelson lacks standing to pursue this remedy because it is for the benefit of the *Lion Air* plaintiffs. In its complaint, Edelson alleges that it has a "contractually created property right to specific percentages of the attorneys' fees" generated by the Boeing settlement funds. Compl. ¶¶ 86–87. Edelson further alleges that the funds owed to Edelson are "commingled with the funds owed to the Lion Air clients" and that the defendants have distributed these funds among themselves. *Id.* ¶ 88. Edelson says that it believes "principles of equity and good conscience, as well as the Rules of Professional Conduct," require that the *Lion Air* plaintiffs receive what is owed to them before Edelson receives what it is owed. *Id.* ¶ 94. For this reason, Edelson asks that a constructive trust be imposed "for the benefit of the Lion Air clients first, then for the benefit of Plaintiff, if sufficient funds remain in

---

[9] Like an accounting, constructive trust is an equitable remedy. *See DeGeer v. Gillis*, 707 F. Supp. 2d 784, 796 (N.D. Ill. 2010) ("[C]ourtsf have consistently affirmed that the imposition of a constructive trust is a particular type of remedy."). "A constructive trust is a device used . . . to compel one who unfairly holds property to convey the property to the party to whom it justly belongs." *People ex rel. Hartigan v. Candy Club*, 149 Ill. App. 3d 498, 502, 501 N.E.2d 188, 191 (1986). Constructive trusts may be imposed when "a party has received money properly belonging to another under circumstances that, in equity, the party ought not be allowed to retain." *Jackson v. Callan Pub., Inc.*, 356 Ill. App. 3d 326, 334, 826 N.E.2d 413, 423 (2005).

trust." *Id.* ¶ 95.

The Court agrees with Lira, in part. To the extent Edelson seeks a constructive trust to be imposed for the benefit of the *Lion Air* clients, it lacks the standing to do so. All parties agree that Edelson no longer has an attorney-client relationship with the *Lion Air* plaintiffs. Without that relationship, Edelson lacks standing to vindicate those plaintiffs' rights. *Kowalski v. Tesmer*, 543 U.S. 125, 129–30, (2004) ("We have adhered to the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties' . . . . [W]e have recognized an [existing] attorney-client relationship as sufficient to confer third-party standing."). Though Edelson argues that principles of equity and good conscience, as well as the Illinois Rules of Professional Conduct, require it to seek a constructive trust for both itself and the *Lion Air* clients, that argument cannot overcome the requirement for Edelson to have standing to assert its claims and to seek its requested remedies. *See Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) ("[P]laintiff must demonstrate standing separately for each form of relief sought."). Edelson cites no case to the contrary, and the Court has not been able to identify any.

But the fact that Edelson lacks standing to seek a constructive trust on behalf of the *Lion Air* plaintiffs does not mean it lacks standing to seek a constructive trust over the property *belonging to Edelson* that it alleges the defendants unjustly hold. *See Jackson*, *356* Ill. App. 3d at 334, 826 N.E.2d at 423. Again, Lira does not contest that Edelson has an injury in fact and that its injury was the result of the defendants' actions. And there is no question that Edelson's injury can be redressed by the imposition of a

24

constructive trust. If Lira and the other defendants are in possession of money to which they are not entitled because it is owed to Edelson and "in equity and good conscience [they] ought not retain it, a constructive trust can be imposed to avoid unjust enrichment." *See Nat'l Union Fire Ins. Co. of Pittsburgh v. DiMucci*, 2015 IL App (1st) 122725, ¶ 76, 34 N.E.3d 1023, 1045 (internal quotation marks omitted).

Third to consider is Edelson's claim for conversion. In its complaint, Edelson alleges that it "has an absolute and unconditional right to the immediate possession of the attorneys' fees, once the appropriate settlement funds have been transferred to the Lion Air clients." Compl. ¶ 117. It further alleges that though it "made numerous demands" on the defendants for an accounting and for payment, its requests were ignored. *See id.* ¶ 118. Instead, the defendants "assumed control and ownership over the attorneys' fees and refused to provide them." *Id.* ¶ 119.

As with the previously discussed remedies, Lira argues that Edelson lacks standing to pursue its conversion claim because it seeks to vindicate the rights of the *Lion Air* plaintiffs. The Court disagrees. The only mention of the *Lion Air* clients in Edelson's claim for conversion is an allegation in which Edelson explains that under the fee-sharing contracts, it "has an absolute and unconditional right to the immediate possession of the attorneys' fees, once the appropriate settlement funds have been transferred to the Lion Air clients." Compl. ¶ 117. That allegation does not amount to seeking a remedy on behalf of a third party. Unlike with its unjust enrichment claim and with the remedy of constructive trust, Edelson limits its conversion claim and the resulting damages to its "share of the attorneys' fees." *Id.* ¶ 120. Given that Edelson has sufficiently alleged injury, causation, and redressability, the Court concludes that

Edelson has standing to bring its conversion claim.

Consideration of Lira's standing challenge as a factual attack produces the same results as the facial attack did. Though "a facial attack does not challenge the alleged facts themselves . . . . a factual attack does [by] testing the existence of the jurisdictional facts underlying the allegations." *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020) (citation omitted). And although "a plaintiff undergoing only a facial attack enjoys treatment of her allegations as true," a plaintiff undergoing a factual attack does not have that benefit. *Id.* Instead, courts considering factual attacks to subject matter jurisdiction "may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action." *Id.* Furthermore, once a factual attack is launched, "the plaintiff must support each controverted element of standing with . . . a showing by a preponderance of the evidence, or proof to a reasonable probability, that standing exists." *Id.* at 278 (citations omitted).

Looking to Lira's arguments, he only attacks Edelson's standing for the constructive trust, conversion, and accounting on the basis that the remedies and claim are premised on the rights of plaintiffs Edelson no longer represents. The Court has already concluded that neither the conversion claim nor the request for an accounting directly implicate the rights of third parties. Lira has produced no evidence that would undermine that conclusion. In fact, the only evidence outside the pleadings that Lira cites are three exhibits that show that Edelson is no longer representing the *Lion Air* plaintiffs—a fact Edelson does not dispute. *See* dkt. nos. 44-9, 44-10, 44-11, 44-12, and 44-13.

With regard to the constructive trust claim, because Edelson does not dispute

that it has no existing attorney-client relationship with the *Lion Air* plaintiffs, the Court's analysis on this issue is likewise unchanged. As noted above, Edelson cannot seek a constructive trust on behalf of the *Lion Air* plaintiffs. But, for the reasons already discussed, Edelson may still seek a constructive trust for the property it alleges it is entitled to that the defendants unjustly hold.

There is one last matter to address before moving on. In addition to the portions of the complaint already considered above, Lira cites a few other portions of the complaint that reference the *Lion Air* clients, their injuries, or what is owed to them. These statements are not coupled with any particular claim or remedy. *See* Compl. at 1–2 ("Plaintiff . . . brings this lawsuit to recover monies due and owing to itself, as well as to seek the disgorgement of all monies due and owing to all clients of Girardi Keese in the matter of *In Re: Lion Air Flight JT 610 Crash*"); *id.* ¶ 7 ("And while the present Complaint is brought in part to enforce Plaintiff's fee agreement with GK, those fees are not the primary focus of this Complaint; rather, this Complaint also seeks to force GK . . . to uphold its fiduciary duty to the surviving families of the victims of Lion Air Flight 610 that it agreed to represent"); *id.* ¶ 16 ("this lawsuit requests that the Court order . . . (2) the disgorgement of all [Boeing settlement] funds from any Defendant (or any non-party) who is improperly in receipt of those funds; (3) the transfer of those funds to the appropriate client recipients; and, *only after those steps have been accomplished* (and any other remedial steps the Court deems warranted), (4) the payment of the contractually required attorneys' fees to Edelson PC"); *id.* at 29 ¶ F (asking the Court to require "the transfer of all Lion Air client funds to the appropriate client recipients"); *id.* at 30 ¶ G (requesting that the Court require "the payment of all contractually required

attorneys' fees to Edelson PC, only after the Court confirms the full and complete payment to the Lion Air clients).

Edelson says that these statements are best read in line with its view that the "principles of equity and good conscience, as well as the Rules of Professional Conduct," require that the *Lion Air* plaintiffs receive what is owed to them before Edelson receives what it is owed. *See id.* ¶ 94. But, as the Court has already explained, to the extent Edelson seeks any remedy on behalf of the *Lion Air* plaintiffs, it lacks standing to do so. Edelson admits it no longer has an attorney-client relationship with the *Lion Air* plaintiffs, and without some other basis for standing, Edelson is permitted to vindicate only its own interests and rights. *See Kowalski*, 543 U.S. at 129–30.

In sum, Edelson has standing to seek the equitable remedies of constructive trust and accounting, as well as to pursue its claim for conversion. It may not, however, seek relief on behalf of the *Lion Air* plaintiffs.

### 2. Automatic bankruptcy stay

Lira next argues that this suit should be automatically stayed pursuant to 11 U.S.C. § 362(a)(1) and (a)(3).[10] The automatic stay is a powerful tool. *Fox Valley Const. Workers Fringe Ben. Funds v. Pride of Fox Masonry & Expert Restorations*, 140 F.3d 661, 666 (7th Cir. 1998). The relevant provisions of section 362 read:

> (a) Except as provided in subsection (b) of this section, a petition filed under section 301, 302, or 303 of this title, or an application filed under section 5(a)(3) of the Securities Investor Protection Act of 1970, operates as a stay, applicable to all entities, of--

---

[10] It is worth noting that the Court has already stayed the case as to Girardi and Girardi Keese based on their pending bankruptcy cases. *See* Dkt. no. 48.

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

. . .

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate.

11 U.S.C. § 362(a).

Courts begins its analysis by considering section 362(a)(1). "On the filing of a bankruptcy petition, the stay automatically stops any other proceedings against the debtor." *Fox Valley*, 140 F.3d at 666. Non-bankrupt third parties generally are not protected by the stay, unless the debtor and the non-bankrupt third party "have such a similarity of interests that failure to protect the third party will mean that the assets of the debtor itself will fall into jeopardy." *Id.* (citing *See A.H. Robins Co. v. Piccinin*, 788 F.2d 994, 998 (4th Cir. 1986)). Both Girardi and Girardi Keese have filed for bankruptcy in the Central District of California. Lira, however, has not filed for bankruptcy, nor has an involuntary bankruptcy petition been filed against him. Instead, he contends the stay should apply to claims against him because he has a right to indemnification against Girardi Keese or Girardi under equitable principles and a statutory right to indemnification under California law.

To establish that he has a "similarity of interests" with Girardi and Girardi Keese such that this suit should be stayed, Lira says that this case presents an "unusual situation" that falls within an exception to the general rule. *See A.H. Robins Co.*, 788 F.2d at 999 (An example of an "unusual situation" is "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might

29

result against them in the case.").  That exception would apply the automatic stay

pursuant to section 362(a)(1), where "'there is such identity between the debtor and the

third-party defendant that the debtor may be said to be the real party defendant and that

a judgment against the third-party defendant will in effect be a judgment or finding

against the debtor.'"  *Matter of Fernstrom Storage & Van Co.*, 938 F.2d 731, 736 (7th

Cir. 1991) (quoting *A.H. Robins Co.*, 788 F.2d at 999).

The problem with Lira's argument is that he is presenting it to the wrong court.

His contention must be adjudicated by the bankruptcy court in California, not this Court.

Lira misunderstands the applicability of *A.H. Robins Co.* when he suggests that section

362(a)(1), alone, results in a stay of the proceedings against him in this case.  The

purpose of section 362(a) "is to protect the debtor from an uncontrollable scramble for

its assets in a number of uncoordinated proceedings in different courts, to preclude one

creditor from pursuing a remedy to the disadvantage of other creditors."  *Fox Valley*,

140 F.3d at 66 (internal quotation marks omitted).  The plain words of section 362(a)(1)

do not "touch proceedings to enforce a court order against non-bankrupt third parties."

*See id.*  In other words, section 362(a)(1) does not, on its face, automatically stay

proceedings involving a non-debtor.  That is presumably why in *A.H. Robins Co.*, the

case Lira relies upon, the court premised the exceptions to the general rule regarding

the applicability of section 362(a)(1) on bankruptcy courts' authority under section

362(a)(1) and 11 U.S.C. § 105, which gives bankruptcy courts the authority to issue an

injunction that is necessary or appropriate to carry out the provisions of the Bankruptcy

Code.  *See A.H. Robins Co.*, 788 F.2d at 1002 ("The statutory power of the bankruptcy

court to stay actions involving the debtor or its property is not, however, limited to

30

section 362(a)(1) and (a)(3).  It has been repeatedly held that 11 U.S.C. § 105 which provides that the bankruptcy court 'may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title,' 'empowers the bankruptcy court to enjoin parties other than the bankrupt' from commencing or continuing litigation.").

The Seventh Circuit has not yet had the opportunity to consider the correct process for invoking an exception to the general rule regarding the applicability of section 362(a)(1).  That is because in the handful of times the Seventh Circuit has considered *A.H. Robins Co* or other exceptions to section 362(a)(1), it has found that the non-debtor does not qualify for the exceptions.  *See Harley-Davidson Credit Corp. v. JHD Holdings Inc.*, No. 19-CV-155-JDP, 2020 WL 7078828, at *1 (W.D. Wis. Dec. 3, 2020); *see, e.g., Matter of Fernstrom Storage & Van Co.*, 938 F.2d at 736 (deciding non-debtor did fit within the exception from *A.H. Robins Co.* or another case and affirming the bankruptcy court); *Fox Valley*, 140 F.3d at 666 (rejecting attorney's argument that "the automatic stay deprived the district court of jurisdiction to sanction him").

Other courts have considered *A.H. Robins Co.*, however, and they have come to same conclusion this Court has.  *See, e.g., Patton v. Bearden*, 8 F.3d 343, 349 (6th Cir. 1993) ("It should be noted that . . . extensions [of section 362(a)(10) to non-debtors, although referred to as extensions of the automatic stay, were in fact injunctions issued by the bankruptcy court after hearing and the establishment of unusual need to take this action to protect the administration of the bankruptcy estate.  Even if we were to adopt the unusual circumstances test, the bankruptcy court would first need to extend the

31

automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105."); *In re Chugach Forest Prods., Inc.*, 23 F.3d 241, 247 (9th Cir. 1994) (citing *Patton* and reaching the same conclusion); *Harley-Davidson Credit Corp.,* 2020 WL 7078828, at *2 (citing both *Patton* and *Chugach* and reaching the same conclusion).

Even if Lira could invoke section 362(a)(1) here, the Court would deny a stay under that provision. Lira asserts that a stay under section 362(a)(1) is required because he has a right of indemnification by Girardi or Girardi Keese under California's Labor Code. Lira's Br. at 8; *see A.H. Robins Co.*, 788 F.2d at 999 (An example of an "unusual situation" is "a suit against a third-party who is entitled to absolute indemnity by the debtor on account of any judgment that might result against them in the case."). Lira has not shown that he is "entitled" to "absolute indemnity." *See id.* Section 2802(a) of the California Labor Code provides that:

> (a) An employer shall indemnify his or her employee for all necessary expenditures or losses incurred by the employee in direct consequence of the discharge of his or her duties, or of his or her obedience to the directions of the employer, even though unlawful, unless the employee, at the time of obeying the directions, believed them to be unlawful.

Cal. Lab. Code § 2802(a). Lira's argument bypasses the last clause of the statute. An employer is required to indemnify an employee *unless* the employee took actions that he knew were unlawful. *See Dowie v. Fleishman-Hillard Inc.*, 422 F. App'x 627, 629 (9th Cir. 2011). The complaint alleges that Lira knew his acts were unlawful. *See* Compl. ¶ 54 ("Lira had knowledge of and cooperated with Girardi's misappropriation and conversion of settlement proceeds[.]"). Viewing the allegations in the light most favorable to the Edelson, Lira's chance of indemnification by his employer would not justify a stay. *See Menzies*, 943 F.3d at 332. Lira must "demonstrate his entitlement to

indemnity under the criteria set forth in the statute" before claiming that his entitlement is absolute.  *See In re Bidermann Indus. U.S.A., Inc.*, 200 B.R. 779, 784–85 (Bankr. S.D.N.Y. 1996).

Though Lira may not invoke section 362(a)(1) to obtain a stay of these proceedings from this Court, he may be able to achieve the same result under section 362(a)(3).  Section 362(a)(3) prevents "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."  Though Edelson argues otherwise, the plain words of the provision go past protecting just the debtor and protect any property of the estate.  Another provision of the Code, 11 U.S.C. § 541(a), says that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case."

Off the bat, it seems obvious that Edelson's request for a constructive trust is subject to a stay under section 362(a)(3).  As stated clearly in Edelson's complaint, it "seeks the imposition of a constructive trust on all money transferred from Boeing to [Girardi Keese] in connection with the Lion Air settlements."  Compl. ¶ 95.  If Edelson were to succeed on a constructive trust theory, "the value of [Girardi or Girardi Keese's] bankruptcy estate would be reduced . . . because [the] property in which the debtor holds legal but not equitable title as of the commencement of the case . . . is property of the estate . . . to the extent of the debtor's legal title."  *See In re Nat. Century Fin. Enters., Inc.*, 423 F.3d 567, 575 (6th Cir. 2005); *see also* 11 U.S.C. §541(d) (stating that property "in which the debtor holds . . . only legal title and not an equitable interest . . . becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable

interest in such property that the debtor does not hold.").  Therefore, Edelson's request for a constructive trust must be stayed until the bankruptcy litigation is resolved.

Conversely, section 363(a)(3) does not automatically stay the conversion and breach-of-contract claims against Lira.  The complaint alleges that Lira (along with the other defendants), was a party to the fee arrangement contract he signed.  *See* Compl. ¶¶ 15, 103, 106.[11]  Edelson also alleges that Lira, with the other defendants, wrongfully and without authorization assumed control and ownership of funds owed to Edelson and converted those funds.  *See id.* ¶¶ 119–120.  Though Lira argues that judgment in favor of Edelson on the conversion and breach-of-contract claims is tantamount to "immediate possession of funds held by the bankruptcy estate," that is not so.  *See* Lira's Reply Br. at 11; *see also id.* at 10.  On their face, these claims are based on Lira's conduct and rest upon his own breach of duty, and thus they implicate Lira's individual liability.  In short, the bankruptcy estates would not be disturbed by entry of a judgment against him on these counts.

Last to consider is the remedy of an accounting.  Edelson requests that all defendants be required "to provide a full and complete accounting of all funds transferred from Boeing that were intended for any [Girardi Keese] client (inclusive of any transfers to third parties associated with, or transfers made for the benefit of, Girardi Keese) related to settlements in *In Re: Lion Air Flight JT 610 Crash*, and a full accounting of what subsequently became of those funds." Compl. at 29, ¶ B.  Lira is a

---

[11] Lira repeatedly asserts that he was not a party to the fee-sharing contract.  But at this stage, and on this issue, the Court is required to accept all facts alleged in the complaint as true, view them in the light most favorable to Edelson, and draw all reasonable inferences in its favor.  *See Menzies*, 943 F.3d at 332.

defendant, and applying the remedy of an accounting *to him* would not impact the bankruptcy estates.[12]  In sum, this remedy is unaffected by the automatic stay.

To summarize, Lira's request to stay this case in its entirety under section 362(a)(1) is inappropriate because the bankruptcy court would first need to extend the automatic stay under its equity jurisdiction pursuant to 11 U.S.C. § 105.  Even if that were not the case  , the Court would not stay the claims against Lira because he has not shown that he is entitled to absolute indemnity from Girardi or Girardi Keese.  Regarding Lira's assertion that this case must be stayed under section 362(a)(3), only Edelson's request for the remedy of constructive trust must be automatically stayed as that is the only provision that directly touches the Girardi or Girardi Keese bankruptcy estates.[13]

### Conclusion[14]

For the reasons stated above, the Court denies Griffin's motion to dismiss [dkt. no. 41] and grants Lira's motion to dismiss [dkt. no. 43] in part, staying litigation on

---

[12] Lira contends that no settlement funds were transferred to him and that he never had control over these funds.  These assertions ignore the allegations in the complaint.  Edelson makes clear that though it has no knowledge of the "whereabouts, distribution, allocation, or transfer" of the *Lion Air* settlement proceeds, it believes the defendants do and that they must therefore provide a full accounting.  *See id.* ¶¶ 98–100.

[13] Lira separately asks for an indefinite stay due to the pending bankruptcy proceedings even if the automatic stay does not apply.  *See Munson v. Butler*, 776 F. App'x 339, 342 (7th Cir. 2019) ("[A] district court has inherent power to exercise its discretion to stay proceedings to avoid unnecessary litigation of the same issues.").  The Court denies this request.  Aside from the constructive trust, the remaining claims against him do not warrant a stay.

[14] As noted at the April 6, 2021 status hearing, Lira's argument vis-à-vis venue is underdeveloped and unsupported.  It is thus forfeited.  *See Batson v. Live Nation Ent., Inc.*, 746 F.3d 827, 833 (7th Cir. 2014); *Gonzales v. Madigan*, 403 F. Supp. 3d 670, 679 (N.D. Ill. 2019) (Kennelly, J.), aff'd, 990 F.3d 561 (7th Cir. 2021).

Count 1 (Unjust Enrichment - Constructive Trust) under 11 U.S.C. § 362(a)(3) unless and until the conclusion of the Girardi and Girardi Keese bankruptcy proceedings or until the bankruptcy court orders otherwise. Both defendants are directed to answer all remaining claims by no later than August 9, 2021. Rule 26(a)(1) disclosures, unless already made, are to be made by August 16, 2021. The parties are directed to confer and attempt to agree upon a discovery and pretrial schedule and are to file by August 23, 2021 a joint status report setting out an agreed schedule or alternative proposed schedules. The case is set for a telephone status hearing on August 31, 2021 at 8:45 a.m., using call-in number 888-684-8852, access code 746-1053, though the Court reserves the right to vacate the status hearing if it determines a hearing is not needed. Counsel should wait for the case to be called before announcing themselves.

_____
MATTHEW F. KENNELLY
United States District Judge

Date:  July 19, 2021