**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| EDELSON PC, an Illinois professional corporation, | Case No.: 20-cv-7115 |
| *Plaintiff,* | Hon. Matthew F. Kennelly |
| *v.* | |
| THOMAS GIRARDI, an individual, GIRARDI KEESE, a California sole proprietorship, DAVID LIRA, an individual, and KEITH GRIFFIN, an individual | |
| *Defendants.* | |

**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Edelson PC ("Edelson") brings this lawsuit against Defendants Thomas Girardi, Girardi Keese, David Lira, and Keith Griffin to recover monies due and owing as a result of services performed in the matter of *In Re: Lion Air Flight JT 610 Crash*, No. 18-cv-07686 (N.D. Ill.).[1] Plaintiff alleges as follows upon personal knowledge as to itself and its own acts and experiences, and, as to all other matters, upon information and belief.

**NATURE OF THE ACTION**

1.      Until December 2020, Tom Girardi ("Tom" or "Girardi") appeared to be operating a reputable and well-regarded law firm in Los Angeles, Girardi Keese ("GK").

2.      In truth, GK was a vehicle for Girardi, his family, and his close associates to steal from their clients, defraud their co-counsel, and generally enrich themselves using others'

---

[1]      Both Thomas Girardi and Girardi Keese are presently the subject of involuntary Chapter 7 bankruptcy proceedings. This case was filed before those bankruptcy proceedings and is stayed with respect to those defendants. The claims against them remain pleaded in this case, but this amended complaint should not be construed as taking any additional action to collect from the debtors.

money. This massive, years-long fraudulent scheme was not maintained by Tom acting alone. At the center of this endeavor were two of his most tenured employees: David Lira and Keith Griffin, both licensed California attorneys.

3.       Together, they stole the proceeds of settlements that belonged their clients—including the widows and orphans who lost loved ones in the tragic crash of Lion Air Flight 610—in order to keep the firm afloat and continue funding Girardi and his family's Beverly Hills lifestyles. As part of stealing the clients' money in the *Lion Air* case, they also stole Edelson PC's portion of the fees.

4.       When Plaintiff brought the Girardi Keese fraud to light in December 2020 with the filing of this Complaint and a motion for rule to show cause in *Lion Air*, Girardi Keese immediately imploded. Defendant Griffin quit the firm. Defendant Lira tried to distance himself further, claiming to have quit in June 2020. Creditors involuntarily put the Girardi Keese firm and Thomas Girardi into bankruptcy. And the Court presiding over the *Lion Air* matter held a three-day evidentiary hearing in December 2021 as to whether Lira and Griffin should be held in contempt of Court. That proceeding is ongoing.

5.       Discovery in this action and public testimony in the contempt proceeding have shown not just that Griffin and Lira should be held to account for the claims originally pled in this action, but for defrauding their clients and Plaintiff Edelson. Griffin and Lira, with full knowledge that Girardi Keese had stolen these clients' money (which included Edelson's fees), lied to Edelson and the clients in hopes of perpetuating the fraud that was the Girardi Keese firm. Not only did Lira and Griffin lie their way through the *Lion Air* case, but Lira also lied under oath in the contempt proceeding to avoid the consequences of his actions.

6.       Edelson seeks damages for the injuries it suffered as a result of Defendants'

wrongful conduct. Edelson originally brought this suit in a manner intended to benefit the *Lion Air* families whose money was stolen as well as itself, seeking a constructive trust over the *Lion Air* settlement funds to benefit first the clients, then itself. The Court determined that Edelson did not have standing to do that. Edelson notes that it has reached (subject to finalization and approval of the *Lion Air* court) an agreement to effect the compensation of the clients in a different manner, so this lawsuit need only be about the fees owed to Edelson.

## PARTIES

7.      Plaintiff Edelson PC is an Illinois professional corporation operating as a law firm, with its principal place of business located at 350 North LaSalle, 14th Floor, Chicago, Illinois 60654. Edelson PC also has offices located at 150 California Street, 18th Floor, San Francisco, California 94111.

8.      Defendant Thomas Girardi is a natural person and citizen of the State of California.

9.      Defendant GK is a sole proprietorship under the laws of the State of California, with its principal place of business located at 1126 Wilshire Boulevard, Los Angeles, California 90017. At all relevant times, GK did business in the State of Illinois and in this District.

10.      Defendant Lira is a natural person and citizen of the State of California. Lira was formerly a partner at Defendant GK. Lira is also Defendant Girardi's son-in-law. He is a member of the bar of the United States District Court for the Northern District of Illinois.

11.      Defendant Griffin is a natural person and a citizen of the State of California. Griffin was formerly a high-ranking employee at Defendant GK, with a status equivalent to an income partner. He is a member of the bar of the United States District Court for the Northern District of Illinois.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 in that the jurisdictional amount exceeds $75,000 and the Plaintiff does not share a state of citizenship with any Defendant.

13.     The Court has personal jurisdiction over Defendants because they conduct business in this District and because they have committed tortious acts purposefully directed at Illinois, and such conduct was designed to create an injury in Illinois and this District.

14.     Additionally, the Court has specific personal jurisdiction over Griffin and Lira because they received and benefited from the legal services provided by Edelson in Illinois. Further, Griffin and Lira each personally traveled to Illinois to participate in mediations for the *Lion Air* litigation.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants have committed tortious acts purposefully in this District and the underlying litigation giving rise to this Action (*In Re: Lion Air Flight JT 610 Crash*, No. 18-cv-07686 (N.D. Ill.)) is ongoing in this District before the Honorable Thomas M. Durkin.

## FACTUAL ALLEGATIONS

### The Crash of Lion Air Flight 610 and Subsequent Litigation

16.     On the morning of October 29, 2018, Lion Air Flight 610, flying on a Boeing 737 Max 8 model aircraft, departed Jakarta, Indonesia. Shortly after takeoff, the flight crew contacted air traffic control and requested to return to Jakarta, but the flight never made it.

17.     After a series of chaotic maneuvers resulting from a fundamental system failure, Flight 610 plummeted into the ocean. There were no survivors.

18.     Those who lost their lives aboard the plane included:

    a.  Eko Sutanto, husband of Anice Kasim;

    b.  Muhammad Ikhsan Riyadi Fitrasyah, husband of Septiana Damayanti;

    c.  Muhammad Nasir Bin Huzaifah, husband of Dian Daniaty

    d.  Hasnawati Binti Nawazar, mother of Bias Ramadhan A.S. Bin Misyadi ("Bias Ramadhan"); and

    e.  Rijal Mahdi, father of Multi Rizki.

19.     Following the crash, government investigations determined that the aircraft's anti-stall system—the maneuvering characteristics augmentation system—caused the aircraft's nose to suddenly, and without warning, drop and dive steeply. Accordingly, the surviving family members of those aboard the plane had viable claims against Boeing, among other defendants, in courts in the United States.

20.     Anice Kasim, Septiana Damayanti, Bias Ramadhan, Dian Daniaty, and Multi Rizki and their respective families ("the Client Families") all hired GK to pursue their claims in relation to the crash. In addition to the Client Families, six other *Lion Air* families also hired GK.

**Defendants Promise Edelson 50% of the Fees, Even Though They Have Already Committed More than 50% of the Fees to Others.**

21.     Because Boeing is based in Chicago, Girardi Keese sought out Edelson to act as co-counsel and file lawsuits on behalf of the Client Families against Boeing in the Circuit Court of Cook County, Illinois.

22.     The Client Families' retainer agreements with GK specifically authorized GK to hire additional counsel, as long as it came at no extra cost to the client.

23.     Edelson on the one hand, and Keith Griffin and Girardi Keese on the other, agreed in writing on April 3, 2019 that in exchange for Edelson's work on the Client Families' cases,

Edelson would receive 50% of the contingent fee obtained in the cases. In reliance on this agreement, Edelson represented the Client Families as local counsel both upon the initial filing of their suits in state court and after removal to federal court. In truth though, Defendants never intended to pay Edelson.

24. On information and belief, Lira was aware of that agreement at the time it was entered into. He was fully aware of the agreement and its terms no later than June 17, 2019.

25. However, Defendants had already promised 25% of the attorneys' fees to Mohamed Eltaher, who is not licensed to practice law in Indonesia or any U.S. jurisdiction. On information and belief, Eltaher reached this arrangement directly with Griffin before Griffin contacted Edelson.

26. Defendants had also promised 10% of the total recovery, (or 1/3 of the attorneys' fees) to George Hatcher, who is not an attorney. Rather, Hatcher was a hired consultant who assisted GK with client communications in air crash cases, including *Lion Air*. This amount was to be paid by GK out of their share of attorneys' fees, not directly by the Client Families. On information and belief, Defendants had reached this arrangement with Hatcher before Griffin contacted Edelson.

27. On November 8, 2019, Girardi executed a "direct pay" letter at the request of litigation funder California Attorney Lending, II, Inc ("CAL"). Girardi and GK had taken out a multimillion loan from CAL, secured in part by the fees GK anticipated receiving in the *Lion Air* matter. The letter, which Girardi signed with Lira's full knowledge, was addressed to Boeing's attorney at Perkins Coie LLP and directed Perkins Coie to wire 100% of the attorneys' fees in the *Lion Air* matters directly to CAL. Defendants did not tell Edelson about this letter.

28.     On January 31, 2020, Lira signed a new direct pay letter, this time directing Perkins Coie to wire half of the amount GK would receive on the *Lion Air* cases to CAL. Defendants did not tell Edelson about this letter either.

**Defendants Receive the Settlement Funds but Don't Tell Edelson.**

29.     In the months that followed, litigation took place in this District, with the assistance of Edelson, before the Honorable Thomas M. Durkin, eventually leading to a series of mediations. In the end, Boeing reached individual settlements with each of the clients and families represented by GK and Edelson. The main terms of the settlements were reached in early 2020 and finalized thereafter.

30.     On March 4, 2020, Boeing, through its counsel at Perkins Coie, wired the settlement funds for Anice Kasim's case. Specifically, Perkins Coie wired ▓▓▓▓▓ to Girardi Keese's IOLTA account at Torrey Pines Bank and ▓▓▓▓ to CAL. That day, Lira received an email from CAL confirming that it had received its wire and Griffin emailed Perkins Coie to confirm that GK had received its wire. Nobody suggested to Edelson that the funds had been wired or received until June 2020.

31.     On March 11, 2020, Boeing, through its counsel at Perkins Coie, wired the settlement funds for Dian Daniaty's case. Specifically, Perkins Coie wired ▓▓▓▓▓ to Girardi Keese's IOLTA account at Torrey Pines Bank and ▓▓▓▓ to CAL. That day, Lira received an email from CAL confirming that it had received its wire and Griffin emailed Perkins Coie to confirm that GK had received its wire. Nobody suggested to Edelson that the funds had been wired or received until June 2020.

32.     On March 27, 2020, Boeing, through its counsel at Perkins Coie, wired the settlement funds for Bias Ramadhan's case. Specifically, Perkins Coie wired ▓▓▓▓▓ to

Girardi Keese's IOLTA account at Torrey Pines Bank and ▓▓▓▓▓ to CAL. On March 28, 2020, Lira received an email from CAL confirming that it had received its wire. On March 30, 2020, Lira emailed Perkins Coie to confirm that GK had received its wire, copying Griffin. Nobody suggested to Edelson that the funds had been wired or received until June 2020.

33.     On March 30, 2020, Boeing, through its counsel at Perkins Coie, wired the settlement funds for Septiana Damayanti's case. Specifically, Perkins Coie wired ▓▓▓▓▓▓ to Girardi Keese's IOLTA account at Torrey Pines Bank and ▓▓▓▓▓ to CAL. On March 30, 2020, Lira received an email from CAL confirming that it had received its wire. On April 2, 2020, Griffin emailed Perkins Coie to confirm that GK had received its wire, copying Lira. Nobody suggested to Edelson that the funds had been wired or received until June 2020.

**Girardi, GK, Griffin, and Lira Agree to Steal the *Lion Air* Settlement Proceeds.**

34.     As the *Lion Air* settlement funds were rolling in to GK's client trust account, GK had a problem: it was running out of money. The firm was routinely overdrawing its operating account and struggling to make payroll. GK's and Girardi's obligations to litigation funders were making those financial problems even worse.

35.     Beyond payroll and funders, there was an bigger problem. GK owed millions of dollars to its clients for settlement proceeds that it had received and misappropriated months or years earlier.

36.     Lira was aware of these financial difficulties and discussed them with Girardi Keese bookkeeper Christopher Kamon in early March 2020. On information and belief, Griffin was also aware of the firm's cashflow problems.

37.     Girardi, GK, Griffin, and Lira agreed that GK would use the *Lion Air* settlement funds, including the attorneys' fees that were due to Edelson, to cover payroll, firm expenses,

personal expenses for Tom and his wife, and payments to clients whose money GK had previously stolen.

38.     Between March 4, 2020 and May 22, 2020, GK issued the checks listed in Table 1 from its GK client trust account on or about the dates shown. All were payable to "Girardi & Keese" and deposited into one of GK's operating accounts.

| Date on Check | Check No. | Memo Line | Amount |
|---|---|---|---|
| 3/4/20 | 125003 | Case # 2018251 Fees $140,000.00 | $140,000.00 |
| 3/4/20 | 125000 | Case # 2018251 Fees $20,000.00 | $20,000.00 |
| 3/4/20 | 125002 | Case # 2018251 Fees $25,000.00 | $25,000.00 |
| 3/5/20 | 125014 | Case # 2018251 Fees $125,000.00 | $125,000.00 |
| 3/10/20 | 125017 | Case # 2018251 Fees $500,000.00 | $500,000.00 |
| 3/16/20 | 125075 | Case # 2018251 Fees $160,000.00 | $160,000.00 |
| 3/17/20 | 125078 | Case # 2018251 Fees $52,000.00 | $52,000.00 |
| 3/18/20 | 125081 | Case # 2018251 Fees $25,000.00 | $25,000.00 |
| 3/19/20 | 125082 | Case # 2018251 Fees $80,000.00 | $80,000.00 |
| 3/20/20 | 125089 | Case # 2018251 Fees $185,000.00 | $185,000.00 |
| 3/24/20 | 125095 | Case # 2018251 Fees $50,000.00 | $50,000.00 |
| 3/25/20 | 125120 | Case # 2018251 Fees $45,000.00 | $45,000.00 |
| 3/31/20 | 125133 | Case # 2018251 Fees $260,000.00 | $260,000.00 |
| 4/1/20 | 125134 | Case # 2018251 Fees $100,000.00 | $100,000.00 |
| 5/22/20 | 125383 | Case # 2018251 Costs $50,000.00 | $50,000.00 |

**Table 1**

39.     2018251 was GK's internal case number for the *Lion Air* matters.

40.     Lira personally signed checks 125017 and 125383.

41.     The money used to cover the checks listed in Table 1 came from the *Lion Air* settlement funds and belonged in part to Edelson.

42.     On March 11, 2020, Lira personally signed check number 125035 from Girardi Keese's IOLTA account at Torrey Pines Bank, payable to ███████. ███████ had been Lira's client in the ███████ case, which had settled many months earlier. On information and belief, when Lira signed check number 125035, he knew that he was distributing funds from the *Lion Air* settlement to ███████.

43. Between April 8, 2020 and September 24, 2020, GK issued the checks listed in Table 2 from its GK client trust account on or about the dates shown. All were payable to Girardi & Keese and deposited into one of Girardi & Keese's operating accounts.

| Date on Check | Check No. | Memo Line | Amount |
|---|---|---|---|
| 4/8/20 | 125140 | Case # 10219 Fees $115,000.00 | $115,000.00 |
| 4/9/20 | 125261 | Case # 10219 Fees $100,000.00 | $100,000.00 |
| 4/9/20 | 125264 | Case # 10219 Fees $15,000.00 | $15,000.00 |
| 4/13/20 | 125265 | Case # 10219 Fees $35,000.00 | $35,000.00 |
| 4/14/20 | 125277 | Case # 10219 Fees $425,000.00 | $425,000.00 |
| 4/15/20 | 125278 | Case # 10219 Fees $150,000.00 | $150,000.00 |
| 4/23/20 | 125317 | Case # 10219 Fees $120,000.00 | $120,000.00 |
| 4/24/20 | 125318 | Case # 10219 Fees $15,000.00 | $15,000.00 |
| 4/27/20 | 125319 | Case # 10219 Fees $40,000.00 | $40,000.00 |
| 4/28/20 | 125321 | Case # 10219 Fees $45,000.00 | $45,000.00 |
| 4/30/20 | 125337 | Case # 10219 Fees $425,000.00 | $425,000.00 |
| 4/30/20 | 125338 | Case # 10219 Fees $75,000.00 | $75,000.00 |
| 5/12/20 | 125358 | Case # 10219 Fees $35,000.00 | $35,000.00 |
| 5/13/20 | 125359 | Case # 10219 Fees $30,000.00 | $30,000.00 |
| 5/19/20 | 125381 | Case # 10219 Fees $100,000.00 | $100,000.00 |
| 5/21/20 | 125382 | Case # 10219 Fees $35,000.00 | $35,000.00 |
| 5/22/20 | 125385 | Case # 10219 Fees $40,000.00 Sovereign Towers | $40,000.00 |
| 5/27/20 | 125407 | Case # 10219 Fees $40,000.00 | $40,000.00 |
| 6/2/20 | 125410 | Case # 10219 Fees $60,000.00 | $60,000.00 |
| 6/3/20 | 125421 | Case # 10219 Fees $35,000.00 Sovereign Towers | $35,000.00 |
| 6/4/20 | 125423 | Case # 10219 Fees $20,000.00 | $20,000.00 |
| 6/5/20 | 125425 | Case # 10219 Fees $15,000.00 Sovereign Towers | $15,000.00 |
| 6/9/20 | 125435 | Case # 10219 Fees $30,000.00 Sovereign Towers | $30,000.00 |
| 6/11/20 | 125436 | Case # 10219 Fees $160,000.00 | $160,000.00 |
| 7/13/20 | 125501 | Case # 10220 Fees $300,000.00 | $300,000.00 |
| 7/16/20 | 125509 | Case # 10220 Fees $17,000.00 | $17,000.00 |
| 9/22/20 | 125562 | Case # 10220 Fees $65,000.00 | $65,000.00 |
| 9/23/20 | 125563 | Case # 10220 Fees $ 36,000.00 | $36,000.00 |
| 9/24/20 | 125564 | Case # 10220 Fees $20,000.00 | $20,000.00 |

**Table 2**

44. Case 10220 was used internally by Girardi Keese to denote "Miscellaneous Case Cost for 2020." On information and belief, Case 10219 was used in a similar manner. Defendants used memo lines with these two case numbers to make draw checks on GK's client trust accounts that appeared to be for attorneys' fees but were in fact embezzlement.

45. Lira personally signed check number 125321.

46. The money used to cover the checks listed in Table 2 came from the *Lion Air* settlement funds and belonged in part to Edelson.

47. On March 24, 2020, Lira received an email from  of ███████ ███████. ███ had represented the plaintiff in █████████████████████████ ███, but the plaintiff switched counsel midway through the lawsuit to Girardi Keese. The plaintiff, represented by Lira, settled with the defendant.

48. According to ████ Lira agreed to pay ████ 20% of his fees plus his out-of-pocket costs. In a declaration executed under penalty of perjury and filed in the Superior Court of California, County of San Diego, Lira represented that ████ firm had incurred costs in the amount of $67,292.03 and sought court approval of those costs. However, according to ████ email, Lira did not pay as agreed.

49. Within minutes of receiving ████ email, Lira forwarded it to Chris Kamon and Tom Girardi. Kamon responded, solely to Lira, asking "How much do we owe him?" Lira responded with another question: "Have we wired any money to Lion air clients (the 2)?" Kamon responded, "Nope."

50. On April 20, 2020, GK issued and Lira personally signed check number 125286 drawn on the Girardi Keese Client Trust Account at Torrey Pines Bank and made payable to ████████████████████. The check was in the amount of $125.567.03 and the memo

line read "Case # ████ Fees $58,275.00; Costs $67,292.03." The money used to cover that check came from the *Lion Air* settlement funds and belonged in part to Edelson.

51.     On April 8, 2020, GK issued and Lira personally signed 115 checks drawn on the Girardi Keese Client Trust Account at Torrey Pines Bank payable to GK clients who were owed money in relation their settlements in a mass tort case against TXI Riverside Cement. The checks totaled $150,942.65. The money used to cover those checks came from the *Lion Air* settlement funds and belonged in part to Edelson.

52.     On April 13, 2020, GK issued and Lira personally signed 6 checks drawn on the Girardi Keese Client Trust Account at Torrey Pines Bank payable to GK clients who were owed money in relation their settlements in a mass tort case against Dole. The checks totaled $50,155.06. The money used to cover those checks came from the *Lion Air* settlement funds and belonged in part to Edelson.

53.     On April 20, 2020, GK issued and Lira personally signed 30 checks drawn on the Girardi Keese Client Trust Account at Torrey Pines Bank payable to GK clients who were owed money in relation their settlements in the *Dole* case. The checks totaled $154,699.43. The money used to cover those checks came from the *Lion Air* settlement funds and belonged in part to Edelson.

**Girardi, GK, Griffin, and Lira Agree to Lie to the Clients and to Edelson to Cover Up Their Fraudulent Scheme.**

54.     Defendants made repeated false statements to Edelson and to the Client Families for the purpose of covering up Defendants' theft.

55.     In late February 2020, during a telephone call with Edelson PC attorney Ari Scharg, Griffin stated that he had spoken to Boeing's attorneys, and that Boeing's attorneys had

told him that Boeing would not release any settlement money until all of the clients GK represented had signed settlement agreements.

56.     At that time, Griffin and Edelson both knew that of the *Lion Air* clients GK represented, only the families of Anice Kasim and Septiana Damayanti had signed settlement agreements. They also each knew that there was a group of GK clients, including Multi Rizki, whose settlements were not yet finalized and would likely not be finalized for some time.

57.     Griffin made that false statement to forestall Edelson's inquiries about the status of the settlement funds that Griffin knew would be arriving shortly. At the time he made that statement, Griffin believed that there would be delays in paying both Edelson and the Client Families, because Defendants needed to steal the money to pay other clients and cover firm expenses.

58.     Indeed, the same thing had happened on other international airline crash cases that Griffin had worked on. For example, Griffin represented families of victims of the ████████ ████████. Payments to those clients were delayed by months. In at least one of those client's matters, Girardi Keese funded the settlement from its own operating account—something that any lawyer knows should never happen. That client's settlement was wired from the defendant to Girardi Keese's IOLTA account at Torrey Pines Bank on June 24, 2019. The client was not paid until two months later, on August 23, 2019, by wire transfer from the IOLTA account. But the same day as the client's wire transfer, GK deposited a check for the exact amount of the wire transfer from its operating account into the IOLTA account.

59.     Edelson believed Griffin's representations and turned its efforts to focus on getting the remainder of the releases signed, believing that the money would remain with Boeing until that happened. Through April and May 2020, Edelson pushed consistently for updates on

getting the remainder of the releases finalized, believing—based on Griffin's express representation—that's what was necessary to get the Client Families the money that they were owed.

60.     On May 12, 2020, Edelson PC CEO Jay Edelson sent Griffin and Lira an email expressing concern about the delay in finalizing the settlements (particularly in light of Boeing's public pronouncements at the time that it was considering whether to file for bankruptcy) and the need to get them funded for the sake of the clients. Lira responded by email, providing a more detailed explanation of where things stood on specific releases, why it was taking so long for them to be translated and executed by the clients, and repeating that Boeing would release the settlement funds when they received the signed releases. He assured Edelson that the funds were paid by insurance and secure in an escrow account, so there was no risk posed by a potential bankruptcy. However, he noted that one of the clients wanted more money and may have been "poached" by another firm.

61.     Jay Edelson responded on May 12, 2020, with a request to reach out to Boeing's attorneys to ask them to release the money for the clients who had already signed. Again, this request was based on Plaintiff's belief, caused by Griffin's false statements, that Boeing would not wire any of the money until all of the releases had been signed. Lira replied "Boeing's lawyers will release the money once they are in receipt of executed releases. I am hopeful the majority will trickle in by the end of this week so we are good with Boeing."

62.     Edelson PC Managing Partner Rafey Balabanian emailed Lira and Griffin again on May 15, with the same request, asking: "[C]an we reach out to Boeing's lawyers to see if they will at least do a partial release of the money?" He further explained that "Our whole point is that

our clients shouldn't be captive to the one remaining holdout." Lira replied only "Rafey: we are good. Executed releases are coming in."

63.     In fact, matters with the *Lion Air* cases were anything but "good," and both Lira and Griffin knew it, because they had been lying to the Client Families for months to cover up Defendants' theft of the settlement funds.

64.     On March 31, 2020, Anice Kasim emailed Keith Griffin to inquire about the status of her settlement funds. On April 2, 2020, Griffin replied that he had forwarded her request to the accounting department, but that "Our office is currently closed due to the Coronavirus." This statement was substantially false. Griffin knew that the accounting department was open and processing payments of Anice Kasim's money to people other than Anice Kasim, without her knowledge or permission.

65.     On April 2, 2020, Dian Daniaty sent David Lira and Keith Griffin an email that read:

> Dear Mr David and Mr Lira
> Mr. David and Mr. Keith, can you lend me 40,000 dollars? I really need it right away. I have a business, if waiting for liquid boeing money there is still no certainty.
>
> Thank you very much.

66.     Lira forwarded the email to George Hatcher approximately four minutes after receiving it, with the notation "FYI." Hatcher quickly responded, to Lira, Griffin, and Kamon, "My recommendation, if Dian is funded, get an okay and send her the money. If you don't have the money, advance her the 40, the repayment is solid." Kamon replied later that day "Tom just gave the ok to advance the $40,000.00. It's too late to process today, so I will process this wire first thing Monday." The following Monday, April 6, 2020, GK wired $40,000 to Dian Daniaty.

67.     Lira and Griffin both knew that the $40,000 was not a loan. It was Dian Daniaty's

own money, which GK had received into its IOLTA account on March 11, 2020. Defendants

intended for Hatcher to falsely represent to Dian Daniaty that the $40,000 was a loan from GK,

so that she did not question why she had not received her settlement funds. On information and

belief, Hatcher did so.

68.     On December 9, 2021, in open court before Hon. Thomas M. Durkin, Lira gave

the following false testimony:

Q. Why was $40,000 sent to Ms. Dian on April the 6th?

A. I have no knowledge why.

Q. Did you know at the time that $40,000 had been wired to Ms. Dian?

A. I did not.

69.     On April 18, 2020, David Lira sent the following email to Bias Ramadahn, Anice

Kasim, Septiana Damayanti, and Dian Daniaty:

> Good morning Bias, Septi, Dian and Ani:
> First, I want to thank you for your patience during this unfortunate pandemic. Our
> office has been closed since March 16th as a result of government mandates. It has
> been extremely difficult to run the day-to-day law office operations without
> employees present. Rest assured we are doing everything we can with limited staff.
> Tom Girardi has final say as to all wire transfers. It is "on his to do list." Our office
> is closed today due to a massive sanitation/disinfectant effort due to a COVID scare
> this week. I will keep you advised I hope you and your families are safe and sound.
> David

70.     This email was substantially false. Lira knew both that the fact that the Client

Families hadn't received their funds had nothing to do with COVID-related closures and that

transferring their money was not on Girardi's to-do list.

71.     The Client Families' inquiries continued, and on or about May 7, 2020,

Defendants agreed that GK would wire half of the amounts owed to the Client Families.

72.     On May 11, 2020, in an email copying Griffin, Lira instructed Chris Kamon not to tell George Hatcher that these wires were going to be sent out. Later that day, Griffin confirmed that the wire amounts (for half of the amount owed to Anice Kasim, Dian Daniaty, Bias Ramadhan, and Septiana Damayanti) were correct, and GK sent the wires. That evening, Lira emailed Anice Kasim, copying Griffin, saying "money was wired to your account today." When Anice Kasim replied the next day to inform them that it was only half, Griffin and Lira did not respond to her.

73.     Finally, on May 13, 2020 (just two days before Lira's "we are good" email to Edelson), Tom Girardi's secretary sent Griffin a draft of a letter from Girardi to Bias Ramadhan, which Griffin forwarded to Lira with the instruction to "take a look." About half an hour later, the secretary sent both Griffin and Lira a draft of a letter from Girardi to Dian Daniaty.

74.     The draft letter to Bias Ramadhan read:

I got enough of the problem taken care of so we were able to release 50% of the settlement. I feel pretty good about the next payment. There are tax issues etc. I am working very hard.

75.     The draft letter to Dian Daniaty read:

We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%. I feel fairly confident the balance will be done within 30 days.

There was also a tax issue that came up that I am trying to resolve.

Thank you for your nice note.

76.     Nearly every sentence in these draft letters is a deliberate lie. Further, the lie in the first sentence of Dian Daniaty's letter is substantially the same lie that Griffin told to Ari Scharg at the end of February 2020. There was no special authorization and no tax issues. The only "problem" was that Defendants had stolen too much of the settlement to pay the Client Families.

77.     In response to receiving these drafts, Lira sent an email to Griffin and Girardi's secretary that read: "These are smart people. There are no tax issues."

78.     The next day, May 14, 2020, Girardi's secretary emailed Lira and Griffin three more draft letters in separate emails, one each to Dian Daniaty and Bias Ramadhan, and another to Septiana Damayanti. In each email, the secretary wrote: "David: Is this ok?"

79.     The draft letters to Dian Daniaty and Bias Ramadhan were identical to the previous day's drafts, except with the sentences referring to tax issues deleted.

80.     The draft letter to Septiana Damayanti read:

There are many confidential issues that I am solving. While I agree with two of the plaintiff's lawyers, we will not distribute until they settle because they knew our cases were settling higher than theirs. I need about 30 days. Believe me, I am working very hard.

81.     There were no "confidential issues," and the reason that GK wasn't distributing the settlements had nothing to do with other people's settlements. The only reason Defendants needed "30 days" was to hope that enough money came in belonging to other clients that they could steal it and use it to pay back Septiana Damayanti for the money they had stolen from her.

82.     In response to each of the secretary's three emails, Lira responded, "Ok." A few minutes later, Lira wrote to her again, saying "I wouldn't send any of these letters. They are lies and can come back to haunt Tom. David." He did not instruct her not to send the letters. When the secretary informed him that two had already gone out, he responded, "Tom will have to be ready for an onslaught on inquires. They all talk and all other victims have received their compensation." He took no action to correct the lies in the emails.

83.     Despite communicating with Edelson attorneys about the specific topic of client settlement funds in May 2020, neither Lira nor Griffin told Edelson about the client inquiries or the letters intentionally lying to the clients to cover up a theft.

**Lira Protects His Friend, F. Anthony Koushan, While Defrauding Multi Rizki and Edelson (Again).**

84.     In addition to the Client Families, Girardi Keese and Edelson jointly represented several other *Lion Air* plaintiffs, including ████████████████████████████████.

85.     These cases were referred to Lira by his friend F. Anthony Koushan. Koushan frequently referred cases to Lira without a written referral agreement. They operated on a "handshake" basis for decades.

86.     On April 9, 2020, Scharg emailed Lira to press him on finalizing the settlements with Boeing for the ████████████████████████████ cases. On April 13, 2020, Lira responded by asking for a copy of the petitions for settlement approval that Scharg had filed with the settlements that had already been approved, which Scharg provided.

87.     Lira then directed his assistant to draft closing statements for the cases, and, after Lira's review, to send them to Scharg to use in drafting the approval documents.

88.      Each of the three closing statements contained the following language above the signature line for the client, which Lira intended Scharg and Edelson to rely upon: "The disbursement of this recovery in accordance with the foregoing closing statement is hereby approved. I hereby authorize the law firm of Girardi │ Keese to receive and sign on my behalf wired funds and/or a check in the amount of THE TOTAL AMOUNT OF RECOVERY, deposit that check in their trust account and forward the NET PROCEEDS consistent with this closing statement." Lira also sent Scharg a draft settlement agreement with Boeing, but the settlement agreement did not yet have wire information filled in.

89.     Scharg and Edelson then relied on these statements to draft approval papers and declarations under penalty of perjury indicating to the Court that the clients' settlement funds would be deposited in GK's trust account.

90.     However, Lira had secretly arranged for Boeing to wire the settlement funds for the ███████████████████████████████ cases to Koushan's trust account. Lira did so not out of concern for the clients, but because he did not want to steal his friend's money and risk losing a valuable source of referrals.

91.     Boeing then did wire the settlement funds for the ███████████████████ ████████████████ to Koushan's trust account.

92.     During the same time period, Lira was also working to finalize the settlement of Multi Rizki, who had not been referred by Koushan.

93.     Lira permitted Multi Rizki's settlement funds to be wired to GK so that Defendants could steal the money and use it to pay other clients and cover firm expenses.

94.     On information and belief, Lira lied to Edelson about the wire instructions for the ███████████████████████████████ cases because he believed that if Edelson learned that he was diverting settlement funds away from GK, Edelson would discover Defendants' criminal activity.

**Lira Leaves GK but, Together with Griffin and Girardi, Keeps Lying to Edelson.**

95.     On June 11, 2020, Defendant Lira sent an email to Edelson asking to set up a call to discuss the status of the cases. On that call, which occurred on June 16, 2020, Defendant Lira informed Scharg and Balabanian that he had recently resigned from GK. He also explained, unprompted, that the settlements had been funded and that the bulk of the funds were received and held by GK. Lira knew that the funds, in large part, were not held by GK but that he had assisted in stealing them. He also knew that a wire for half the money owed to the clients had been sent out just a month before. However, he repeatedly refused to answer whether the clients had been paid.

96.     Instead, on July 6, 2020, Lira sent a letter to Edelson admitting that he was aware that Edelson was due to receive 50% of the attorneys' fees on one group of cases and 20% on another. The letter claimed, in a confusing manner, that some of the settlements with Boeing had been funded but others had not. Lira also enclosed a check to Edelson, which he represented was for some portion of the attorneys' fees owed. Edelson did not then, and has not since, cashed that check.

97.     A few days later, Plaintiff responded with a letter to Defendants Girardi and Lira, which stated, among other things, that "in response to David's cover letter that encloses a check to our firm for some portion of the fees owed on three of the Lion Air cases, we decline to accept any monies until we are given adequate assurances that each and every one of our collective clients who are entitled to settlement monies have, in fact, received the entirety of the monies owed." The letter also requested, again, information about the status of the settlement proceeds owed to the clients.

98.     On July 13, 2020, Lira responded again. This time, he said: "as to the current status of payment to the four (4) clients settled in late 2019 and referred to Keith and Tom, I do not know the current status. I resigned from Girardi | Keese effective on June 13, 2020, and I do not have access to such information."

99.     The statement quoted in the preceding paragraph was a deliberate lie.

100.     On July 13, 2020, Lira both knew the current status of the clients' settlement funds and had access to highly relevant information about those funds.

101.     Just three days earlier, on July 10, 2020, Lira logged onto his GK email account using his personal Blackberry device. On that day, he viewed an email sent to him by Septiana Damayanti, one of the four *Lion Air* clients whose case settled in late 2019.

102.     Septiana Damayanti's email reads, in relevant part, "I appreciate to your effort, and It has been two weeks since your last email. I have received the fifty thousand dollars in my account. The fact that you are able to send us money got us more curious of what is holding you from sending us the rest of the money."

103.     Lira not only read Septiana Damayanti's email but forwarded it, to George Hatcher from his Blackberry, with the annotation "???"

104.     As of July 13, 2020, GK's IOLTA account at Torrey Pines Bank had a balance of $917,098.32. On that date, Anice Kasim was owed ███████; Septiana Damayanti was owed ███████; Bias Ramadhan was owed ███████; Dian Daniaty was owed ███████, Multi Rizki was owed ███████, and Edelson was owed at least $1,650,000.

105.     Edelson attorneys continued to press Defendants Girardi and Griffin as to the status of the settlement proceeds and whether any clients were yet to be paid. Starting in July 2020, Edelson's managing partner, Rafey Balabanian, took the lead in communicating with Girardi and Griffin. In a series of phone calls that took place over the course of the latter half of July 2020, Defendant Griffin indicated that despite Boeing fully funding the settlements, he understood from Defendant Girardi that the clients had not received the full amount owed to them and were still owed about half of what was due to them. Griffin could not elaborate on why such an amount was still owed to certain clients or the status of the remaining settlement proceeds because, according to Griffin, those questions could only be answered by Girardi. Griffin also claimed that part of the difficulty in speaking with and delay in getting answers from Girardi was attributable to Girardi being unavailable in recent weeks due to a serious illness that caused him to be hospitalized and for which he sought treatment.

106.    Balabanian ultimately got an opportunity to speak with Defendant Girardi in late July. Girardi's explanation regarding the status of the settlement proceeds was extremely convoluted and meandering, and he couched everything in terms of him recovering from the illness that he was being treated for, so Balabanian would have to bear with his inability to give a long and detailed explanation of why payment of the settlement proceeds to the clients (and of lesser importance, payment of Edelson's portion of fees) had been delayed. Girardi claimed that his illness, which caused him to be away from his firm for several weeks, is what ultimately caused the—in his words—"mistake" of not getting certain clients paid in full, and that he planned to immediately remedy the issue by getting the remaining amount that was owed wired out within a few days. Girardi said that he or Griffin would follow up once that occurred.

107.    Consistent with what Defendants Griffin and Lira were initially saying, and with the letters to the clients, Girardi also attributed the delay in paying out the settlement proceeds to the clients to Boeing's refusal to fund the settlement without all of the executed settlement agreements in hand. Girardi also mentioned a tax issue affecting the tax treatment of proceeds recovered on account of wrongful death claims and that getting a determination from the IRS was also holding up finalizing and getting the settlements funded.

108.    Despite his assurances, Girardi did not follow back up with Balabanian. Instead, Balabanian made several more attempts over the course of the following weeks to reach Girardi to confirm that payment had been made to the clients. They finally spoke again in late August 2020, at which point the conversation quickly became contentious after Girardi stated that he didn't need to explain himself to Balabanian when it came to clients of GK and that, as he promised a few weeks ago, arrangements had been made for them to receive the remaining

monies owed to them, as well as the attorneys' fees owed to Edelson. Girardi then advised that Griffin would follow up and quickly ended the call.

109.   Eventually, though, on or about September 3, 2020, Griffin advised Balabanian that a wire for half of the outstanding amount owed to the clients had been initiated, with the other half set to be initiated the following Monday. While Griffin said he could send proof of the wired funds, he did not do so until after this case was filed.

110.   By the end of September 2020, only $199,996.46 remained in the Torrey Pines IOLTA account and GK was insolvent.

111.   Creditors of GK and Girardi initiated involuntary Chapter 7 bankruptcy proceedings on December 18, 2020. Both bankruptcy cases are still pending.

112.   All told, GK, in concert with Girardi, Lira, and Griffin, stole $500,000 each from Anice Kasim, Bias Ramadhan, Dian Daniaty, and Septiana Damayanti; ████████ from Multi Rizki; and $1,650,000 from Edelson.

## COUNT I
## UNJUST ENRICHMENT – CONSTRUCTIVE TRUST
(preserved for appeal)

113.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

114.   Unjust enrichment, or restitution, may be alleged where a defendant unjustly obtains and retains a benefit to the plaintiff's detriment, and where such retention violates fundamental principles of equity, justice, and good conscience.

115.   On information and belief, Defendants Girardi, GK, Lira, and Griffin are each holding funds that properly belong to the victims of Lion Air Flight 610 and to Plaintiff Edelson.

116.     A large, but confidential sum of money, was transferred from Boeing to Defendant GK in mid-2020. This money was for the benefit of Lion Air clients represented by GK, minus agreed upon attorneys' fees.

117.     Plaintiff Edelson has contractually created property rights to specific percentages of the attorneys' fees generated by those settlement funds.

118.     However, on information and belief, the funds owed to Plaintiff Edelson are now commingled with the funds owed to the Lion Air clients and have been distributed among the Defendants and other unknown entities. Nevertheless, the funds are identifiable, and there is a direct chain from the Boeing payments to the current persons in possession of the money.

119.     Defendants Girardi, Griffin, and Lira represent or represented the Lion Air clients and owe them a fiduciary duty as counsel. On information and belief, Defendants Girardi, Griffin, and Lira breached their fiduciary duties to the Lion Air clients by causing, permitting, facilitating, or otherwise allowing the Lion Air clients' money to be commingled with funds belonging to Plaintiff Edelson and distributed to the other Defendants and/or retained for their own personal benefit.

120.     Under principles of equity and good conscience, Defendants should not be permitted to retain any of the funds transferred from Boeing to GK.

121.     However, principles of equity and good conscience, as well as the Rules of Professional Conduct, prevent Plaintiff Edelson from taking possession of any of these commingled funds unless and until the Lion Air clients receive their share of the settlement money paid by Boeing.

122.     Plaintiff seeks the imposition of a constructive trust on all money transferred from Boeing to GK in connection with the Lion Air settlements, for the benefit of the Lion Air clients

first, then for the benefit of Plaintiff, if sufficient funds remain in trust. In the alternative, Plaintiff requests that all such sums should be disgorged.

## COUNT II
## BREACH OF CONTRACT
### (As Against Defendants GK, Girardi, and Griffin)

123. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

124. Plaintiff entered into an enforceable contract with GK and Griffin. The contract, presented and executed by Defendant Griffin, provided that Edelson would receive 50% of total attorneys' fees recovered for a specific set of Lion Air clients in the matter of *In Re: Lion Air Flight JT 610 Crash*, No. 18-cv-07686 (N.D. Ill.). By the terms of the contract, Edelson was expected to act as local counsel, as well as participate directly in the litigation and settlement process.

125. These contract terms were negotiated and agreed to both verbally and in writing.

126. Edelson fully performed its obligations under the contracts by acting as local counsel and assisting in the litigation and settlement of the Lion Air cases.

127. Defendants GK, Girardi, and Griffin breached their contractual obligations by not paying Edelson its share of attorneys' fees.

128. As a direct, foreseeable, and proximate result of Defendants' breaches, Plaintiff has been damaged in amount to be proven at trial.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
### (As Against Defendants Griffin and Lira)
### (*As to Griffin, in the Alternative to Count II*)

129. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-128.

130.    Edelson entered into an enforceable contract with GK that entitles Edelson to 50% of the attorneys' fees obtained from the representation of the Client Families.

131.    Defendants Lira and Griffin were both aware of that contract.

132.    Lira and Griffin induced GK to breach the contract by participating in the theft of the Client Families' settlement funds from the Girardi Keese IOLTA account.

133.    Lira and Griffin's participation in the theft was both intentional and without justification.

134.    As a result of Lira and Griffin's participating in the theft, GK was unable to pay the amount owed to Edelson under their contract and thereby breached it.

135.    As a direct, foreseeable, and proximate result of Defendants Lira and Griffin's tortious interference with Plaintiff's contract, Plaintiff has been damaged in amount to be proven at trial.

**COUNT IV**
**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(As Against Defendants Griffin and Lira)**
***(In the Alternative to Count III, and, as to Griffin only, Count II)***

136.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-135.

137.    By agreeing to act as local counsel for the Client Families, Plaintiff Edelson PC had a reasonable expectation of a valid business relationship with the Client Families, by which the Client Families would pay Edelson PC for representing them in connection with their claims against Boeing.

138.    Defendants Lira and Griffin knew that Edelson expected to and was entitled to be paid for their representation of the Clients Families in the event a recovery was obtained.

139.     Griffin and Lira intentionally interfered with that expectancy by participating in the theft of Client Families' settlement funds from the Girardi Keese IOLTA account, out of which Edelson would otherwise have been paid.

140.     In addition, Lira intentionally interfered with that expectancy by signing a direct pay letter that entitled CAL to 50% of GK's proceeds of the *Lion Air* matters, even though he knew that GK had already promised a third of those proceeds to George Hatcher, 25% to Mohamed Eltaher, and 50% to Edelson PC.

141.     Edelson was injured by the intentional interference because it has not been paid for its work on the Client Families' cases.

142.     As a direct, foreseeable, and proximate result of the intentional interference by Defendants Griffin and Lira, Plaintiff has been damaged in amount to be proven at trial.

## COUNT V
## CONVERSION
### (As Against Defendants GK, Girardi, Griffin, and Lira)

143.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

144.     A large, but confidential sum of money, was transferred from Boeing to Defendant GK in mid-2020. This money was for the benefit of Lion Air clients represented by GK, minus agreed upon attorneys' fees.

145.     Plaintiff Edelson has contractually created property right to specific percentages of the attorneys' fees generated by those settlement funds.

146.     Under the contract, Plaintiff Edelson has an absolute and unconditional right to the immediate possession of the attorneys' fees.

147.     Plaintiff has made numerous demands on Defendants GK, Girardi, Griffin, and Lira for an accounting and payment of attorneys' fees, to no avail.

148.     Defendants GK, Girardi, Griffin, and Lira have wrongfully and without authorization assumed control and ownership over the attorneys' fees and refused to provide them to Plaintiff.

149.     As a direct, foreseeable, and proximate result of the conversion of Plaintiff's share of attorneys' fees by Defendants GK, Girardi, Griffin, and Lira, Plaintiff has been damaged in amount to be proven at trial.

**COUNT VI**
**RECEIPT AND CONCEALMENT OF STOLEN PROPERTY**
**Cal. Penal Code § 496(c)**
**(As Against Defendants Griffin and Lira)**

150.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

151.     During March 2020, Perkins Coie wired money to GK's IOLTA account at Torrey Pines Bank in connection with the Client Families' settlements with Boeing.

152.     Because GK's half of the attorneys' fees had been wired directly to CAL, the remainder of the attorneys' fees that Perkins Coie wired to GK's IOLTA account belonged to Plaintiff.

153.     Knowing that all of the attorneys' fees wired to GK's IOLTA account belonged to Plaintiff, Lira signed a check transferring all of Edelson's fees on the Anice Kasim case to GK's operating account for the purpose of stealing those funds.

154.     By way of additional checks payable to GK's operating account and to third parties, GK stole the remainder of Edelson's attorneys' fees.

155.     Defendants Griffin and Lira knew that GK had stolen Edelson's fees.

156.     Defendants Griffin and Lira aided GK in concealing and withholding Edelson's fees from Edelson.

157.     Knowing that GK was using Edelson's fees to fund the firm's payroll, Griffin and Lira accepted paychecks from GK.

158.     As a direct, foreseeable, and proximate result of Lira and Griffin's violations of Cal. Penal Code § 496(a), Plaintiff has suffered injuries including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding. Plaintiff has been damaged in an amount to be proved at trial.

159.     Plaintiff is entitled to judgment in the amount of three times its actual damages, costs, and reasonable attorneys' fees.

**COUNT VII**
**RECEIPT AND CONCEALMENT OF STOLEN PROPERTY**
**Cal. Penal Code § 496(c)**
**(As Against Defendants Griffin and Lira)**

160.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

161.     During March 2020, Perkins Coie wired money to GK's IOLTA account at Torrey Pines Bank in connection with the Client Families' settlements with Boeing. The vast majority of the money belonged to the Client Families.

162.     By way of checks payable to GK's operating account and to third parties, GK stole the Client Families' settlement monies.

163.     Lira and Griffin knew that GK had stolen the Client Families' settlement monies.

164.     Lira and Griffin concealed and withheld the Clients Families' settlement monies from them.

165.     Lira and Griffin aided Girardi and GK in concealing and withholding the Client Families' settlement monies from them.

166.     Knowing that GK was using the Client Families' settlement moneys to fund the firm's payroll, Lira and Griffin accepted paychecks from GK.

167.     Lira and Griffin's violations of Cal. Penal Code § 496(a) prevented Plaintiff from collecting attorneys' fees for its work on the Client Families' cases.

168.     As a direct, foreseeable, and proximate result of Lira and Griffin's violations of Cal. Penal Code § 496(a), Plaintiff has suffered injuries including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding. Plaintiff has been damaged in an amount to be proved at trial.

169.     Plaintiff is entitled to judgment in the amount of three times its actual damages, costs, and reasonable attorneys' fees.

## COUNT VIII
## PROMISSORY FRAUD
### (As Against Defendant Griffin)

170.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

171.     On April 3, 2019, Griffin promised in writing that Plaintiff would receive 50% of the attorneys' fees obtained in the Client Families' cases against Boeing.

172.     At the time Griffin made that promise, he knew that it would be impossible to fulfill and did not intend to keep it. Griffin knew that GK routinely stole its co-counsel's portion of the fee and believed that GK would do so here. Further, Griffin knew that GK had already promised 25% of the fee to Mohamed Eltaher and a third of the fee to George Hatcher, making it impossible to pay Plaintiff 50% of the fee.

31

173. Griffin's false promise was part of a scheme to defraud that included repeated and egregious lies both to Edelson and the Client Families.

174. Because the Client Families' cases were originally filed in state court and Griffin is not a member of the Illinois bar, Griffin needed to associate with Illinois attorneys to file the cases. By promising half of the fees obtained in the action, Griffin intended to induce Plaintiff to act as local counsel in Illinois on behalf of the Client Families.

175. Relying on Griffin's promise that it would receive half of the attorneys' fees obtained in the cases, Plaintiff did act as local counsel in Illinois on behalf of the Client Families.

176. As a result of its reliance on Griffin's false statements, Plaintiff has been damaged in an amount to be proved at trial, including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding.

## COUNT IX
### FRAUDULENT MISREPRESENTATION
### (As Against Defendant Griffin)

177. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

178. In late February 2020, on a telephone call, Defendant Griffin told Edelson attorney Ari Scharg that Boeing's attorneys had told Griffin that they would not release any of the settlement monies until all of GK's clients had signed settlement agreements.

179. At the time Griffin made that statement, he knew it to be false.

180. By making this false statement, Griffin intended to induce Edelson not to inquire about the status of the settlement funds or to take any other action to ensure that the Client Families and Edelson received the amounts due to them in a reasonable amount of time after the wires were received.

181.     In particular, Griffin knew that Plaintiff had represented to the court overseeing the *Lion Air* actions that GK would transfer the clients their money as soon as practicable, and, by his words, Griffin intended to delay Plaintiff from inquiring as to whether that had been done, so as to allow Defendants time to steal the settlement funds.

182.     Plaintiff reasonably relied on Griffin's false statement.

183.     As a result of Plaintiff's reliance on Griffin's false statements, Plaintiff suffered damages in an amount to be proved at trial, including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding.

## COUNT X
## FRAUDULENT MISREPRESENTATION
### (As Against Defendant Lira)

184.     Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

185.     On April 13, 2020, Lira directed his assistant to send Plaintiff closing statements for three *Lion Air* clients: ███████████████████████████.

186.     The closing statements included the lines: "The disbursement of this recovery in accordance with the foregoing closing statement is hereby approved. I hereby authorize the law firm of Girardi │ Keese to receive and sign on my behalf wired funds and/or a check in the amount of THE TOTAL AMOUNT OF RECOVERY, deposit that check in their trust account and forward the NET PROCEEDS consistent with this closing statement."

187.     At the time Lira directed his assistant to send that email, he knew this statement was false. In fact, he had diverted ████████████████████████████████ wires to the trust account of his friend, F. Anthony Koushan.

188.    Lira believed that if Plaintiff learned about the change in wire information, it would insist on an explanation as to why the money was not being transferred to GK's trust account or take other action that would result in the discovery of his criminal actions.

189.    Because Lira is a licensed attorney and had sent the closing statements to Scharg for the specific purpose of drafting documents that would be filed with a court, Plaintiff was justified in relying upon them.

190.    Between May 7, 2020 and May 15, 2020, Plaintiff sent a series of increasingly urgent emails to Defendants Griffin and Lira regarding the status of the Client Families' settlement funds. Relying on Griffin's false statements to Scharg in February 2020, Edelson reasonably believed that Boeing would not release any of the settlement money until all of GK's clients had settled, and it referenced that fact in its emails.

191.    In his final response in the series of emails in which Plaintiff asked if it could reach out to Boeing's counsel, Lira said "Rafey: we are good. Executed releases are coming in."

192.    By this statement, Lira meant for Plaintiff to understand that there was no cause for alarm, and that Boeing would be able to wire all of the client settlement funds soon.

193.    Lira knew this statement to be false. He knew that Perkins Coie had already wired the Client Families' money to GK's IOLTA account and that Defendants were in the process of stealing that money.

194.    By his statement, Lira intended for Plaintiff to stand down in its attempts to speed along Boeing's transfer of the settlement funds, and in particular he intended for Plaintiff not to contact Boeing's counsel. Lira knew that if Plaintiff contacted Boeing's counsel, Plaintiff would learn that GK had received the Client Families' money in March.

195. In justifiable reliance on Lira's false statement, Plaintiff did stand down and did not contact Boeing's counsel.

196. On July 13, 2020, Lira wrote to Edelson PC in a letter: "Lastly, as to the current status of payment to the four (4) clients settled in late 2019 and referred to Keith and Tom, I do not know the current status. I resigned from Girardi | Keese effective on June 13, 2020, and I do not have access to such information."

197. Lira knew these statements to be false when he made them. He knew that the Client Families had been paid only half of what they were owed, that GK had stolen much of the Client Families' settlement money already, and that the clients were regularly inquiring as to the status of the settlement funds. Also, he did have access to up-to-date information regarding the status of the settlement funds, including by way of his GK email account, which he was able to access, and did in fact access, using his Blackberry.

198. Lira knew that if he told the truth about what had happened, Plaintiff would take action in the courts and report him to law enforcement. By his false statements, he intended for Edelson to forbear from such actions, which Plaintiff in fact did, in justifiable reliance on those statements.

199. Edelson has suffered damages as a result of its reliance on Lira's false statements, in an amount to be proved at trial, including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding.

## COUNT XI
## FRAUDULENT CONCEALMENT
### (As Against Defendants Griffin and Lira)

200. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

201.     Plaintiff acted as local counsel for Griffin and Lira with respect to the Client Families claims against Boeing.

202.     Under this arrangement, Plaintiff handled court appearances and filings, as well as attending mediations together with Griffin and Lira. Griffin and Lira, who had the original relationship with the clients, were responsible for direct communications with the clients. Plaintiff did not have direct communications with the clients.

203.     From April through at least July of 2020, the Client Families sent increasingly urgent emails regarding the status of their settlement funds to Lira and Griffin. Neither Lira nor Griffin shared these emails with Plaintiff.

204.     In May 2020, Lira and Griffin assisted Girardi in sending letters to the Client Families that contained deliberate lies, or, at the very least, were aware that Girardi had sent such letters and did nothing to correct the lies contained therein. Lira suggested changes to the letters that would make the lie less obvious, then personally approved the sending of the letters to Bias Ramadhan, Dian Daniaty, and Septiana Damayanti. Neither Lira nor Griffin shared these letters with Plaintiff. In fact, Plaintiff did not obtain the letters until just before the contempt proceedings began and through discovery in this proceeding.

205.     Griffin and Lira also personally communicated with the Client Families in April, May, and June 2020 to respond to their queries regarding the settlement funds and to advise them when partial payment was made. The goal of these responses was to reassure the clients that there was nothing wrong and that any delays in wiring their funds were due to the COVID-19 pandemic. These were lies.

206.    Even before the *Lion Air* settlement money came in, lying to clients had become routine practice at GK. Lira was aware of that fact, emailing Chris Kamon on March 4, 2020 to say "Tom is lying to clients."

207.    However, Lira did not tell anyone at Edelson PC that Girardi was lying to clients until he had to testify about it in December 2021. Even then, he lied under oath, stating that he was not aware of any occasion where Tom lied to clients under than letters sent in May 2020.

208.    Under these circumstances, Lira and Griffin had a duty to tell their co-counsel, Edelson, that they were lying to the clients and that GK was stealing the *Lion Air* settlement money.

209.    Because attorneys have a fiduciary duty to their clients and are held to the highest standards of honesty and trust, Edelson reasonably and justifiably had no reason to think that Lira and Griffin were lying to the clients or concealing facts. And although Plaintiff routinely inquired about the status of the case, it had no reasonable way to discover that Lira and Griffin were lying to the clients and helping steal settlement funds.

210.    Had Edelson been aware that GK, Girardi, Lira, and Griffin were committing crimes, it would have acted differently. For example, if it had known about the letters containing falsehoods in May 2020, it could have acted in time to prevent Multi Rizki's settlement from being wired to GK's IOLTA account.

211.    Plaintiff's reliance resulted in damages in an amount to be proved at trial, including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff Edelson PC respectfully requests that this Court enter judgment in its favor and enter an order (subject to the alternative pleading identified above):

A. Finding that Defendants GK's, Girardi's, and Griffin's conduct constitutes a breach of contract;

B. Finding that Defendants Griffin's and Lira's conduct constitutes tortious interference with contract;

C. Finding that Defendants Griffin's and Lira's conduct constitutes tortious interference with prospective economic advantage;

D. Finding that Defendants Griffin's and Lira's conduct constitutes a violation of Cal. Penal Code § 496(a);

E. Finding that Defendants Griffin's and Lira's conduct constitutes common-law fraud;

F. Awarding actual damages;

G. Awarding three times the amount of actual damages for any injury caused by violations of Cal. Penal Code § 496(a);

H. Awarding punitive or exemplary damages;

I. Awarding Plaintiff its costs and expenses in this litigation, including reasonable attorneys' fees as permitted by law; and

J. Awarding such other and further relief as the Court deems equitable and just.

## REQUEST FOR JURY TRIAL

Plaintiff demands a trial by jury for all issues so triable.

Respectfully submitted,

**EDELSON PC**

Dated: April 4, 2022

/s/ Alexander G. Tievsky
One of Plaintiff's Attorneys

Jay Edelson
jedelson@edelson.com
Alexander G. Tievsky
atievsky@edelson.com
J. Eli Wade-Scott
ewadescott@edelson.com
Angela Reilly
areilly@edelson.com
EDELSON PC
350 North LaSalle Street, 14th Floor
Chicago, Illinois 60654
Tel: 312.589.6370
Fax: 312.589.6378