# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF ILLINOIS

### EASTERN DIVISION

| | | |
|---|---|---|
| EDELSON PC, an Illinois Professional corporation, | ) ) ) | Case No.: 20-cv-07115 |
| Plaintiff, | ) ) | |
| THOMAS GIRARDI, an individual, et al., | ) ) ) | Honorable Matthew F. Kennelly |
| Defendants. | ) ) ) ) | |

## ANSWER OF DEFENDANT LIRA TO FIRST
## AMENDED COMPLAINT

COMES NOW Defendant, David Lira, by and through his undersigned attorneys, respectfully submits the following answer to Plaintiff's First Amended Complaint filed on August 30, 2022, [Dkt. #178] and states as follows:

## DEFENDANT'S RESPONSES TO THE NUMBERED PARAGRAPHS

In response to the First Amended Complaint, all allegations in the First Amended Complaint, including relief sought are denied except when specifically admitted. Defendant admits, denies, or otherwise avers as follows:

## NATURE OF THE ACTION

1.      Until December 2020, Tom Girardi ("Tom" or "Girardi") appeared to be operating a reputable and well-regarded law firm in Los Angeles, Girardi Keese ("GK").

**ANSWER:** Defendant admits that until December 2020, Tom Girardi operated Girardi Keese. Defendant admits that Girardi Keese appeared to be a reputable and well-regarded firm.

2.      In truth, GK was a vehicle for Girardi, his family, and his close associates to steal from their clients, defraud their co-counsel, and generally enrich themselves using others' money. This massive, years-long fraudulent scheme was not maintained by Tom acting alone. At the center of this endeavor were two of his most tenured employees: David Lira and Keith Griffin, both licensed California attorneys.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph two of the First Amended Complaint and therefore denies the allegations. This Responding Defendant denies that he committed tortious acts.

3.      Together, they stole the proceeds of settlements that belonged their clients—including the widows and orphans who lost loved ones in the tragic crash of Lion Air Flight 610—in order to keep the firm afloat and continue funding Girardi and his family's Beverly Hills lifestyles. As part of stealing the clients' money in the *Lion Air* case, they also stole Edelson PC's portion of the fees.

**ANSWER:** Defendant denies that he stole proceeds of settlements that belonged to his clients. Defendant is informed and believes, based upon the admissions made by Girardi's criminal counsel that Girardi did not pay monies that were due to certain Lion

2

Air Plaintiffs, that Girardi is not able to pay those monies to them and that Girardi allegedly does not know where the monies have gone. Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph three of the First Amended Complaint and therefore denies the remaining allegations.

4.     When Plaintiff brought the Girardi Keese fraud to light in December 2020 with the filing of this Complaint and a motion for rule to show cause in *Lion Air*, Girardi Keese immediately imploded. Defendant Griffin quit the firm. Defendant Lira tried to distance himself further, claiming to have quit in June 2020. Creditors involuntarily put the Girardi Keese firm and Thomas Girardi into bankruptcy. And the Court presiding over the *Lion Air* matter held a three-day evidentiary hearing in December 2021 as to whether Lira and Griffin should be held in contempt of Court. That proceeding is ongoing.

**ANSWER:**  Defendant quit his employment with Girardi Keese in June 2020. Defendant admits that involuntary bankruptcy proceedings were commenced against Girardi Keese and Thomas Girardi in December 2020. Defendant admits that Judge Durkin held a three-day evidentiary hearing in December 2021 as to whether Mr. Lira and/or Mr. Griffin should be held in contempt of Court. Defendant admits that that proceeding is ongoing; the proceeding has expanded to include whether the Edelson firm can be held in Contempt and/or be subject to sanctions. Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph four of the First Amended Complaint and therefore denies the remaining allegations.

5.     Discovery in this action and public testimony in the contempt proceeding have shown not just that Griffin and Lira should be held to account for the claims originally pled in this action, but for defrauding their clients and Plaintiff Edelson. Griffin and Lira, with full knowledge that Girardi Keese had stolen these clients' money (which included Edelson's fees), lied to Edelson and the clients in hopes of perpetuating the fraud that was the Girardi Keese firm. Not only did Lira and Griffin lie their way through the *Lion Air* case, but Lira also lied under oath in the contempt proceeding to avoid the consequences of his actions.

**ANSWER:**  Many of the allegations contained in paragraph five of the First

3

Amended Complaint consist of legal conclusions to which no response from Defendant is required. Defendant otherwise denies the allegations contained in paragraph five of the First Amended Complaint.

6.     Edelson seeks damages for the injuries it suffered as a result of Defendants' wrongful conduct. Edelson originally brought this suit in a manner intended to benefit the *Lion Air* families whose money was stolen as well as itself, seeking a constructive trust over the *Lion Air* settlement funds to benefit first the clients, then itself. The Court determined that Edelson did not have standing to do that. Edelson notes that it has reached (subject to finalization and approval of the *Lion Air* court) an agreement to effect the compensation of the clients in a different manner, so this lawsuit need only be about the fees owed to Edelson.

**ANSWER:**   Defendant admits that Edelson originally brought this suit on behalf of the *Lion Air* families and that Edelson sought a constructive trust over the settlement funds. Defendant admits hat the Court determined that Edelson did not have standing to do so. On information and belief Defendant admits that Edelson and the *Lion Air* clients have entered into an assignment, where in exchange for payments of certain sums, the *Lion Air* clients appear to have assigned their claims against Defendant to the Edelson Firm. Defendant denies that Edelson suffered damage. Defendant denies that he engaged in wrongful conduct. Defendant denies all remaining allegations in paragraph six of the First Amended Complaint.

## **PARTIES**

7.     Plaintiff Edelson PC is an Illinois professional corporation operating as a law firm, with its principal place of business located at 350 North LaSalle, 14th Floor, Chicago, Illinois 60654. Edelson PC also has offices located at 150 California Street, 18th Floor, San Francisco, California 94111.

**ANSWER:**   On information and belief, Defendant admits the allegations contained in paragraph seven of the First Amended Complaint.

8.     Defendant Thomas Girardi is a natural person and citizen of the State of California.

**ANSWER:** On information and belief, Defendant admits the allegations contained in paragraph eight of the First Amended Complaint.

9. Defendant GK is a sole proprietorship under the laws of the State of California, with its principal place of business located at 1126 Wilshire Boulevard, Los Angeles, California 90017. At all relevant times, GK did business in the State of Illinois and in this District.

**ANSWER:** On information and belief Defendant admits the allegations contained in paragraph nine of the First Amended Complaint.

10. Defendant Lira is a natural person and citizen of the State of California. Lira was formerly a partner at Defendant GK. Lira is also Defendant Girardi's son-in-law. He is a member of the bar of the United States District Court for the Northern District of Illinois.

**ANSWER:** Defendant admits that he is a natural person and a resident the State of California; Defendant denies that he has ever been a partner at Girardi Keese and states that he worked at Girardi Keese as a salaried employee until June 13, 2020. Defendant admits that he is the estranged son-in-law of Thomas Girardi. On information and belief, Defendant admits that he is a member of the bar of the United States District Court for the Northern District of Illinois.

11. Defendant Griffin is a natural person and a citizen of the State of California. Griffin was formerly a high-ranking employee at Defendant GK, with a status equivalent to an income partner. He is a member of the bar of the United States District Court for the Northern District of Illinois.

**ANSWER:** Defendant admits that Griffin is a person who is a resident of the State of California. On information and belief, Defendant admits that Mr. Griffin was previously an employee at Girardi Keese but denies on information and belief that Mr. Griffin was a "high ranking employee at Defendant GK with the status equivalent to an income partner. On information and belief, Defendant admits that Mr. Griffin is a member of the bar of the United States District Court for the Northern District of Illinois.

## JURISDICTION AND VENUE

12.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332 in that the jurisdictional amount exceeds $75,000 and the Plaintiff does not share a state of citizenship with any Defendant.

**ANSWER:** The allegations contained in paragraph twelve consist of legal conclusions to which no response from Defendant is required. Defendant admits that the Court has subject matter jurisdiction over this matter.

13.     The Court has personal jurisdiction over Defendants because they conduct business in this District and because they have committed tortious acts purposefully directed at Illinois, and such conduct was designed to create an injury in Illinois and this District.

**ANSWER:** Defendant admits that this Court has personal jurisdiction, but Defendant denies that he committed tortious acts, denies that he committed tortious acts directed at Illinois, and denies that any act of this responding defendant was designed to create an injury in Illinois.

14.     Additionally, the Court has specific personal jurisdiction over Griffin and Lira because they received and benefited from the legal services provided by Edelson in Illinois. Further, Griffin and Lira each personally traveled to Illinois to participate in mediations for the *Lion Air* litigation.

**ANSWER:**   Defendant denies that he received or benefitted from the legal services provided by Edelson in Illinois. Defendant lacks sufficient information to admit or deny whether Mr. Griffin received or benefitted from the legal services provided by Edelson in Illinois, and therefore must deny. Defendant admits that he and Mr. Griffin travelled to Illinois to participate in mediations related to the *Lion Air* litigation. Defendant Lira is not contesting whether specific personal jurisdiction exists for purposes of this matter.

15.     Venue is proper pursuant to 28 U.S.C. § 1391(b) because Defendants have committed tortious acts purposefully in this District and the underlying litigation giving rise to this Action (*In Re: Lion Air Flight JT 610 Crash*, No. 18-cv-07686 (N.D. Ill.)) is ongoing in this District before the Honorable Thomas M. Durkin.

**ANSWER:** This responding Defendant believes this matter should be tried in the same district as the pending *Edelson v. Lira, et al.* matter, United States District Court for the Northern District of California San Francisco Division Case No. 3:22-cv-03977*,* and will be filing a motion to transfer this action pursuant to 28 U.S. Code §1404. This Responding Defendant denies that he committed tortious acts and denies that he committed tortious acts purposely in this district. Defendant admits that the underlying litigation remains pending before the Honorable Thomas M. Durkin.

## FACTUAL ALLEGATIONS

### The Crash of Lion Aur Flight 610 and Subsequent Litigation.

16.     On the morning of October 29, 2018, Lion Air Flight 610, flying on a Boeing 737 Max 8 model aircraft, departed Jakarta, Indonesia. Shortly after takeoff, the flight crew contacted air traffic control and requested to return to Jakarta, but the flight never made it.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph sixteen of the First Amended Complaint.

17.     After a series of chaotic maneuvers resulting from a fundamental system failure, Flight 610 plummeted into the ocean. There were no survivors.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph seventeen of the First Amended Complaint.

18.     Those who lost their lives aboard the plane included:

    a.     Eko Sutanto, husband of Anice Kasim;

    b.     Muhammad Ikhsan Riyadi Fitrasyah, husband of Septiana Damayanti;

    c.     Muhammad Nasir Bin Huzaifah, husband of Dian Daniaty

    d.     Hasnawati Binti Nawazar, mother of Bias Ramadhan A.S. Bin Misyadi ("Bias Ramadhan"); and

    e.     Rijal Mahdi, father of Multi Rizki.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph eighteen of the complaint.

19.     Following the crash, government investigations determined that the aircraft's

antistall system—the maneuvering characteristics augmentation system—caused the aircraft's nose to suddenly, and without warning, drop and dive steeply. Accordingly, the surviving family members of those aboard the plane had viable claims against Boeing, among other defendants, in courts in the United States.

**ANSWER:** Defendant admits on information and belief that the anti-stall system caused the nose of the plane to drop and drive; however, at least some of the government investigations identified additional potential causes of the crash. On information and belief, Defendant admits that surviving family members of those aboard the plane had viable claims against Boeing, which were filed in courts in the United States.

20. Anice Kasim, Septiana Damayanti, Bias Ramadhan, Dian Daniaty, and Multi Rizki and their respective families ("the Client Families") all hired GK to pursue their claims in relation to the crash. In addition to the Client Families, six other *Lion Air* families also hired GK.

**ANSWER:** Defendant admits that Anice Kasim, Septiana Damayanti, Bias Ramadhan, Dian Daniaty, and Multi Rizki's families hired GK to pursue their claims related to the crash. Girardi Keese and Plaintiff represented a number of other families (because certain families changed counsel at various points in the litigation, the number of families represented varied over the life of the representation Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph 20 of the First Amended Complaint and therefore denies the remaining allegations.

> **Defendants Promise Edelson 50% of the Fees, Even Though They Have Already Committed More than 50% of the Fees to Others.**

21. Because Boeing is based in Chicago, Girardi Keese sought out Edelson to act as co-counsel and file lawsuits on behalf of the Client Families against Boeing in the Circuit Court of Cook County, Illinois.

**ANSWER:** Defendant admits that Girardi Keese sought local counsel in the *Lion Air* proceedings. Girardi Keese ultimately selected Edelson as local counsel. On information and belief, Defendant admits that Girardi Keese and Edelson filed lawsuits on

behalf of certain Lion Air families against Boeing in the Circuit Court of Cook County, Illinois.

22.    The Client Families' retainer agreements with GK specifically authorized GK to hire additional counsel, as long as it came at no extra cost to the client.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations in paragraph twenty-two of the First Amended Complaint and therefore, must deny.

23. Edelson on the one hand, and Keith Griffin and Girardi Keese on the other, agreed in writing on April 3, 2019 that in exchange for Edelson's work on the Client Families' cases, Edelson would receive 50% of the contingent fee obtained in the cases. In reliance on this agreement, Edelson represented the Client Families as local counsel both upon the initial filing of their suits in state court and after removal to federal court. In truth though, Defendants never intended to pay Edelson.

**ANSWER:**   Defendant denies the allegations in paragraph twenty-three of the First Amended Complaint.

24.    On information and belief, Lira was aware of that agreement at the time it was entered into. He was fully aware of the agreement and its terms no later than June 17, 2019.

**ANSWER:**   Defendant admits that he was aware of, no later than June 17, 2019, the letter setting forth the fee sharing agreement between Edelson and Girardi Keese for certain Lion Air plaintiffs which stated:

> "This will confirm our agreement that our fee split will be 50/50 on the Boeing cases tat you have filed with us in Chicago concerning the Lion Air crash. If it turns out that one of our two firms performs significantly more work than expected, or less if the case settles fairly quickly, we will adjust the fee split as would be reasonable to both firms."

Defendant denies the remaining allegations in paragraph twenty-four of the First Amended Compliant.

25.    However, Defendants had already promised 25% of the attorneys' fees to

Mohamed Eltaher, who is not licensed to practice law in Indonesia or any U.S. jurisdiction. On information and belief, Eltaher reached this arrangement directly with Griffin before Griffin contacted Edelson.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations in paragraph twenty-five of the First Amended complaint and therefore must deny the allegations.

26. Defendants had also promised 10% of the total recovery, (or 1/3 of the attorneys' fees) to George Hatcher, who is not an attorney. Rather, Hatcher was a hired consultant who assisted GK with client communications in air crash cases, including *Lion Air*. This amount was to be paid by GK out of their share of attorneys' fees, not directly by the Client Families. On information and belief, Defendants had reached this arrangement with Hatcher before Griffin contacted Edelson.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations in paragraph twenty-five of the First Amended complaint and therefore must deny the allegations.

27. On November 8, 2019, Girardi executed a "direct pay" letter at the request of litigation funder California Attorney Lending, II, Inc ("CAL"). Girardi and GK had taken out a multimillion loan from CAL, secured in part by the fees GK anticipated receiving in the *Lion Air* matter. The letter, which Girardi signed with Lira's full knowledge, was addressed to Boeing's attorney at Perkins Coie LLP and directed Perkins Coie to wire 100% of the attorneys' fees in the *Lion Air* matters directly to CAL. Defendants did not tell Edelson about this letter.

**ANSWER:** Defendant admits that 50% of the Lion Air attorneys' fee was assigned by "Tom" to California Lending on November 8, 2019. Defendant admits that on January 31, 2020, he confirmed by letter the assignment made by Girardi that certain fees be paid to California Attorney Lending pursuant to a valid lien. Defendant Denies the remaining allegations in paragraph twenty-seven of the First Amended Complaint.

28. On January 31, 2020, Lira signed a new direct pay letter, this time directing Perkins Coie to wire half of the amount GK would receive on the *Lion Air* cases to CAL.

Defendants did not tell Edelson about this letter either.

**ANSWER:** Defendant admits that 50% of the Lion Air attorneys' fee was assigned by "Tom" to California Lending on November 8, 2019. Defendant admits that on January 31, 2020, he confirmed by letter the assignment made by Girardi that certain fees be paid to California Attorney Lending pursuant to a valid lien. Defendant Denies the remaining allegations in paragraph twenty-eight of the First Amended Complaint.

### Defendants Receive the Settlement Funds but Don't Tell Edelson.

29.     In the months that followed, litigation took place in this District, with the assistance of Edelson, before the Honorable Thomas M. Durkin, eventually leading to a series of mediations. In the end, Boeing reached individual settlements with each of the clients and families represented by GK and Edelson. The main terms of the settlements were reached in early 2020 and finalized thereafter.

**ANSWER:**   Defendant admits that litigation took place in this District before the Honorable Thomas M. Durkin. Defendant admits that there were a series of mediations. Defendant admits that nine plaintiffs' families represented by Girardi Keese with Edelson as local counsel executed settlements with Boeing. Four settlement were reached in November 2019, with releases signed in February and March 2020.  Five settlements were reached in February with four releases being signed in May 2020 and one being signed in October 2020.

30.     On March 4, 2020, Boeing, through its counsel at Perkins Coie, wired the settlement funds for Anice Kasim's case. Specifically, Perkins Coie wired ▓▓▓▓▓ to Girardi Keese's IOLTA account at Torrey Pines Bank and ▓▓▓▓ to CAL. That day, Lira received an email from CAL confirming that it had received its wire and Griffin emailed Perkins Coie to confirm that GK had received its wire. Nobody suggested to Edelson that the funds had been wired or received until June 2020.

**ANSWER:**   On information and belief, Defendant admits that on March 4, 2020, Boeing, wired ▓▓▓▓▓ to Girardi Keese's IOLTA account at Torrey Pines Bank and ▓▓▓▓▓ to CAL for  the Anice Kasim matter. On information and belief Defendant admits

11

that he received an email from CAL confirming that it had received its wire and Griffin emailed Perkins Coie to confirm that GK had received its wire. Defendant denies the remaining allegations in paragraph thirty of the First Amended Complaint.

31. On March 11, 2020, Boeing, through its counsel at Perkins Coie, wired the settlement funds for Dian Daniaty's case. Specifically, Perkins Coie wired ████████ to Girardi Keese's IOLTA account at Torrey Pines Bank and ██████ to CAL. That day, Lira received an email from CAL confirming that it had received its wire and Griffin emailed Perkins Coie to confirm that GK had received its wire. Nobody suggested to Edelson that the funds had been wired or received until June 2020.

**ANSWER:** On information and belief, Defendant admits that on March 11, 2020, Boeing, wired ██████ to Girardi Keese's IOLTA account at Torrey Pines Bank and ██████ to CAL for the Dian Daniaty matter. On information and belief Defendant admits that he received an email from CAL confirming that it had received its wire and Griffin emailed Perkins Coie to confirm that GK had received its wire. Defendant denies the remaining allegations in paragraph thirty-one of the First Amended Complaint.

32. On March 27, 2020, Boeing, through its counsel at Perkins Coie, wired the settlement funds for Bias Ramadhan's case. Specifically, Perkins Coie wired ██████ to Girardi Keese's IOLTA account at Torrey Pines Bank and ██████ to CAL. On March 28, 2020, Lira received an email from CAL confirming that it had received its wire. On March 30, 2020, Lira emailed Perkins Coie to confirm that GK had received its wire, copying Griffin. Nobody suggested to Edelson that the funds had been wired or received until June 2020.

**ANSWER:** On information and belief, Defendant admits that on March 27, 2020, Boeing, wired ██████ to Girardi Keese's IOLTA account at Torrey Pines Bank and ██████ to CAL for the Bias Ramadhan matter. On information and belief Defendant admits that he received an email from CAL confirming that it had received its wire and he emailed Perkins Coie to confirm that GK had received its wire, copying Griffin. Defendant denies the remaining allegations in paragraph thirty-two of the First Amended Complaint.

33. On March 30, 2020, Boeing, through its counsel at Perkins Coie, wired the

12

settlement funds for Septiana Damayanti's case. Specifically, Perkins Coie wired ▊▊▊▊▊ to Girardi Keese's IOLTA account at Torrey Pines Bank and ▊▊▊▊ to CAL. On March 30, 2020, Lira received an email from CAL confirming that it had received its wire. On April 2, 2020, Griffin emailed Perkins Coie to confirm that GK had received its wire, copying Lira. Nobody suggested to Edelson that the funds had been wired or received until June 2020.

**ANSWER:** On information and belief, Defendant admits that on March 30, 2020, Boeing wired ▊▊▊▊ to Girardi Keese's IOLTA account at Torrey Pines Bank and ▊▊▊▊ to CAL for the Septiana Damayanti matter. On information and belief, Defendant admits that he received an email from CAL confirming that it had received its wire. On April 2, 2020, Griffin emailed Perkins Coie to confirm that GK had received its wire, copying Lira. Defendant denies the remaining allegations in paragraph thirty-three of the First Amended Complaint.

### Girardi, GK, Griffin, and Lira Agree to Steal the *Lion Air* Settlement Proceeds.

34. As the *Lion Air* settlement funds were rolling in to GK's client trust account, GK had a problem: it was running out of money. The firm was routinely overdrawing its operating account and struggling to make payroll. GK's and Girardi's obligations to litigation funders were making those financial problems even worse.

**ANSWER:** Defendants lack sufficient information to either admit or deny the allegations in paragraph thirty-four of the First Amended Complaint and therefore must deny the allegations.

35. Beyond payroll and funders, there was an bigger problem. GK owed millions of dollars to its clients for settlement proceeds that it had received and misappropriated months or years earlier.

**ANSWER:** Defendants lack sufficient information to either admit or deny the allegations in paragraph thirty-five of the First Amended Complaint and therefore must deny the allegations.

36. Lira was aware of these financial difficulties and discussed them with Girardi

13

Keese bookkeeper Christopher Kamon in early March 2020. On information and belief, Griffin was also aware of the firm's cashflow problems.

**ANSWER:** Defendant denies the allegations in paragraph thirty-six of the complaint.

37. Girardi, GK, Griffin, and Lira agreed that GK would use the *Lion Air* settlement funds, including the attorneys' fees that were due to Edelson, to cover payroll, firm expenses, personal expenses for Tom and his wife, and payments to clients whose money GK had previously stolen.

**ANSWER:** Defendant denies the allegations in paragraph thirty-seven of the complaint.

38. Between March 4, 2020 and May 22, 2020, GK issued the checks listed in Table 1 from its GK client trust account on or about the dates shown. All were payable to "Girardi & Keese" and deposited into one of GK's operating accounts.

| Date on Check | Check No. | Memo Line | Amount |
|---:|---:|---|---:|
| 3/4/20 | 125003 | Case # 2018251 Fees $140,000.00 | $140,000.00 |
| 3/4/20 | 125000 | Case # 2018251 Fees $20,000.00 | $20,000.00 |
| 3/4/20 | 125002 | Case # 2018251 Fees $25,000.00 | $25,000.00 |
| 3/5/20 | 125014 | Case # 2018251 Fees $125,000.00 | $125,000.00 |
| 3/10/20 | 125017 | Case # 2018251 Fees $500,000.00 | $500,000.00 |
| 3/16/20 | 125075 | Case # 2018251 Fees $160,000.00 | $160,000.00 |
| 3/17/20 | 125078 | Case # 2018251 Fees $52,000.00 | $52,000.00 |
| 3/18/20 | 125081 | Case # 2018251 Fees $25,000.00 | $25,000.00 |
| 3/19/20 | 125082 | Case # 2018251 Fees $80,000.00 | $80,000.00 |
| 3/20/20 | 125089 | Case # 2018251 Fees $185,000.00 | $185,000.00 |
| 3/24/20 | 125095 | Case # 2018251 Fees $50,000.00 | $50,000.00 |
| 3/25/20 | 125120 | Case # 2018251 Fees $45,000.00 | $45,000.00 |

| Date on Check | Check No. | Memo Line | Amount |
|---|---|---|---|
| **3/31/20** | 125133 | Case # 2018251 Fees $260,000.00 | $260,000.00 |
| **4/1/20** | 125134 | Case # 2018251 Fees $100,000.00 | $100,000.00 |
| **5/22/20** | 125383 | Case # 2018251 Costs $50,000.00 | $50,000.00 |

**Table 1**

**ANSWER:** Defendant admits on information and belief that Girardi Keese issued the checks listed in Table 1 from the Torrey Pines Bank account ending 5859. Defendant admits that the checks listed in Table 1 total $1,677,000. Defendant admits on information and beleif and that the checks listed in Table 1 were made payable to Girardi Keese. Defendant admits on information and belief that the checks in Table 1 were deposited into GK accounts.

39.     2018251 was GK's internal case number for the *Lion Air* matters.

**ANSWER:** Defendant admits on information and belief the allegations contained in Paragraph 39 of the First Amended Complaint.

40.     Lira personally signed checks 125017 and 125383.

**ANSWER:** Defendant admits the allegations in paragraph 40 of the First Amended Complaint.

41.     The money used to cover the checks listed in Table 1 came from the *Lion Air* settlement funds and belonged in part to Edelson.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph forty-one of the First Amended Complaint and therefore must deny.

42.     On March 11, 2020, Lira personally signed check number 125035 from Girardi Keese's IOLTA account at Torrey Pines Bank, payable to ████████████. ████ ████ had been Lira's client in the ████████████ case, which had settled many months earlier. On information and belief, when Lira signed check number 125035, he knew that he was distributing funds from the *Lion Air* settlement to ████████████

**ANSWER:**   Defendant admits that he signed check number 125035 made payable

15

to ██████████ who was a client in the ██████████ case which had been settled subject to certain liens. Defendant denies the remaining allegations in paragraph forty-two of the First Amended Complaint.

43. Between April 8, 2020 and September 24, 2020, GK issued the checks listed in Table 2 from its GK client trust account on or about the dates shown. All were payable to Girardi & Keese and deposited into one of Girardi & Keese's operating accounts.

| Date on Check | Check No. | Memo Line | Amount |
|---|---|---|---|
| 4/8/20 | 125140 | Case # 10219 Fees $115,000.00 | $115,000.00 |
| 4/9/20 | 125261 | Case # 10219 Fees $100,000.00 | $100,000.00 |
| 4/9/20 | 125264 | Case # 10219 Fees $15,000.00 | $15,000.00 |
| 4/13/20 | 125265 | Case # 10219 Fees $35,000.00 | $35,000.00 |
| 4/14/20 | 125277 | Case # 10219 Fees $425,000.00 | $425,000.00 |
| 4/15/20 | 125278 | Case # 10219 Fees $150,000.00 | $150,000.00 |
| 4/23/20 | 125317 | Case # 10219 Fees $120,000.00 | $120,000.00 |
| 4/24/20 | 125318 | Case # 10219 Fees $15,000.00 | $15,000.00 |
| 4/27/20 | 125319 | Case # 10219 Fees $40,000.00 | $40,000.00 |
| 4/28/20 | 125321 | Case # 10219 Fees $45,000.00 | $45,000.00 |
| 4/30/20 | 125337 | Case # 10219 Fees $425,000.00 | $425,000.00 |
| 4/30/20 | 125338 | Case # 10219 Fees $75,000.00 | $75,000.00 |
| 5/12/20 | 125358 | Case # 10219 Fees $35,000.00 | $35,000.00 |
| 5/13/20 | 125359 | Case # 10219 Fees $30,000.00 | $30,000.00 |
| 5/19/20 | 125381 | Case # 10219 Fees $100,000.00 | $100,000.00 |
| 5/21/20 | 125382 | Case # 10219 Fees $35,000.00 | $35,000.00 |
| 5/22/20 | 125385 | Case # 10219 Fees $40,000.00 Sovereign Towers | $40,000.00 |
| 5/27/20 | 125407 | Case # 10219 Fees $40,000.00 | $40,000.00 |
| 6/2/20 | 125410 | Case # 10219 Fees $60,000.00 | $60,000.00 |
| 6/3/20 | 125421 | Case # 10219 Fees $35,000.00 Sovereign Towers | $35,000.00 |
| 6/4/20 | 125423 | Case # 10219 Fees $20,000.00 | $20,000.00 |
| 6/5/20 | 125425 | Case # 10219 Fees $15,000.00 Sovereign Towers | $15,000.00 |
| 6/9/20 | 125435 | Case # 10219 Fees $30,000.00 Sovereign Towers | $30,000.00 |
| 6/11/20 | 125436 | Case # 10219 Fees $160,000.00 | $160,000.00 |
| 7/13/20 | 125501 | Case # 10220 Fees $300,000.00 | $300,000.00 |
| 7/16/20 | 125509 | Case # 10220 Fees $17,000.00 | $17,000.00 |
| 9/22/20 | 125562 | Case # 10220 Fees $65,000.00 | $65,000.00 |
| 9/23/20 | 125563 | Case # 10220 Fees $ 36,000.00 | $36,000.00 |
| 9/24/20 | 125564 | Case # 10220 Fees $20,000.00 | $20,000.00 |

**Table 2**

**ANSWER:** Defendant admits on information and belief that Girardi Keese issued the checks listed in Table 2 from the Torrey Pines Bank account ending in 5859. Defendant admits that the checks listed in Table 2 total $2,598,000. Defendant admits on information and belief that the checks in Table two were deposited into Girardi Keese accounts.

44.    Case 10220 was used internally by Girardi Keese to denote "Miscellaneous Case Cost for 2020." On information and belief, Case 10219 was used in a similar manner. Defendants used memo lines with these two case numbers to make draw checks on GK's client trust accounts that appeared to be for attorneys' fees but were in fact embezzlement.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in Paragraph 112 of the Complaint and therefore denies the allegations.

45.    Lira personally signed check number 125321.

**ANSWER:** Defendant admits he signed check number 125321.

46.    The money used to cover the checks listed in Table 2 came from the *Lion Air* settlement funds and belonged in part to Edelson.

**ANSWER:** Defendant denies that anything "belonged to Edelson." Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph 46 of the First Amended Complaint and therefore must deny the remaining allegations.

47.    On March 24, 2020, Lira received an email from ▮▮▮▮▮▮▮▮▮▮▮ of ▮▮▮▮▮▮  ▮▮▮▮▮▮▮▮▮▮▮▮ had represented the plaintiff in ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ but the plaintiff switched counsel midway through the lawsuit to Girardi Keese. The plaintiff, represented by Lira, settled with the defendant.

**ANSWER:** Defendant admits that the subject law firm was asserting an attorney lien for fees and costs in the referenced matter. Defendant denies that Plaintiff "switched counsel midway through the lawsuit." Defendant admits that Lira represented the Plaintiff throughout the pendency of the litigation and through settlement.

48. According to ▮▮▮▮▮, Lira agreed to pay ▮▮▮▮▮ 20% of his fees plus his out-of-

pocket costs. In a declaration executed under penalty of perjury and filed in the Superior Court of California, County of San Diego, Lira represented that ▮▮▮▮ firm had incurred costs in the amount of $67,292.03 and sought court approval of those costs. However, according to ▮▮▮▮ email, Lira did not pay as agreed.

**ANSWER:** Defendant admits, after lengthy negotiations, Girardi & Keese agreed to pay the subject law firm 20% of attorneys' fees plus costs. Defendant further admits that he filed a "Petition to Compromise" the claim of a disabled adult with the court. Defendant denies that the subject law firm was not paid as alleged.

49.     Within minutes of receiving ▮▮▮▮ email, Lira forwarded it to Chris Kamon and Tom Girardi. Kamon responded, solely to Lira, asking "How much do we owe him?" Lira responded with another question: "Have we wired any money to Lion air clients (the 2)?" Kamon responded, "Nope."

**ANSWER:** Defendant admits that he requested payment of the attorney lien as approved by the Court. This instruction was directed to Chris Kamon and Tom Girardi. Defendant further admits that on or about March 24, 2020, he asked Mr. Kamon whether money had been wired to two of the Lion Air Clients. Defendant admits Mr. Kamon responded, "Nope."

50.     On April 20, 2020, GK issued, and Lira personally signed, check number 125286 drawn on the Girardi Keese Client Trust Account at Torrey Pines Bank and made payable to ▮▮▮▮ The check was in the amount of $125.567.03 and the memo line read "Case # ▮▮▮▮ Fees $58,275.00; Costs $67,292.03." The money used to cover that check came from the *Lion Air* settlement funds and belonged in part to Edelson.

**ANSWER:** On information and belief, Defendant admits that on April 20, 2020, Girardi Keese issued check number 125286 drawn on the Torrey Pines Account ending in 5859, made payable to ▮▮▮▮. The check was in the amount of $125.567.03 and the memo line read "Case # ▮▮▮▮ Fees $58,275.00; Costs $67,292.03." Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph 50 of the First Amended Complaint and therefore must deny the

remaining allegations.

51.    On April 8, 2020, GK issued, and Lira personally signed 115 checks drawn on the Girardi Keese Client Trust Account at Torrey Pines Bank payable to GK clients who were owed money in relation their settlements in a mass tort case against TXI Riverside Cement. The checks totaled $150,942.65. The money used to cover those checks came from the *Lion Air* settlement funds and belonged in part to Edelson.

**ANSWER:**   On information and belief, defendant admits cosigning the checks payable to TXI cases as listed in Appendix A attached to the RICO action filed by the Edelson firm in the Northern District of California.

52.    On April 13, 2020, GK issued, and Lira personally signed 6 checks drawn on the Girardi Keese Client Trust Account at Torrey Pines Bank payable to GK clients who were owed money in relation their settlements in a mass tort case against Dole. The checks totaled $50,155.06. The money used to cover those checks came from the *Lion Air* settlement funds and belonged in part to Edelson.

**ANSWER:**  Defendant lacks sufficient information to admit or deny the allegations in paragraph fifty-two of the First Amended Complaint and therefore must deny.

53. On April 20, 2020, GK issued, and Lira personally signed 30 checks drawn on the Girardi Keese Client Trust Account at Torrey Pines Bank payable to GK clients who were owed money in relation their settlements in the *Dole* case. The checks totaled $154,699.43. The money used to cover those checks came from the *Lion Air* settlement funds and belonged in part to Edelson.

**ANSWER:**  Defendant lacks sufficient information to admit or deny the allegations in paragraph fifty-three of the First Amended Complaint and therefore must deny.

### Girardi, GK, Griffin, and Lira Agree to Lie to the Clients and to Edelson to Cover Up Their Fraudulent Scheme.

54.    Defendants made repeated false statements to Edelson and to the Client Families for the purpose of covering up Defendants' theft.

**ANSWER:  D**efendant denies the allegations in paragraph fifty-four of the First Amended Complaint.

55.    In late February 2020, during a telephone call with Edelson PC attorney Ari Scharg, Griffin stated that he had spoken to Boeing's attorneys, and that Boeing's attorneys had told him that Boeing would not release any settlement money until all of the clients GK represented had signed settlement agreements.

**ANSWER:** Defendant lacks sufficient information to admit or deny the  allegations in paragraph 55 of the First Amended Complaint and therefore must deny the allegations.

56.    At that time, Griffin and Edelson both knew that of the *Lion Air* clients GK represented, only the families of Anice Kasim and Septiana Damayanti had signed settlement agreements. They also each knew that there was a group of GK clients, including Multi Rizki, whose settlements were not yet finalized and would likely not be finalized for some time.

**ANSWER:**  On information and belief, Defendant denies that Edelson was told by Lira or Griffin that Boeing's attorneys had told him that Boeing would not release any settlement money until all of the clients GK represented had signed settlement agreements. Defendant admits that Anice Kasim and Septiana Damayanti had signed settlement agreements. Defendant admits hat there was a group of GK clients, including Multi Rizki, whose settlements were not yet finalized.

57.    Griffin made that false statement to forestall Edelson's inquiries about the status of the settlement funds that Griffin knew would be arriving shortly. At the time he made that statement, Griffin believed that there would be delays in paying both Edelson and the Client Families, because Defendants needed to steal the money to pay other clients and cover firm expenses.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations in paragraph 57 of the First Amended Complaint and therefore must deny the allegations.

58.    Indeed, the same thing had happened on other international airline crash cases that Griffin had worked on. For example, Griffin represented families of victims of

the ███████████████. Payments to those clients were delayed by months. In at least one of those client's matters, Girardi Keese funded the settlement from its own operating account—something that any lawyer knows should never happen. That client's settlement was wired from the defendant to Girardi Keese's IOLTA account at Torrey Pines Bank on June 24, 2019. The client was not paid until two months later, on August 23, 2019, by wire transfer from the IOLTA account. But the same day as the client's wire transfer, GK deposited a check for the exact amount of the wire transfer from its operating account into the IOLTA account.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph fifty-eight of the First Amended Complaint and therefore must deny.

59.     Edelson believed Griffin's representations and turned its efforts to focus on getting the remainder of the releases signed, believing that the money would remain with Boeing until that happened. Through April and May 2020, Edelson pushed consistently for updates on getting the remainder of the releases finalized, believing—based on Griffin's express representation—that's what was necessary to get the Client Families the money that they were owed.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph fifty-nine of the First Amended Complaint and therefore must deny.

60.     On May 12, 2020, Edelson PC CEO Jay Edelson sent Griffin and Lira an email expressing concern about the delay in finalizing the settlements (particularly in light of Boeing's public pronouncements at the time that it was considering whether to file for bankruptcy) and the need to get them funded for the sake of the clients. Lira responded by email, providing a more detailed explanation of where things stood on specific releases, why it was taking so long for them to be translated and executed by the clients, and repeating that Boeing would release the settlement funds when they received the signed releases. He assured Edelson that the funds were paid by insurance and secure in an escrow account, so there was no risk posed by a potential bankruptcy. However, he noted that one

of the clients wanted more money and may have been "poached" by another firm.

**ANSWER:** Defendant admits that on Edelson sent an e mail to responding Defendant on May 12, 2020 expressing concern about the delays and potential of a Boeing bankruptcy. Responding Defendant responded on May 12, 2020, that he had received final releases for the second group of cases and the releases had been sent to the clients. In that same email string regarding the second group of cases, responding Defendant stated that Boeing would release the money when they executed releases. Responding Defendant did not state the money would only be released when Boeing had all of the executed releases. Responding Defendant did state that the funds for the second group of cases were in the trust account of Boeing's attorney and the funds had come from insurance. Responding Defendant also advised that one of the clients in the second group of cases had elected to change attorneys. Responding Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph sixty of the First Amended Complaint and therefore denies the remaining allegations.

61.    Jay Edelson responded on May 12, 2020, with a request to reach out to Boeing's attorneys to ask them to release the money for the clients who had already signed. Again, this request was based on Plaintiff's belief, caused by Griffin's false statements, that Boeing would not wire any of the money until all of the releases had been signed. Lira replied "Boeing's lawyers will release the money once they are in receipt of executed releases. I am hopeful the majority will trickle in by the end of this week so we are good with Boeing."

**ANSWER:** Defendant admits that Jay Edelson sent an email on May 12, 2020 which stated:

> "Do you have any issue with me reaching out to Boeing's attorneys and letting them know the situation and getting them to release the rest of the money as we continue to try to get our client back on board?"

Defendant denies that that this statement referred to the plaintiffs who had executed releases in February and March 2020, and whose settlements had already been approved by the Court. On information and belief, Defendant denies that Griffin told Edelson that

22

Boeing would not wire any of the money until all of the releases had been signed. Defendant admits that on May 12, 2020, he emailed Jay Edelson, cc'ing others, stating:

> "Boeing's lawyers will release the money once they are in receipt of executed releases. I am hopeful the majority will trickle in by the end of this week so we are good with Boeing."

Defendant denies the remaining allegations in paragraph sixty-one of the First Amended Complaint.

62.     Edelson PC Managing Partner Rafey Balabanian emailed Lira and Griffin again on May 15, with the same request, asking: "[C]an we reach out to Boeing's lawyers to see if they will at least do a partial release of the money?" He further explained that "Our whole point is that our clients shouldn't be captive to the one remaining holdout." Lira replied only "Rafey: we are good. Executed releases are coming in."

**ANSWER**: Defendant admits that the above quote is part of Rafey Balabanian's May 15 email. Defendant admits that he responded as quoted above. Defendant denies the remaining allegations in paragraph sixty-two of the First Amended Complaint.

63.     In fact, matters with the *Lion Air* cases were anything but "good," and both Lira and Griffin knew it, because they had been lying to the Client Families for months to cover up Defendants' theft of the settlement funds.

**ANSWER:**   Defendant denies the allegations in paragraph sixty-three of the First Amended Complaint.

64.     On March 31, 2020, Anice Kasim emailed Keith Griffin to inquire about the status of her settlement funds. On April 2, 2020, Griffin replied that he had forwarded her request to the accounting department, but that "Our office is currently closed due to the Coronavirus." This statement was substantially false. Griffin knew that the accounting department was open and processing payments of Anice Kasim's money to people other than Anice Kasim, without her knowledge or permission.

**ANSWER:** On information and belief Defendant admits that On March 31, 2020, Anice Kasim emailed Keith Griffin to inquire about the status of her settlement funds. On April 2, 2020, Griffin replied that he had forwarded her request to the accounting

department, but that "Our office is currently closed due to the Coronavirus." Defendant denies the remaining allegations contained in paragraph sixty-four of the First Amended Complaint.

65.     On April 2, 2020, Dian Daniaty sent David Lira and Keith Griffin an email that read:

> Dear Mr David and Mr Lira
>
> Mr. David and Mr. Keith, can you lend me 40,000 dollars? I really need it right away. I have a business, if waiting for liquid boeing money there is still no certainty.
>
> Thank you very much.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph sixty-five of the First Amended Complaint.

66.     Lira forwarded the email to George Hatcher approximately four minutes after receiving it, with the notation "FYI." Hatcher quickly responded, to Lira, Griffin, and Kamon, "My recommendation, if Dian is funded, get an okay and send her the money. If you don't have the money, advance her the 40, the repayment is solid." Kamon replied later that day "Tom just gave the ok to advance the $40,000.00. It's too late to process today, so I will process this wire first thing Monday." The following Monday, April 6, 2020, GK wired $40,000 to Dian Daniaty.

**ANSWER:** Defendant admits forwarding the Dian Daniaty email of April 2, 2020, to Hatcher and receiving the responses from Mr. Kamon detailed in paragraph 66 of the First Amended Complaint. Defendant admits on information and belief that on April 6, 2020, a wire for $40,000 was sent to Dian Daniaty by Girardi Keese.

67.     Lira and Griffin both knew that the $40,000 was not a loan. It was Dian Daniaty's own money, which GK had received into its IOLTA account on March 11, 2020. Defendants intended for Hatcher to falsely represent to Dian Daniaty that the $40,000 was a loan from GK, so that she did not question why she had not received her settlement funds. On information and belief, Hatcher did so.

**ANSWER:** Defendant denies the allegations contained in paragraph sixty-seven

24

of the First Amended Complaint.

68.     On December 9, 2021, in open court before Hon. Thomas M. Durkin, Lira gave the following false testimony:

> Q.     Why was $40,000 sent to Ms. Dian on April the 6th?
>
> A.     I have no knowledge why.
>
> Q.     Did you know at the time that $40,000 had been wired to Ms. Dian?
>
> A.     I did not.

**ANSWER:**  Defendant admits the accuracy of the quoted testimony from the evidentiary hearing in the Lion Air matter. Defendant denies that he gave "false testimony."

69.     On April 18, 2020, David Lira sent the following email to Bias Ramadahn, Anice Kasim, Septiana Damayanti, and Dian Daniaty:

> Good morning Bias, Septi, Dian and Ani:
>
> First, I want to thank you for your patience during this unfortunate pandemic. Our office has been closed since March 16th as a result of government mandates. It has been extremely difficult to run the day-to-day law office operations without employees present. Rest assured we are doing everything we can with limited staff. Tom Girardi has final say as to all wire transfers. It is "on his to do list." Our office is closed today due to a massive sanitation/disinfectant effort due to a COVID scare this week. I will keep you advised I hope you and your families are safe and sound. David

**ANSWER:**   Defendant admits on information and belief the allegations contained in paragraph sixty-nine of the First Amended Complaint.

70.     This email was substantially false. Lira knew both that the fact that the Client Families hadn't received their funds had nothing to do with COVID-related closures and that transferring their money was not on Girardi's to-do list.

**ANSWER:** Defendant denies the allegations contained in paragraph seventy of the First Amended Complaint.

71.     The Client Families' inquiries continued, and on or about May 7, 2020,

Defendants agreed that GK would wire half of the amounts owed to the Client Families.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations in paragraph seventy-one of the First Amended Complaint and therefore denies the allegations.

72. On May 11, 2020, in an email copying Griffin, Lira instructed Chris Kamon not to tell George Hatcher that these wires were going to be sent out. Later that day, Griffin confirmed that the wire amounts (for half of the amount owed to Anice Kasim, Dian Daniaty, Bias Ramadhan, and Septiana Damayanti) were correct, and GK sent the wires. That evening, Lira emailed Anice Kasim, copying Griffin, saying "money was wired to your account today."

When Anice Kasim replied the next day to inform them that it was only half, Griffin and Lira did not respond to her.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations in paragraph seventy-two of the First Amended Complaint and therefore denies the allegations.

73. Finally, on May 13, 2020 (just two days before Lira's "we are good" email to Edelson), Tom Girardi's secretary sent Griffin a draft of a letter from Girardi to Bias Ramadhan, which Griffin forwarded to Lira with the instruction to "take a look." About half an hour later, the secretary sent both Griffin and Lira a draft of a letter from Girardi to Dian Daniaty.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph seventy-three of the First Amended Complaint.

74. The draft letter to Bias Ramadhan read:

> I got enough of the problem taken care of so we were able to release 50% of the settlement. I feel pretty good about the next payment. There are tax issues etc. I am working very hard.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph seventy-four of the First Amended Complaint.

75. The draft letter to Dian Daniaty read:

We made an agreement with Boeing that all of the cases would be resolved. They gave us special authorization to distribute 50%. I feel fairly confident the balance will be done within 30 days.

There was also a tax issue that came up that I am trying to resolve.

Thank you for your nice note.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph seventy-five of the First Amended Complaint.

76. Nearly every sentence in these draft letters is a deliberate lie. Further, the lie in the first sentence of Dian Daniaty's letter is substantially the same lie that Griffin told to Ari Scharg at the end of February 2020. There was no special authorization and no tax issues. The only "problem" was that Defendants had stolen too much of the settlement to pay the Client Families.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph seventy-six of the First Amended Complaint.

77. In response to receiving these drafts, Lira sent an email to Griffin and Girardi's secretary that read: "These are smart people. There are no tax issues."

**ANSWER:** Defendant admits sending the quoted email to Griffin and Mr. Girardi's secretary on May 13, 2020.

78. The next day, May 14, 2020, Girardi's secretary emailed Lira and Griffin three

more draft letters in separate emails, one each to Dian Daniaty and Bias Ramadhan, and another to Septiana Damayanti. In each email, the secretary wrote: "David: Is this ok?"

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph seventy-eight of the First Amended Complaint.

79. The draft letters to Dian Daniaty and Bias Ramadhan were identical to the previous day's drafts, except with the sentences referring to tax issues deleted.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph seventy-nine of the First Amended Complaint.

80. The draft letter to Septiana Damayanti read:

There are many confidential issues that I am solving. While I agree with two of the plaintiff's lawyers, we will not distribute until they settle because they knew our cases were settling higher than theirs. I need about 30 days. Believe me, I am working very hard.

**ANSWER:** Defendant admits on information and belief the allegations contained in paragraph eighty of the First Amended Complaint.

81. There were no "confidential issues," and the reason that GK wasn't distributing the settlements had nothing to do with other people's settlements. The only reason Defendants needed "30 days" was to hope that enough money came in belonging to other clients that they could steal it and use it to pay back Septiana Damayanti for the money they had stolen from her.

**ANSWER:** Defendant denies the allegations contained in paragraph eighty-one of the First Amended Complaint.

82. In response to each of the secretary's three emails, Lira responded, "Ok." A few minutes later, Lira wrote to her again, saying "I wouldn't send any of these letters. They are lies and can come back to haunt Tom. David." He did not instruct her not to send the letters. When the secretary informed him that two had already gone out, he responded, "Tom will have to be ready for an onslaught on inquires. They all talk and all other victims have received their compensation." He took no action to correct the lies in the emails.

**ANSWER:** On information and belief Defendant admits that he responded to each of the three emails, "Ok." On information and belief Defendant admits that approximately two to three minutes later he emailed her, saying ""I wouldn't send any of these letters. They are lies and can come back to haunt Tom. David." Defendant admits on information and belief that she responded that two of the letters had been sent, defendant responded "Tom will have to be ready for an onslaught on inquires. They all talk and all other victims have received their compensation." Defendant denies that he "took" no action to correct the lies in the letters.

83. Despite communicating with Edelson attorneys about the specific topic of

28

client settlement funds in May 2020, neither Lira nor Griffin told Edelson about the client inquiries or the letters intentionally lying to the clients to cover up a theft.

**ANSWER:** Defendant denies the allegations in paragraph eighty-three of the First Amended complaint.

### Lira Protects His Friend, F. Anthony Koushan, While Defrauding Multi Rizki and Edelson (Again).

84. In addition to the Client Families, Girardi Keese and Edelson jointly represented several other *Lion Air* plaintiffs, including 

**ANSWER:** Defendant admits that in addition to the Client Families, Girardi Kees represented several other Lion Air plaintiffs, including ███████████████████ ██████████. Defendant admits that Edelson was local counsel on those matters.

85. These cases were referred to Lira by his friend F. Anthony Koushan. Koushan frequently referred cases to Lira without a written referral agreement. They operated on a "handshake" basis for decades.

**ANSWER:** Defendant admits the allegations in paragraph eighty-five of the First Amended Complaint.

86. On April 9, 2020, Scharg emailed Lira to press him on finalizing the settlements with Boeing for the ██████████████████████████ cases. On April 13, 2020, Lira responded by asking for a copy of the petitions for settlement approval that Scharg had filed with the settlements that had already been approved, which Scharg provided.

**ANSWER:** Defendant admits that on April 9, 2020, Scharg emailed him: "Just checking in on this. Let me know if there's anything I can do to help." Defendant admits that he responded on April 9, 2020, stating that he was still finalizing the releases, inquiring what documents were needed Court approval of the incoming settlements involving minors, and suggesting they should start drafting those petitions. Defendant admits he emailed Mr. Scharg asking Scharg to "send [Lira] a completed petition from the first four settlements so [Lira] can see what is required in the petition for minors?" Defendant admits

that Scharg responded by sending him a previous declaration Scharg had filed for another plaintiff.

87.     Lira then directed his assistant to draft closing statements for the cases, and, after Lira's review, to send them to Scharg to use in drafting the approval documents.

**ANSWER:**  Lira admits that he asked his assistant to prepare closing statements for certain Lion Air Plaintiffs. Defendant denies the remainder of the allegations in paragraph 87 of the Fist Amended Complaint.

88.     Each of the three closing statements contained the following language above the signature line for the client, which Lira intended Scharg and Edelson to rely upon: "The disbursement of this recovery in accordance with the foregoing closing statement is hereby approved. I hereby authorize the law firm of Girardi │ Keese to receive and sign on my behalf wired funds and/or a check in the amount of THE TOTAL AMOUNT OF RECOVERY, deposit that check in their trust account and forward the NET PROCEEDS consistent with this closing statement." Lira also sent Scharg a draft settlement agreement with Boeing, but the settlement agreement did not yet have wire information filled in.

**ANSWER:**   Defendant admits that the above quoted language was contained in the three closing statements. Defendant admits that he sent Scharg draft settlement agreements with Boeing.  Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph eighty-eight of the First Amended Complaint and therefore must deny them.

89.     Scharg and Edelson then relied on these statements to draft approval papers and declarations under penalty of perjury indicating to the Court that the clients' settlement funds would be deposited in GK's trust account.

**ANSWER:**   Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph eighty-nine of the First Amended Complaint and therefore must deny them.

90.     However, Lira had secretly arranged for Boeing to wire the settlement funds for the ███████████████████████████████████ cases to Koushan's trust account. Lira did so not out of concern for the clients, but because he did not want to steal

his friend's money and risk losing a valuable source of referrals.

**ANSWER:** Defendant denies the allegations in paragraph ninety of the First Amended Complaint.

91.     Boeing then did wire the settlement funds for the ███████████████ ████████████████ to Koushan's trust account.

**ANSWER:**  Defendant admits the allegations contained in paragraph ninety-one of the First Amended Complaint.

92.     During the same time period, Lira was also working to finalize the settlement of Multi Rizki, who had not been referred by Koushan.

**ANSWER:**  Defendant admits that in the Spring of 2020 he was working to finalize the settlement of Multi Rizki. Defendant admits that Multi Rizki was not referred to Girardi Keese by Mr. Koushan.

93.     Lira permitted Multi Rizki's settlement funds to be wired to GK so that Defendants could steal the money and use it to pay other clients and cover firm expenses.

**ANSWER:**  Defendant denies the allegations in paragraph ninety-three of the First Amended Complaint.

94.     On information and belief, Lira lied to Edelson about the wire instructions for the ██████████████████████ cases because he believed that if Edelson learned that he was diverting settlement funds away from GK, Edelson would discover Defendants' criminal activity.

**ANSWER:**  Defendant denies the allegations in paragraph ninety-four of the First Amended Complaint.

**Lira Leaves GK but, Together with Griffin and Girardi, Keeps Lying to Edelson.**

95.     On June 11, 2020, Defendant Lira sent an email to Edelson asking to set up a call to discuss the status of the cases. On that call, which occurred on June 16, 2020, Defendant Lira informed Scharg and Balabanian that he had recently resigned from GK. He also explained, unprompted, that the settlements had been funded and that the bulk of the funds were received and held by GK. Lira knew that the funds, in large part, were not

held by GK but that he had assisted in stealing them. He also knew that a wire for half the money owed to the clients had been sent out just a month before. However, he repeatedly refused to answer whether the clients had been paid.

**ANSWER:** Defendant admits that on June 11, 2020, he sent an email to Ari Schar asking to set up a call to "bring you up on the status of matters." On information and belief, Defendant admits that there was a telephone call between him, Ari Scharg, and Rafey Balabanian on June 16, 2020. Defendant admits that during that call he stated that he had resigned from Girardi Keese and that certain settlements had been funded. Defendant denies the remaining allegations contained in paragraph ninety-five of the First Amended Complaint.

96. Instead, on July 6, 2020, Lira sent a letter to Edelson admitting that he was aware that Edelson was due to receive 50% of the attorneys' fees on one group of cases and 20% on another. The letter claimed, in a confusing manner, that some of the settlements with Boeing had been funded but others had not. Lira also enclosed a check to Edelson, which he represented was for some portion of the attorneys' fees owed. Edelson did not then, and has not since, cashed that check.

**ANSWER:** Defendant admits that he sent a letter to Ari Scharg and Rafey Balabanian on July 6, 2020. Defendant admits that the letter states it was defendants understanding that Edelson was supposed to receive 50% of the attorneys' fees on one set of cases ("Keith's cases") and 20% of the attorneys' fees on another set of cases ("[Lira's] cases"). Defendant admits that the letter said that of the Releases in Keith's cases have been delivered to Boing [sic]and have funded, and that only three of Lira's cases had funded. Defendant admits that a check for a portion of the attorney's owed to Edelson on the Lira cases was enclosed. Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph ninety-six of the First Amended Complaint and must therefore deny them.

97. A few days later, Plaintiff responded with a letter to Defendants Girardi and Lira, which stated, among other things, that "in response to David's cover letter that encloses a check to our firm for some portion of the fees owed on three of the Lion Air

cases, we decline to accept any monies until we are given adequate assurances that each and every one of our collective clients who are entitled to settlement monies have, in fact, received the entirety of the monies owed." The letter also requested, again, information about the status of the settlement proceeds owed to the clients.

**ANSWER:** Defendant admits the allegations contained in paragraph ninety-seven of the First Amended Complaint.

98. On July 13, 2020, Lira responded again. This time, he said: "as to the current status of payment to the four (4) clients settled in late 2019 and referred to Keith and Tom, I do not know the current status. I resigned from Girardi | Keese effective on June 13, 2020, and I do not have access to such information."

**ANSWER:** Defendant admits the allegations contained in paragraph ninety-eight of the First Amended Complaint.

99. The statement quoted in the preceding paragraph was a deliberate lie.

**ANSWER:** Defendant denies that the statement in paragraph ninety-eight of the First Amended Complaint was a deliberate lie.

100. On July 13, 2020, Lira both knew the current status of the clients' settlement funds and had access to highly relevant information about those funds.

**ANSWER:** Defendant denies the allegations in paragraph one hundred of the First Amended Complaint.

101. Just three days earlier, on July 10, 2020, Lira logged onto his GK email account using his personal Blackberry device. On that day, he viewed an email sent to him by Septiana Damayanti, one of the four *Lion Air* clients whose case settled in late 2019.

**ANSWER:** Defendant admits on information and belief that he saw a July 8, 2020, email from Septiana Damayanti, on or about July 10, 2020. Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph one hundred and one and therefore denies them.

102. Septiana Damayanti's email reads, in relevant part, "I appreciate to your effort, and It has been two weeks since your last email. I have received the fifty thousand dollars in my account. The fact that you are able to send us money got us more curious of

what is holding you from sending us the rest of the money."

**ANSWER:** On information and belief, Defendant admits that Septiana Damayanti's July 8, 2020, email includes the above quoted language, among other statements.

103.   Lira not only read Septiana Damayanti's email but forwarded it, to George Hatcher from his Blackberry, with the annotation "???"

**ANSWER:** On information and belief, Defendant admits that the forwarded Septiana Damayanti's July 8, 2020 email to George Hatcher on July 10, 2020. Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph one hundred and three and therefore denies them.

104.   As of July 13, 2020, GK's IOLTA account at Torrey Pines Bank had a balance of $917,098.32. On that date, Anice Kasim was owed ███████; Septiana Damayanti was owed ███████; Bias Ramadhan was owed ███████; Dian Daniaty was owed ███████, Multi Rizki was owed ███████, and Edelson was owed at least $1,650,000.

**ANSWER:** Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph one hundred and three and therefore denies them. Defendant specifically denies that Edelson was owed at least $1,650,000.

105.   Edelson attorneys continued to press Defendants Girardi and Griffin as to the status of the settlement proceeds and whether any clients were yet to be paid. Starting in July 2020, Edelson's managing partner, Rafey Balabanian, took the lead in communicating with Girardi and Griffin. In a series of phone calls that took place over the course of the latter half of July 2020, Defendant Griffin indicated that despite Boeing fully funding the settlements, he understood from Defendant Girardi that the clients had not received the full amount owed to them and were still owed about half of what was due to them. Griffin could not elaborate on why such an amount was still owed to certain clients or the status of the remaining settlement proceeds because, according to Griffin, those questions could only be answered by Girardi. Griffin also claimed that part of the difficulty in speaking with and delay in getting answers from Girardi was attributable to Girardi being unavailable in

recent weeks due to a serious illness that caused him to be hospitalized and for which he sought treatment.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph one hundred and five of the First Amended Complaint and therefore must deny the allegations.

106.     Balabanian ultimately got an opportunity to speak with Defendant Girardi in late July. Girardi's explanation regarding the status of the settlement proceeds was extremely convoluted and meandering, and he couched everything in terms of him recovering from the illness that he was being treated for, so Balabanian would have to bear with his inability to give a long and detailed explanation of why payment of the settlement proceeds to the clients (and of lesser importance, payment of Edelson's portion of fees) had been delayed. Girardi claimed that his illness, which caused him to be away from his firm for several weeks, is what ultimately caused the—in his words—"mistake" of not getting certain clients paid in full, and that he planned to immediately remedy the issue by getting the remaining amount that was owed wired out within a few days. Girardi said that he or Griffin would follow up once that occurred.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph one hundred and six of the First Amended Complaint and therefore must deny the allegations.

107.     Consistent with what Defendants Griffin and Lira were initially saying, and with the letters to the clients, Girardi also attributed the delay in paying out the settlement proceeds to the clients to Boeing's refusal to fund the settlement without all of the executed settlement agreements in hand. Girardi also mentioned a tax issue affecting the tax treatment of proceeds recovered on account of wrongful death claims and that getting a determination from the IRS was also holding up finalizing and getting the settlements funded.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph one hundred and seven of the First Amended Complaint and therefore must deny the allegations.

108.    Despite his assurances, Girardi did not follow back up with Balabanian. Instead, Balabanian made several more attempts over the course of the following weeks to reach Girardi to confirm that payment had been made to the clients. They finally spoke again in late August 2020, at which point the conversation quickly became contentious after Girardi stated that he didn't need to explain himself to Balabanian when it came to clients of GK and that, as he promised a few weeks ago, arrangements had been made for them to receive the remaining monies owed to them, as well as the attorneys' fees owed to Edelson. Girardi then advised that Griffin would follow up and quickly ended the call.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph one hundred and eight of the First Amended Complaint and therefore must deny the allegations.

109.    Eventually, though, on or about September 3, 2020, Griffin advised Balabanian that a wire for half of the outstanding amount owed to the clients had been initiated, with the other half set to be initiated the following Monday. While Griffin said he could send proof of the wired funds, he did not do so until after this case was filed.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph one hundred and nine of the First Amended Complaint and therefore must deny the allegations.

110.    By the end of September 2020, only $199,996.46 remained in the Torrey Pines IOLTA account and GK was insolvent.

**ANSWER:** Defendant denies that by the end of September 2020, only $199,996.46 remained in the Torrey Pines account ending in 5859. Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph one hundred and ten of the First Amended Complaint, and therefore denies them.

111.    Creditors of GK and Girardi initiated involuntary Chapter 7 bankruptcy proceedings on December 18, 2020. Both bankruptcy cases are still pending.

**ANSWER:** Defendant admits the allegations in paragraph one hundred and eleven.

112.    All told, GK, in concert with Girardi, Lira, and Griffin, stole $500,000 each from Anice Kasim, Bias Ramadhan, Dian Daniaty, and Septiana Damayanti; ▅▅▅▅▅

36

from Multi Rizki; and $1,650,000 from Edelson.

**ANSWER:** Defendant denies the allegations in paragraph one hundred and twelve of the First Amended Complaint.

## COUNT I
## UNJUST ENRICHMENT – CONSTRUCTIVE TRUST
### (Preserved For Appeal)

113.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein.

**ANSWER:**   Defendant incorporates his responses to the foregoing paragraphs as if fully set forth herein.

114.    Unjust enrichment, or restitution, may be alleged where a defendant unjustly obtains and retains a benefit to the plaintiff's detriment, and where such retention violates fundamental principles of equity, justice, and good conscience.

**ANSWER:**   This paragraph sets forth legal conclusions and questions of law to which no response is required of defendant.

115.    On information and belief, Defendants Girardi, GK, Lira, and Griffin are each holding funds that properly belong to the victims of Lion Air Flight 610 and to Plaintiff Edelson.

**ANSWER:**   Defendant denies that he is holding funds belonging to the victims of Lion Air Flight 610 and to Plaintiff Edelson.  Defendant lacks sufficient information to admit or deny these allegations as to the other defendants, so therefor must deny.

116.    A large, but confidential sum of money, was transferred from Boeing to Defendant GK in mid-2020. This money was for the benefit of Lion Air clients represented by GK, minus agreed upon attorneys' fees.

**ANSWER:**   Defendant admits that Boeing transferred settlements monies to Defendant GK in mid-2020 for the benefit of Lion Air clients represented by GK, minus agreed upon attorneys' fees and costs.

117.    Plaintiff Edelson has contractually created property rights to specific percentages of the attorneys' fees generated by those settlement funds.

**ANSWER:**   Defendant denies the allegations in paragraph one hundred and

seventeen of the Frist Amended Complaint.

118.    However, on information and belief, the funds owed to Plaintiff Edelson are now commingled with the funds owed to the Lion Air clients and have been distributed among the Defendants and other unknown entities. Nevertheless, the funds are identifiable, and there is a direct chain from the Boeing payments to the current persons in possession of the money.

**ANSWER:**  Defendant denies that Edelson is owed funds. On information and belief Defendant agrees that any funds that were wired to the Torrey Pines account ending in 5859 were comingled and have likely been distributed out of that account. Defendant denies that the funds are identifiable or that there is a "direct chain from the Boeing payments to the current persons in possession of the money."

119.    Defendants Girardi, Griffin, and Lira represent or represented the Lion Air clients and owe them a fiduciary duty as counsel. On information and belief, Defendants Girardi, Griffin, and Lira breached their fiduciary duties to the Lion Air clients by causing, permitting, facilitating, or otherwise allowing the Lion Air clients' money to be commingled with funds belonging to Plaintiff Edelson and distributed to the other Defendants and/or retained for their own personal benefit.

**ANSWER:**  Defendant admits that Girardi, Griffin and Lira represented certain Lion Air clients and owed them a fiduciary duty. Defendant denies that he breached fiduciary duties owed to the Lion Air Client. Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph one hundred nineteen and therefore must deny.

120.    Under principles of equity and good conscience, Defendants should not be permitted to retain any of the funds transferred from Boeing to GK.

**ANSWER:**  This paragraph sets forth legal conclusions and questions of law to which no response is required of Defendant. Defendant denies that he has any of the funds that were transferred from Boeing to GK.

121.    However, principles of equity and good conscience, as well as the Rules of Professional Conduct, prevent Plaintiff Edelson from taking possession of any of these

commingled funds unless and until the Lion Air clients receive their share of the settlement money paid by Boeing.

**ANSWER:** This paragraph sets forth legal conclusions and questions of law to which no response is required of Defendant. Defendant denies that Edelson is entitled to funds.

122. Plaintiff seeks the imposition of a constructive trust on all money transferred from Boeing to GK in connection with the Lion Air settlements, for the benefit of the Lion Air clients first, then for the benefit of Plaintiff, if sufficient funds remain in trust. In the alternative, Plaintiff requests that all such sums should be disgorged.

**ANSWER:** This paragraph sets forth legal conclusions and questions of law to which no response is required of Defendant. To the extent an answer is required, Defendant admits that Edelson originally brought this suit on behalf of the *Lion Air* families and that Edelson sought a constructive trust over the settlement funds. Defendant admits that the Court determined that Edelson did not have standing to do so. Defendant denies all remaining allegations in paragraph one hundred and twenty-two of the First Amended Complaint.

### COUNT II
### BREACH OF CONTRACT
### (As Against Defendants GK, Girardi, and Griffin)

123. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

**ANSWER:** Defendant incorporates his responses to the foregoing paragraphs as if fully set forth herein.

124. Plaintiff entered into an enforceable contract with GK and Griffin. The contract, presented and executed by Defendant Griffin, provided that Edelson would receive 50% of total attorneys' fees recovered for a specific set of Lion Air clients in the matter of *In Re: Lion Air Flight JT 610 Crash*, No. 18-cv-07686 (N.D. Ill.). By the terms of the contract, Edelson was expected to act as local counsel, as well as participate directly in the litigation and settlement process.

**ANSWER:** This paragraph sets forth legal conclusions and questions of law to which no response is required of Defendant. To the extent an answer is required, on information and belief, Defendant denies that Plaintiff entered into an enforceable contract with Girardi and Griffin, the letter agreement states:

> "This will confirm our agreement that our fee split will be 50/50 on the Boeing cases that you have filed with us in Chicago concerning the Lion Air crash. If it turns out that one of our two firms performs significantly more work than expected, or less if the case settles fairly quickly, we will adjust the fee split as would be reasonable to both firms."

Defendant denies the remaining allegations in paragraph one hundred and twenty-four of the First Amended Compliant.

125. These contract terms were negotiated and agreed to both verbally and in writing.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph one hundred twenty-five of the First Amended Complaint and therefore must deny them.

126. Edelson fully performed its obligations under the contracts by acting as local counsel and assisting in the litigation and settlement of the Lion Air cases.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations contained in paragraph one hundred twenty-five of the First Amended Complaint and therefore must deny them.

127. Defendants GK, Girardi, and Griffin breached their contractual obligations by not paying Edelson its share of attorneys' fees.

**ANSWER:** This paragraph sets forth legal conclusions and questions of law to which no response is required of Defendant. on information and belief, Defendant denies that Plaintiff entered into an enforceable contract with Girardi and Griffin and is entitled to 50% of the attorneys' fees.

128. As a direct, foreseeable, and proximate result of Defendants' breaches, Plaintiff has been damaged in amount to be proven at trial.

**ANSWER:** This paragraph sets forth legal conclusions and questions of law to which no response is required of Defendant. On information and belief, Defendant denies that Plaintiff entered into an enforceable contract with Girardi and Griffin and is entitled to 50% of the attorneys' fees.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACT
### (As Against Defendants Griffin and Lira)
### (*As to Griffin, in the Alternative to Count II*)

129.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-128.

**ANSWER:**  Defendant incorporates his responses to the foregoing paragraphs as if fully set forth herein.

130.    Edelson entered into an enforceable contract with GK that entitles Edelson to 50% of the attorneys' fees obtained from the representation of the Client Families.

**ANSWER:**  This paragraph sets forth legal conclusions and questions of law to which no response is required of Defendant. On information and belief, Defendant denies that Plaintiff entered into an enforceable contract with Girardi and Griffin and is entitled to 50% of the attorneys' fees.

131.    Defendants Lira and Griffin were both aware of that contract.

**ANSWER:**  Defendant admits that he was aware of the letter from Griffin to Edelson dated April 3, 2019, that stated:

> "This will confirm our agreement that our fee split will be 50/50 on the Boeing cases that you have filed with us in Chicago concerning the Lion Air crash. If it turns out that one of our two firms performs significantly more work than expected, or less if the case settles fairly quickly, we will adjust the fee split as would be reasonable to both firms."

132.    Lira and Griffin induced GK to breach the contract by participating in the theft of the Client Families' settlement funds from the Girardi Keese IOLTA account.

**ANSWER:**  Defendant denies the allegations in paragraph one hundred thirty-two of the First Amended Complaint.

133.    Lira and Griffin's participation in the theft was both intentional and without justification.

**ANSWER:**  Defendant denies the allegations in paragraph one hundred thirty-three of the First Amended Complaint.

134.    As a result of Lira and Griffin's participating in the theft, GK was unable to pay the amount owed to Edelson under their contract and thereby breached it.

**ANSWER:**  Defendant denies the allegations in paragraph one hundred thirty-four of the First Amended Complaint.

135.    As a direct, foreseeable, and proximate result of Defendants Lira and Griffin's tortious interference with Plaintiff's contract, Plaintiff has been damaged in amount to be proven at trial.

**ANSWER:**  Defendant denies that he acted tortiously and denies the allegations in paragraph one hundred thirty-five of the First Amended Complaint.

## COUNT IV
## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (As Against Defendants Griffin and Lira)
### *(In the Alternative to Count III, and, as to Griffin only, Count II)*

136.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-135.

**ANSWER:**  Defendant incorporates his responses to the foregoing paragraphs as if fully set forth herein.

137.    By agreeing to act as local counsel for the Client Families, Plaintiff Edelson PC had a reasonable expectation of a valid business relationship with the Client Families, by which the Client Families would pay Edelson PC for representing them in connection with their claims against Boeing.

**ANSWER:**  Defendant lacks sufficient information to admit or deny the allegations in paragraph one hundred thirty-seven of the First Amended Complaint and therefore must deny them.

138.    Defendants Lira and Griffin knew that Edelson expected to and was entitled

to be paid for their representation of the Clients Families in the event a recovery was obtained.

**ANSWER:** Defendant denies the allegations contained in paragraph one hundred thirty-eight of the First Amended Complaint.

139. Griffin and Lira intentionally interfered with that expectancy by participating in the theft of Client Families' settlement funds from the Girardi Keese IOLTA account, out of which Edelson would otherwise have been paid.

**ANSWER:** Defendant denies the allegations contained in paragraph one hundred thirty-nine of the First Amended Complaint.

140. In addition, Lira intentionally interfered with that expectancy by signing a direct pay letter that entitled CAL to 50% of GK's proceeds of the *Lion Air* matters, even though he knew that GK had already promised a third of those proceeds to George Hatcher, 25% to Mohamed Eltaher, and 50% to Edelson PC.

**ANSWER:** Defendant denies the allegations contained in paragraph one hundred forty of the First Amended Complaint.

141. Edelson was injured by the intentional interference because it has not been paid for its work on the Client Families' cases.

**ANSWER:** Defendant denies the allegations contained in paragraph one hundred forty-one of the First Amended Complaint.

142. As a direct, foreseeable, and proximate result of the intentional interference by Defendants Griffin and Lira, Plaintiff has been damaged in amount to be proven at trial.

**ANSWER:** Defendant denies that he acted tortiously and denies the allegations in paragraph one hundred forty-two of the First Amended Complaint.

## COUNT V
## CONVERSION
### (As Against Defendants GK, Girardi, Griffin, and Lira)

143. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

**ANSWER:** Defendant incorporates his responses to the foregoing paragraphs as

if fully set forth herein.

144.   A large, but confidential sum of money, was transferred from Boeing to Defendant GK in mid-2020. This money was for the benefit of Lion Air clients represented by GK, minus agreed upon attorneys' fees.

**ANSWER:**   Defendant admits that Boeing transferred settlements monies to Defendant GK in mid-2020 for the benefit of Lion Air clients represented by GK, minus agreed upon attorneys' fees and costs.

145.   Plaintiff Edelson has contractually created property right to specific percentages of the attorneys' fees generated by those settlement funds.

**ANSWER:**   Defendant denies the allegations in paragraph one hundred and forty-five of the Frist Amended Complaint.

146.   Under the contract, Plaintiff Edelson has an absolute and unconditional right to the immediate possession of the attorneys' fees.

**ANSWER:**   Defendant denies the allegations in paragraph one hundred and forty-six of the Frist Amended Complaint.

147.   Plaintiff has made numerous demands on Defendants GK, Girardi, Griffin, and Lira for an accounting and payment of attorneys' fees, to no avail.

**ANSWER:**   Defendant lacks sufficient information to admit or deny the allegations in paragraph one hundred forty-seven and therefore must deny them.

148.   Defendants GK, Girardi, Griffin, and Lira have wrongfully and without authorization assumed control and ownership over the attorneys' fees and refused to provide them to Plaintiff.

**ANSWER:**   Defendant denies the allegations in paragraph one hundred and forty-eight of the Frist Amended Complaint.

149.   As a direct, foreseeable, and proximate result of the conversion of Plaintiff's share of attorneys' fees by Defendants GK, Girardi, Griffin, and Lira, Plaintiff has been damaged in amount to be proven at trial.

**ANSWER:**   Defendant denies that he acted tortiously and denies the allegations in paragraph one hundred forty-nine of the First Amended Complaint.

## COUNT VI
## RECEIPT AND CONCEALMENT OF STOLEN PROPERTY
### Cal. Penal Code § 496(c)
### (As Against Defendants Griffin and Lira)

150.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

**ANSWER:** Defendant admits that funds for certain Lion Air plaintiffs were wired to Girardi Keese's Torrey Pines Bank Account ending in 5859 in March 2020. A portion of those funds were for attorneys' fees and costs and a portion of those funds were net settlement funds to be transferred to plaintiffs.

151.    During March 2020, Perkins Coie wired money to GK's IOLTA account at Torrey Pines Bank in connection with the Client Families' settlements with Boeing.

**ANSWER:** Defendant admits that funds for certain Lion Air plaintiffs were wired to Girardi Keese's Torrey Pines Bank Account ending in 5859 in March 2020.

152.    Because GK's half of the attorneys' fees had been wired directly to CAL, the remainder of the attorneys' fees that Perkins Coie wired to GK's IOLTA account belonged to Plaintiff.

**ANSWER:** Defendant denies the allegations in paragraph one hundred and fifty-two of the Frist Amended Complaint.

153.    Knowing that all of the attorneys' fees wired to GK's IOLTA account belonged to Plaintiff, Lira signed a check transferring all of Edelson's fees on the Anice Kasim case to GK's operating account for the purpose of stealing those funds.

**ANSWER:** Defendant denies the allegations in paragraph one hundred and fifty-three of the Frist Amended Complaint.

154.    By way of additional checks payable to GK's operating account and to third parties, GK stole the remainder of Edelson's attorneys' fees.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations in paragraph one hundred fifty-four of the First Amended Complaint and therefore must deny them.

155.    Defendants Griffin and Lira knew that GK had stolen Edelson's fees.

**ANSWER:** Defendant denies the allegations in paragraph one hundred and fifty-five of the Frist Amended Complaint.

156. Defendants Griffin and Lira aided GK in concealing and withholding Edelson's fees from Edelson.

**ANSWER:** Defendant denies the allegations in paragraph one hundred and fifty-six of the Frist Amended Complaint.

157. Knowing that GK was using Edelson's fees to fund the firm's payroll, Griffin and Lira accepted paychecks from GK.

**ANSWER:** Defendant admits that he was a salaried employee at Girardi Keese and received biweekly payments until his departure in June 2020. Defendant denies the remaining allegations in paragraph one hundred and fifty-seven of the Frist Amended Complaint.

158. As a direct, foreseeable, and proximate result of Lira and Griffin's violations of Cal. Penal Code § 496(a), Plaintiff has suffered injuries including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding. Plaintiff has been damaged in an amount to be proved at trial.

**ANSWER:** Defendant denies that he acted tortiously and denies the allegations in paragraph one hundred fifty-eight of the First Amended Complaint.

159. Plaintiff is entitled to judgment in the amount of three times its actual damages, costs, and reasonable attorneys' fees.

**ANSWER:** The allegations contained in paragraph one hundred fifty-nine of the First Amended Complaint consist of legal conclusions to which no response from Defendant is required. Defendant denies the allegations contained in paragraph one hundred fifty-nine of the First Amended Complaint.

**COUNT VII**
**RECEIPT AND CONCEALMENT OF STOLEN PROPERTY**
**Cal. Penal Code § 496(c)**
**(As Against Defendants Griffin and Lira)**

160. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein,

excluding paragraphs 113-122.

**ANSWER:** Defendant incorporates his responses to the foregoing paragraphs as if fully set forth herein.

161. During March 2020, Perkins Coie wired money to GK's IOLTA account at Torrey Pines Bank in connection with the Client Families' settlements with Boeing. The vast majority of the money belonged to the Client Families the remainder constituted attorneys' fees and costs.

**ANSWER:** Defendant admits that funds for certain Lion Air plaintiffs were wired to Girardi Keese's Torrey Pines Bank Account ending in 5859 in March 2020. A portion of those funds were for attorneys' fees and costs and a portion of those funds were net settlement funds to be transferred to plaintiffs.

162. By way of checks payable to GK's operating account and to third parties, GK stole the Client Families' settlement monies.

**ANSWER:** Defendant lacks sufficient information to admit or deny the allegations in paragraph one hundred sixty-two of the First Amended Complaint and therefore must deny them.

163. Lira and Griffin knew that GK had stolen the Client Families' settlement monies.

**ANSWER:** Defendant denies the allegations in paragraph one hundred and sixty-three of the Frist Amended Complaint.

164. Lira and Griffin concealed and withheld the Clients Families' settlement monies from them.

**ANSWER:** Defendant denies the allegations in paragraph one hundred and sixty-four of the Frist Amended Complaint.

165. Lira and Griffin aided Girardi and GK in concealing and withholding the Client Families' settlement monies from them.

**ANSWER:** Defendant denies the allegations in paragraph one hundred and sixty-five of the Frist Amended Complaint.

166. Knowing that GK was using the Client Families' settlement moneys to fund

the firm's payroll, Lira and Griffin accepted paychecks from GK.

**ANSWER:** Defendant admits that he was a salaried employee at Girardi Keese and received biweekly payments until his departure in June 2020. Defendant denies the remaining allegations in paragraph one hundred and sixty-six of the Frist Amended Complaint.

167. Lira and Griffin's violations of Cal. Penal Code §496(a) prevented Plaintiff from collecting attorneys' fees for its work on the Client Families' cases.

**ANSWER:** Defendant denies the allegations in paragraph one hundred sixty-seven of the complaint.

168. As a direct, foreseeable, and proximate result of Lira and Griffin's violations of Cal. Penal Code §496(a), Plaintiff has suffered injuries including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding. Plaintiff has been damaged in an amount to be proved at trial.

**ANSWER:** Defendant denies that he acted tortiously and denies the allegations in paragraph one hundred sixty-eight of the First Amended Complaint.

169. Plaintiff is entitled to judgment in the amount of three times its actual damages, costs, and reasonable attorneys' fees.

**ANSWER:** The allegations contained in paragraph one hundred sixty-nine of the First Amended Complaint consist of legal conclusions to which no response from Defendant is required. To the extent a response is required, Defendant denies the allegations contained in paragraph one hundred sixty-nine of the First Amended Complaint.

### COUNT VIII
### PROMISSORY FRAUD
### (As Against Defendant Griffin)

170. Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

**ANSWER:** Count VIII is not alleged as against this Defendant and thus this

Defendant is not responding to paragraphs 171- 176 of the First Amended Complaint.

## COUNT IX
## FRAUDULENT MISREPRESENTATION
### (As Against Defendant Griffin)

177.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

**ANSWER:**  Count IX is not alleged as against this Defendant and thus this Defendant is not responding to paragraphs 178-183 of the First Amended Complaint.

## COUNT X
## FRAUDULENT MISREPRESENTATION
### (As Against Defendant Lira)

184.   Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

185.   On April 13, 2020, Lira directed his assistant to send Plaintiff closing statements for three *Lion Air* clients: ███████████████████████████

**ANSWER:**  Lira admits that at some point he asked his assistant to help him prepare closing statements for certain Lion Air Plaintiffs.

186.   The closing statements included the lines: "The disbursement of this recovery in accordance with the foregoing closing statement is hereby approved. I hereby authorize the law firm of Girardi │ Keese to receive and sign on my behalf wired funds and/or a check in the amount of THE TOTAL AMOUNT OF RECOVERY, deposit that check in their trust account and forward the NET PROCEEDS consistent with this closing statement."

**ANSWER:**  Defendant admits that the above quoted language was contained in the three closing statements.

187.   At the time Lira directed his assistant to send that email, he knew this statement was false. In fact, he had diverted ████████████████████████ ██████████████ wires to the trust account of his friend, F. Anthony Koushan.

**ANSWER:**  Defendant admits that the settlement funds for ████████████ ████████████████ were wired to the trust account for F. Anthony Koushan,

in accordance with the executed releases for those plaintiffs. Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph one hundred eighty-seven of the First Amended Complaint and therefore must deny them.

188.    Lira believed that if Plaintiff learned about the change in wire information, it would insist on an explanation as to why the money was not being transferred to GK's trust account or take other action that would result in the discovery of his criminal actions.

**ANSWER:**   Defendant denies the allegations contained in paragraph one hundred eighty-eight of the First Amended Complaint.

189.    Because Lira is a licensed attorney and had sent the closing statements to Scharg for the specific purpose of drafting documents that would be filed with a court, Plaintiff was justified in relying upon them.

**ANSWER:**   The allegations contained in paragraph one hundred eighty-nine of the First Amended Complaint consist of legal conclusions to which no response from Defendant is required. To the extent a response is required, Defendant denies the allegations contained in paragraph one hundred eighty-nine of the First Amended Complaint.

190.    Between May 7, 2020 and May 15, 2020, Plaintiff sent a series of increasingly urgent emails to Defendants Griffin and Lira regarding the status of the Client Families' settlement funds. Relying on Griffin's false statements to Scharg in February 2020, Edelson reasonably believed that Boeing would not release any of the settlement money until all of GK's clients had settled, and it referenced that fact in its emails.

**ANSWER:** On information and belief, Defendant denies that Griffin made a false statement to Scharg in February 2020, and denies that it was reasonable for Edelson to believe that Boeing would not release settlement funds until all GK clients had settled. On information and belief, Defendant denies that the emails Edelson sent between May 7, 2020, and May 15, 2020, related to the plaintiffs who had already executed releases and whose settlements had been approved by the Court. Defendant denies all remaining allegations in paragraph one hundred ninety of the First Amended Complaint.

191.    In his final response in the series of emails in which Plaintiff asked if it could

reach out to Boeing's counsel, Lira said "Rafey: we are good. Executed releases are coming in."

**ANSWER:** Defendant admits that on May 15, 2020, he sent an email to Rafey Balabanian stating "we are good. Executed releases are coming in." Defendant denies that this was his "final response" in the series of emails between him and Mr. Balabanian.

192. By this statement, Lira meant for Plaintiff to understand that there was no cause for alarm, and that Boeing would be able to wire all of the client settlement funds soon.

**ANSWER:** Defendant denies the allegations contained in paragraph one hundred ninety-two of the First Amended Complaint.

193. Lira knew this statement to be false. He knew that Perkins Coie had already wired the Client Families' money to GK's IOLTA account and that Defendants were in the process of stealing that money.

**ANSWER:** Defendant denies that this statement was false. Defendant admits that Boeing had wired funds for certain Lion Air plaintiffs to Girardi Keese's Torrey Pines Account ending in 5859. Defendant denies that Defendants were in the process of stealing that money.

194. By his statement, Lira intended for Plaintiff to stand down in its attempts to speed along Boeing's transfer of the settlement funds, and in particular he intended for Plaintiff not to contact Boeing's counsel. Lira knew that if Plaintiff contacted Boeing's counsel, Plaintiff would learn that GK had received the Client Families' money in March.

**ANSWER:** Defendant's statement referred to certain Lion Air families who had settled in principle but had not yet executed releases with Boeing. Defendant denies the allegations contained in paragraph one hundred ninety-four of the First Amended Complaint.

195. In justifiable reliance on Lira's false statement, Plaintiff did stand down and did not contact Boeing's counsel.

**ANSWER:** Defendant denies the allegations contained in paragraph one hundred ninety-five of the First Amended Complaint.

51

196.    On July 13, 2020, Lira wrote to Edelson PC in a letter: "Lastly, as to the current status of payment to the four (4) clients settled in late 2019 and referred to Keith and Tom, I do not know the current status. I resigned from Girardi | Keese effective on June 13, 2020, and I do not have access to such information."

**ANSWER:** Defendant admits the allegations contained in paragraph one hundred ninety-six of the First Amended Complaint.

197.    Lira knew these statements to be false when he made them. He knew that the Client Families had been paid only half of what they were owed, that GK had stolen much of the Client Families' settlement money already, and that the clients were regularly inquiring as to the status of the settlement funds. Also, he did have access to up-to-date information regarding the status of the settlement funds, including by way of his GK email account, which he was able to access, and did in fact access, using his Blackberry.

**ANSWER:** Defendant denies the allegations in paragraph one hundred ninety-seven of the First Amended Complaint.

198.    Lira knew that if he told the truth about what had happened, Plaintiff would take action in the courts and report him to law enforcement. By his false statements, he intended for Edelson to forbear from such actions, which Plaintiff in fact did, in justifiable reliance on those statements.

**ANSWER:** Defendant denies the allegations in paragraph one hundred ninety-eight of the First Amended Complaint.

199.    Edelson has suffered damages as a result of its reliance on Lira's false statements, in an amount to be proved at trial, including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding.

**ANSWER:** The allegations contained in paragraph one hundred ninety-nine of the First Amended Complaint consist of legal conclusions to which no response from Defendant is required. To the extent a response is required, Defendant denies the allegations contained in paragraph one hundred ninety-nine of the First Amended Complaint.

## COUNT XI
## FRAUDULENT CONCEALMENT
### (As Against Defendants Griffin and Lira)

200.    Plaintiff incorporates the foregoing paragraphs as if fully set forth herein, excluding paragraphs 113-122.

**ANSWER:**  Defendant incorporates his responses to the foregoing paragraphs as if fully set forth herein.

201.    Plaintiff acted as local counsel for Griffin and Lira with respect to the Client Families claims against Boeing.

**ANSWER:**  Defendant denies the allegations contained in paragraph two-hundred one of the First Amended Complaint except that Defendant admits that the Edelson firm served as local counsel for the Lion Air clients.

202.    Under this arrangement, Plaintiff handled court appearances and filings, as well as attending mediations together with Griffin and Lira. Griffin and Lira, who had the original relationship with the clients, were responsible for direct communications with the clients. Plaintiff did not have direct communications with the clients.

**ANSWER:**  Defendant admits that he and Griffin were responsible for communications with the client. On information and belief, Defendant admits that Plaintiff did not communicate with the clients. Defendant admits that certain Edelson attorneys attended the mediations. Defendant admits that Lira was present for certain mediation sessions and Griffin was present for certain mediation sessions. Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph two hundred two of the First Amended Complaint and therefore denies the remaining allegations.

203.    Defendant admits that the clients sent emails regarding the status of their settlement funds and admits that those emails were not shared with the Edelson firm by this responding defendant. Defendant lacks sufficient information to admit or deny the remaining allegations contained in paragraph 203 of the First Amended Complaint and therefore must deny the allegations.

**ANSWER:**  Defendant lacks sufficient information to admit or deny the

allegations contained in paragraph two hundred three of the First Amended Complaint and therefore must deny the allegations.

204.    In May 2020, Lira and Griffin assisted Girardi in sending letters to the Client Families that contained deliberate lies, or, at the very least, were aware that Girardi had sent such letters and did nothing to correct the lies contained therein. Lira suggested changes to the letters that would make the lie less obvious, then personally approved the sending of the letters to Bias Ramadhan, Dian Daniaty, and Septiana Damayanti. Neither Lira nor Griffin shared these letters with Plaintiff. In fact, Plaintiff did not obtain the letters until just before the contempt proceedings began and through discovery in this proceeding.

**ANSWER:**  Defendant denies the allegations contained in paragraph two hundred four of the First Amended Complaint.

205.    Griffin and Lira also personally communicated with the Client Families in April, May, and June 2020 to respond to their queries regarding the settlement funds and to advise them when partial payment was made. The goal of these responses was to reassure the clients that there was nothing wrong and that any delays in wiring their funds were due to the COVID-19 pandemic. These were lies.

**ANSWER:**  Defendant denies the allegations contained in paragraph two hundred five of the First Amended Complaint.

206.    Even before the *Lion Air* settlement money came in, lying to clients had become routine practice at GK. Lira was aware of that fact, emailing Chris Kamon on March 4, 2020 to say "Tom is lying to clients."

**ANSWER:** Defendant admits that on March 4, 2020, Defendant emailed Chris Kamon "Tom is lying to clients." Defendant denies the remaining allegations contained in paragraph two hundred six of the First Amended Complaint.

207.    Defendant admits that he did not tell Edelson that Girardi was lying to clients and admits that in his testimony in December 2021 he acknowledged that certain statements made by Girardi in letters he drafted to the clients were false. Defendant denies the remaining allegations in paragraph 207 of the First Amended Complaint.

**ANSWER:**  Defendant denies the allegations in paragraph two hundred seven of

the First Amended Complaint.

208.    Under these circumstances, Lira and Griffin had a duty to tell their co-counsel, Edelson, that they were lying to the clients and that GK was stealing the *Lion Air* settlement money.

**ANSWER:**   The allegations contained in paragraph two hundred eight of the First Amended Complaint consist of legal conclusions to which no response from Defendant is required. Defendant denies the allegations contained in paragraph two hundred eight of the First Amended Complaint.

209.    Because attorneys have a fiduciary duty to their clients and are held to the highest standards of honesty and trust, Edelson reasonably and justifiably had no reason to think that Lira and Griffin were lying to the clients or concealing facts. And although Plaintiff routinely inquired about the status of the case, it had no reasonable way to discover that Lira and Griffin were lying to the clients and helping steal settlement funds.

**ANSWER:** The allegations contained in paragraph two hundred nine of the First Amended Complaint consist of legal conclusions to which no response from Defendant is required. To the extent a response is required, Defendant denies the allegations contained in paragraph two hundred nine of the First Amended Complaint.

210.    Had Edelson been aware that GK, Girardi, Lira, and Griffin were committing crimes, it would have acted differently. For example, if it had known about the letters containing falsehoods in May 2020, it could have acted in time to prevent Multi Rizki's settlement from being wired to GK's IOLTA account.

**ANSWER:**   Defendant denies he committed a crime. Defendant lacks sufficient information to admit or deny the remaining allegations in paragraph two hundred ten of the First Amended Complaint and therefore must deny them.

211.    Plaintiff's reliance resulted in damages in an amount to be proved at trial, including but not limited to loss of attorneys' fees owed to it, investigation costs, reputational harm, and the costs of litigating the contempt proceeding.

**ANSWER:**   The allegations contained in paragraph two hundred eleven of the First Amended Complaint consist of legal conclusions to which no response from

Defendant is required. Defendant denies the allegations contained in paragraph two hundred eleven of the First Amended Complaint.

As to each and every allegation which has not been expressly admitted or denied, Defendant lacks sufficient information upon which to admit or deny, and on that basis denies those allegations.

## AFFIRMATIVE DEFENSES

### FIRST DEFENSE

Defendant reserves the right to amend this Answer to assert any other matter that constitutes an avoidance or affirmative defense under Fed. R. Civ. P. 8(c).

### SECOND DEFENSE

Plaintiff cannot recover the damages in its complaint because it has unclean hands.

### THIRD DEFENSE

The contracts at issue are invalid or enforceable because they are unconscionable.

### FOURTH DEFENSE

The contracts at issue are invalid or unenforceable because they are unlawful pursuant to California and/or Illinois law.

### FIFTH DEFENSE

The contracts at issue are invalid or unenforceable because there was insufficient consideration.

### SIXTH DEFENSE

The contracts at issue are not enforceable as to responding defendant because responding defendant is not a party to the contracts at issue.

### SEVENTH DEFENSE

The contracts at issue are invalid or unenforceable because their terms are uncertain.

### EIGHTH DEFENSE

It was impossible for responding defendant to perform pursuant to the terms of the contracts.

### NINTH DEFENSE

Plaintiff may not recover because Plaintiff is equally responsible for the harmful

conduct under a theory of In Pari Delicto.

<h2 align="center">TENTH DEFENSE</h2>

Defendant is entitled to indemnification from Girardi Keese and Thomas Girardi pursuant to California Labor Code §2802.

<h2 align="center">ELEVENTH DEFENSE</h2>

Plaintiff has waived its claims to fees by entering into an agreement with the Lion Air Plaintiffs that they do not have to pay the fees if they choose not to do so.

<h2 align="center">TWELFTH AFFIRMATIVE DEFENSE</h2>

As an employee of GK Defendant had no personal responsibility for contracts entered into by GK or for any false and fraudulent activity of others at GK

<h2 align="center">PRAYER FOR RELIEF</h2>

WHEREFORE, Defendant prays that Plaintiff take nothing by or through its First Amended Complaint, that Defendants be dismissed and discharged here from with their costs and fees herein expended and incurred and for such other and further relief as may be deemed just, proper and equitable.

<h2 align="center">REQUEST FOR JURY TRIAL</h2>

Defendant demands a trial by jury for all issues so triable.

DATED:     July 5, 2022                          DAVID LIRA

                                        /s/ Edith R. Matthai
                                By:     _____
                                             His Attorney

        Edith R. Matthai, Esq.-Pro Hac Vice
        Leigh P. Robie, Esq.-Pro Hac Vice
        350 S. Grand Avenue, Suite 3950
        Los Angeles, California 90071
        (213) 706-8000
        ematthai@romalaw.com
        lrobie@romalaw.com
        Attorneys for Defendant David Lira

57